FILED
RICHARD W. NAGEL
CLERK OF COURT

# UNITED STATES DISTRICT COURT

2017 APR 27  AM 9: 33

for the

Southern District of Ohio

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIV. DAYTON

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. **3 : 17 mj 177** |
| LAITH WALEED ALEBBINI | ) | |
| | ) | **MICHAEL J. NEWMAN** |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  on an exact date that is unknown, but at least by on or about April 26, 2017   in the county of   Montgomery   in the

Southern   District of   Ohio and elsewhere  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2339B | Attempt to Provide Material Support and Resources to a Foreign Terrorist Organization |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Michael Herwig, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  4/27/17

_____
*Judge's signature*

City and state:   Dayton, Ohio

Hon. Michael J. Newman, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Michael Herwig, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of a Complaint charging **LAITH WALEED ALEBBINI ("ALEBBINI")** with, on an exact date that is unknown, but at least by on or about April 26, 2017, in the Southern District of Ohio and elsewhere, attempting to provide material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have been an agent since March 16, 2008.  I have been assigned to the Joint Terrorism Task Force since 2008 and have worked cases involving international and domestic terrorism.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

4.      Title 18, United States Code, Section 2339B prohibits, in pertinent part, a person from knowingly providing "material support or resources to a foreign terrorist organization," or attempting or conspiring to do the same.

5.      The term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel…, and transportation, except medicine or religious materials."  18 U.S.C. Section

2339A(b)(1) and Section 2339B(g)(4). Section 2339B(h) provides that "[n]o person may be prosecuted under this section in connection with the term 'personnel' unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct that operation of that organization. Individuals who act entirely independent of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control."

6.     On or about October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224.

7.     On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham ("ISIS"—which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

8.     From my participation in the investigation, including my review of FBI reports and recordings, I have learned the following:

2

a. **ALEBBINI** is a citizen of the country of Jordan. He is a legal permanent resident of the United States as of April 8, 2014. Immigration records indicate that **ALEBBINI** initially arrived in the United States from Jordan on or about July 24, 2011. He subsequently left the United States, and returned to the United States on or about August 6, 2014, as travel records indicate that **ALEBBINI** arrived on a flight from Amman, Jordan.

b. An individual identified herein as "Q.A." also is a citizen of the country of Jordan. He entered the United States on a student visa, which was revoked, and he is currently in the United States illegally.

c. **ALEBBINI** is related to Q.A. and an individual identified herein as "R.A.," all three of whom were present in the Dayton, Ohio, area at various times as described below.

d. On or about January 10, 2017, **ALEBBINI** was arrested for unlawful entry into the Turkish Embassy in Washington, D.C. The charges against **ALEBBINI** subsequently were dismissed. **ALEBBINI** refused to say why he was on the property, but he did say "You are going to regret this" when being escorted off the property.

e. On or about January 12, 2017, **ALEBBINI** attempted to travel to the country of Turkey via Amsterdam with R.A., but **ALEBBINI** was denied entry by Turkey because his Jordanian passport expired. **ALEBBINI** traveled with only a backpack and did not check luggage. On or about January 15, 2017, **ALEBBINI** returned to the United States.

3

f. On or about January 23, 2017, **ALEBBINI** was interviewed by the FBI and the U.S. Secret Service regarding the incident at the Turkish Embassy. During the interview, **ALEBBINI** admitted posting pro-ISIS videos on his Facebook page in the past. **ALEBBINI** stated: "I am the perfect recruit for ISIS." **ALEBBINI** admitted to supporting ISIS's desire for a united Middle East, but he said he did not agree with their violence. **ALEBBINI** claimed he wanted to speak with the Turkish Ambassador to discuss the conflict in the Middle East. **ALEBBINI** said the security at the Embassy was very lax, and that "[i]f I had a bomb on me, I swear to God, three embassies would have gone down."

g. **ALEBBINI** met a woman from Dayton, Ohio, who he claims to be his spouse (identified herein as "D.E."). **ALEBBINI** and D.E. claimed to have been married in a private ceremony by a man at a mosque, but it is believed they are not married pursuant to any state law or certificate. On or about March 1, 2017, **ALEBBINI** moved to Dayton, Ohio, in the Southern District of Ohio, to be with D.E. From that point in time to the present, **ALEBBINI** has resided with D.E. in Dayton.

h. From approximately March 3, 2017, to the present, **ALEBBINI** has had multiple conversations with a Confidential Human Source ("CHS")[1] in

---

[1] The CHS is a previously convicted felon. He/she was convicted in this Court for a weapons-related offense, as well as for benefit and wire fraud offenses. He/she has completed his/her sentence and is no longer under court supervision. The CHS hopes to receive immigration-related benefits for his/her cooperation. In this case, the FBI has paid the CHS approximately $3,500 to date, approximately $3,000 of which was to reimburse the CHS for a personal trip that the FBI requested the CHS cancel (for

and around Dayton, Ohio. At times, and as described below, Q.A. and/or

R.A. were present for the discussions.[2]

i.  On or about March 7, 2017, the CHS met with **ALEBBINI**, R.A., and

Q.A. During the consensually recorded conversation, **ALEBBINI**

discussed the Jordanian pilot who was burned to death by ISIS.[3] Q.A.

stated: "one who burns by fire will be burned by it." **ALEBBINI** further

stated that he watches ISIS videos and said that ISIS follows the

"prophet," which is proven by its success on the battlefield. R.A.

expressed similar sentiments.

j.  On or about March 9, 2017, the CHS again met with **ALEBBINI**, R.A.,

and Q.A. During the consensually recorded conversation, **ALEBBINI**

complained about the politics of Jordan and its leaders. **ALEBBINI** stated

he followed the news of ISIS through "Amaq" and "Dabiq" magazines

online.[4] R.A. said he read that a person was arrested after booking a one-

way ticket to Turkey. R.A. also stated polls show that 98% of the Arab

---

purposes of this case), and approximately $500 in reimbursement for other expenses incurred. In total, over the course of his cooperation in all cases, the FBI has paid the CHS approximately $18,500.

[2] Most of the conversations summarized below were conducted in the Arabic language. The summaries of, and quotes from, the conversations refer to preliminary translations provided by FBI translators. References to "Dawla," the "State," or the "Islamic State" are interpreted as referring to ISIS, which is the FTO defined above.

[3] Your affiant is aware that ISIS publicly released a video of a Royal Jordanian Air Force pilot who was captured and burned to death by ISIS members after his aircraft crashed in or around Raqqa, Syria, on December 24, 2014.

[4] Dabiq Magazine is an online magazine published by ISIS. Amaq is an ISIS media outlet.

5

world supports ISIS. The group discussed what countries and groups support ISIS and how ISIS is recruiting people and obtaining weapons. At one point, **ALEBBINI** said: "You need a regime like the regime of [ISIS] right now. They come to exterminate the old regime. They don't leave anyone." **ALEBBINI** stated his Facebook account was disabled after he posted pro-ISIS videos. **ALEBBINI** said: "Allah willing, when [ISIS] comes, it will cut off the head of King Abdullah. Then it will go to free Palestine. Things will be back to normal." At **ALEBBINI**'s urging, the four individuals watched a video on YouTube that was titled: "The Islamic State, A to Z in 15 minutes."

k.  On or about March 12, 2017, the CHS again met with **ALEBBINI**, R.A., and Q.A. During the consensually recorded conversation, **ALEBBINI** stated Jordan would eventually become part of ISIS. Q.A. made a statement regarding a Jordanian soldier who was recently released from prison after murdering 7 Israeli girls in 1997. Q.A. stated: "to Hell with them, let him shoot them," while R.A. stated the murders were not justified.

l.  On or about March 16, 2017, R.A. traveled from the United States to Amman, Jordan. He purchased a one-way ticket on the same day of his travel. R.A. arrived in Jordan on or about March 17, 2017.

m.  On or about March 19, 2017, the CHS met with **ALEBBINI** and Q.A. During the consensually recorded conversation, the CHS claimed to have legal problems and to be facing deportation. Q.A. stated that the CHS

6

should go to ISIS. **ALEBBINI** agreed that the right thing was to go to ISIS, even if the CHS did not go there to fight. Q.A. and **ALEBBINI** both spoke of the benefits of living within ISIS's borders, including cheap rent. The CHS said he was not aware of that until he saw the propaganda video. **ALEBBINI** stated he watches ISIS videos all the time and they are the "right group." He further stated he heard that ISIS and Syrian opposition groups were close to the border with Jordan. **ALEBBINI** stated that his father told him that ISIS would enter Jordan soon. When the CHS asked how to get to ISIS, **ALEBBINI** advised that he should travel through Turkey, specifically Gaziantep, a border city in Turkey. **ALEBBINI** further stated to the CHS that ISIS would welcome the CHS and not force him to fight. **ALEBBINI** stated to the CHS that he (**ALEBBINI**) would not tell anyone about their conversation (referring to their March 19, 2017 conversation). **ALEBBINI** also advised that they should hide their phones in another room, or talk in a car without the presence of phones, when they meet to talk about this topic. Later, **ALEBBINI** stated that the right place to be, from a religious point of view, is with ISIS. **ALEBBINI** said that he went to a mosque and found anti-ISIS literature being distributed, and that **ALEBBINI** took the brochures to his car and then threw them in a garbage can.

n.  Later that night, on the evening of March 19, 2017, the CHS again met with **ALEBBINI** and Q.A. at **ALEBBINI**'s residence. During the consensually recorded conversation, **ALEBBINI** and Q.A. suddenly were

cautious about what was discussed in front of the CHS and appeared guarded with the CHS. During the meeting, **ALEBBINI** and Q.A. made statements that were less supportive of ISIS and the idea of traveling to join ISIS.

o.   The CHS later learned that D.E. mistakenly told **ALEBBINI** that the CHS was a U.S. citizen, which made **ALEBBINI** suspicious of the CHS as potentially working with law enforcement.

p.   On March 21, 2017, the CHS met with **ALEBBINI** and Q.A. During the consensually recorded conversation, the CHS confronted them about their suspicions. **ALEBBINI** acknowledged they were mistaken about CHS's citizenship status and apologized to the CHS.

q.   On or about March 22, 2017, the CHS had a consensually recorded phone call with **ALEBBINI**. During the call, **ALEBBINI** turned down an offer to do yard work for the CHS, claimed that he had received his tax return, and stated he would be flying back to Jordan in one week.

r.   On or about March 27, 2017, the CHS met with **ALEBBINI** at **ALEBBINI**'s residence. The conversation was consensually recorded. The CHS had brought a phone to **ALEBBINI** purportedly for the purpose of having **ALEBBINI** deliver the phone to one of the CHS's family members in Jordan. In addition:

    i.   **ALEBBINI** stated R.A. is not staying in Jordan; rather, he was going to get married and then move with his wife. **ALEBBINI** then

stated they were in the "implementation phase" and that his own wife, D.E., knows what is being planned.

ii. **ALEBBINI** said he will be leaving in one week on a train from Cincinnati to Virginia.

iii. **ALEBBINI** said: "They want us to fight them. They wish that we come down to the ground. . . The situation is not easy. . . They also thinking that Arabs are sheep and do not realize that is really happening and that the resistance is growing and they are feeding it, and the people want their freedom, and they want one country, and one decision." He later added, "The best choice is the Islamic State, best choice for the Muslims. The Islamic State and the Mujahid in Syria." He also decried that there was a heinous war being waged on ISIS.

iv. **ALEBBINI** also stated that he will throw away his Permanent Resident "Green Card" one day, because he believes he was living amongst apostates who kill Muslims and that it will be used against him on judgment day.

v. **ALEBBINI** stated he wanted to follow R.A. and there was a good chance that Q.A. would follow too. He said he would go and make sure the "group" is right first, seemingly referring to the prior discussion of ISIS.

vi. **ALEBBINI** spoke at length about ISIS and the perceived righteousness of ISIS's activities. **ALEBBINI** then added that he

would rather stay 10 years in prison than 1 year in America. If he became a prisoner, **ALEBBINI** stated he could at least say that he tried to support the cause, but he was prevented from doing so. He further lamented that others are going to fight for ISIS, "while we are sitting here."

vii.   At the end of the meeting, **ALEBBINI** reiterated that, like he told Q.A., **ALEBBINI** will be the first to go "look for a way and see what the story is. . . If anything happen to me, you see and learn. If nothing happen to me and group turns out to be right, on the phone . . . and then you spread . . . Anticipate that there will be a call."

**ALEBBINI** stated the CHS should go through Turkey because he has no interest in Amman. **ALEBBINI**, however, stated he will go to Jordan and see family that lives in Irbid, a town that is near an ISIS border. The CHS asked **ALEBBINI** if he is afraid about being questioned when he goes over the border (presumably to ISIS).

**ALEBBINI** said no because "Abu Bakr al-Bhagdadi called."[5]

s.   On or about March 28, 2017, the CHS and **ALEBBINI** met for breakfast. During the consensually recorded conversation, **ALEBBINI** received a phone call. **ALEBBINI** went outside to speak on the phone. **ALEBBINI's** demeanor changed after his return.

---

[5] Abu Bakr al-Bhagdadi is the claimed leader of ISIS.

t.    Later that same day (March 28, 2017), the CHS and **ALEBBINI** went

fishing.  During the consensually recorded conversation, **ALEBBINI** told

the CHS that he learned R.A. had been arrested by Jordanian authorities.

**ALEBBINI** believed that the arrest occurred because there was a meeting

of Middle Eastern leaders in Jordan, so the authorities were arresting a lot

of people.  **ALEBBINI** also said he believed the Jordanians must have

received information about R.A. from the United States, or from videos

that R.A. might have watched.

u.    On or about March 29, 2017, **ALEBBINI** met with the CHS for

approximately 77 minutes.  During the conversation, which was

consensually recorded, **ALEBBINI** and the CHS discussed **ALEBBINI**'s

travel plans, including his plans to travel by train to Washington, D.C.

**ALEBBINI** then intended to travel from Washington, D.C., to Jordan,

where he could continue to Syria and fight with ISIS.  **ALEBBINI**

indicated his plan was to leave at approximately 3:00 a.m. on Friday

morning, the context indicating that he was referring to Friday, March 31,

2017.  **ALEBBINI** indicated that his family knows that he (**ALEBBINI**)

wants to join ISIS, but that his family is against him joining ISIS and, for

that reason, took his passport.

v.    **ALEBBINI** indicated that when he joins ISIS, it will be to please God.

They ended the conversation with a discussion of **ALEBBINI's** intentions

regarding his travel overseas, with **ALEBBINI** indicating that his

intention was to fight with ISIS for the purpose of fighting against the

11

Syrian leadership.  **ALEBBINI** explained: "Our duty is to support the Islamic State.  Those are the words, what is your duty?  Jihad.  A person is supposed to stay away from the people of sins . . . and what happens, happens . . . caught?  Let them arrest you, then, let them arrest me.  This is the true conversation."

w.  Consistent with the conversations above, information from Amtrak confirms that **ALEBBINI** obtained a ticket to travel by Amtrak train from Cincinnati, Ohio, to Washington, D.C., departing on March 31, 2017, at approximately 3:30 a.m.

x.  Based on physical surveillance, it is believed that **ALEBBINI** did not leave his residence overnight, and he did not board, or otherwise travel on, the above-mentioned scheduled train.

y.  On or about April 3, 2017, **ALEBBINI** met with the CHS for approximately 40 minutes.  Q.A. joined them after the first 20 minutes of the meeting.  During the consensually recorded conversation, **ALEBBINI** stated that he got into "100 argument" with his cousins because he told them he "will be going down to Jihad".  The CHS asked **ALEBBINI**: "Okay, what happened to the ticket your brother booked for you?"

**ALEBBINI** responded: "We canceled that one.  Because I wanted to go there, now the passport is with me." **ALEBBINI** further stated that he let his cousin know his intentions, so if he is arrested by the Jordanian officials, his family "can see what they can do to take me out."

**ALEBBINI** stated that he told his cousins that "my wife will [be] coming

12

to Jordan and raise my son there. If I die, she does not want to be divorced in America, she decided to come to Jordan." **ALEBBINI** stated: "Because. . . to be honest, before I was planning anything, I decided to go fight in Jihad, the same way Umar Ibn al-Khattab did." **ALEBBINI** instructed the CHS that the best plan for travel is to book a Turkish airline flight to Jordan going through Turkey. Then, during the layover in Turkey, instead of boarding the flight to Jordan, "you take yourself and leave". **ALEBBINI** later stated: "I do not have money, I swear, from where can I --." The CHS responded: "I told you we will manage the situation. This is not a problem." **ALEBBINI** stated: "We will manage the situation, okay, we will manage the situation, that is to say, til now I want to support them…." **ALEBBINI** later stated: "I . . . I was planning if I go there, I do not want to just support fighting the oppressors, we want to fight with weapons, with tongue, and we want to protect the Muslims." Later during the meeting, an unidentified male—who **ALEBBINI** referred to as his cousin and to whom **ALEBBINI** was communicating with via audio text in the presence of the CHS—could be heard on the phone quoting the ISIS motto "remaining and expanding, God willing", and saying that he (the unidentified male) will be looking for **ALEBBINI** when he comes and to not fear or hesitate. **ALEBBINI** stated that even if he joins Al-Dawlah (ISIS) and only fires a couple shots before he is killed, it would be good, because he would be inciting the faithful.

z.      On or about April 4, 2017, **ALEBBINI** met with the CHS for approximately 10 minutes. During the consensually recorded conversation, **ALEBBINI** and the CHS discussed airline flights on Turkish Airlines. The CHS asked **ALEBBINI** if he wanted to travel together. **ALEBBINI** stated that he would like to do so, but **ALEBBINI** expressed concern that if they go together, he does not want anything bad to happen to the CHS. **ALEBBINI** went on to state that the CHS could decide, but **ALEBBINI** would be going, with or without the CHS. **ALEBBINI** then asked the CHS for a loan, because he did not have the money for a ticket. **ALEBBINI** stated he had asked his cousin for help the day prior, but his cousin told him to forget about it. **ALEBBINI** stated he would "write a paper," and if he died, his cousins or his brothers would pay his debt.

aa.     On or about the evening of April 4, 2017, the CHS met with **ALEBBINI** and Q.A. at their residence. During the consensually recorded conversation, the CHS brought up their conversation from earlier in the day and began to ask **ALEBBINI** if he was sure about the plan. **ALEBBINI** changed the subject and stated that R.A.'s family had received news that R.A. would be released soon from jail in Jordan. **ALEBBINI** stated that R.A.'s family had received this information from a high-ranking Intelligence Services officer.

bb.     On or about the evening of April 6, 2017, the CHS met with **ALEBBINI** and Q.A. at their residence. The conversation was consensually recorded.

During a discussion of the Islamic State and the current conflict in the
Middle East region, **ALEBBINI** contrasted the defeat in Palestine to the
resistance in Mosul and said that the Islamic State has been holding
steadfast against attacks from U.S., Russia, Shi'ites, and Arab nations.
Q.A. stated that the Islamic State has not been holding off anyone and
asked if the United States is incapable of beating the Islamic State.

**ALEBBINI** screamed in response, and stated that the United States is
incapable and asked who forced the United States to leave Iraq.

**ALEBBINI** then said that the Islamic State has weapons now and is
wreaking havoc, and that the Islamic State has built a complicated tunnel
system.

cc.     On or about the evening of April 8, 2017, the CHS met with **ALEBBINI**
and Q.A. at their residence.  During the consensually recorded
conversation, **ALEBBINI** discussed how R.A. was currently in jail in
Jordan, and **ALEBBINI** explained that he believed R.A. would tell
Jordanian officials that he and **ALEBBINI** had watched videos, got
foolish and wanted to go to the Islamic State.  **ALEBBINI** added that the
Jordanian officials knew that R.A. wanted to go to the Islamic State when
R.A. started to ask about the matter of how to get there.  Later in the
meeting, **ALEBBINI** discussed a statement issued by the Islamic State,
addressed to Jordan, vowing to come for King Abdallah, and how the
Islamic State beheaded four Syrians who were trained by the Jordanian
government.  **ALEBBINI** also explained that many Jordanians were

joining the Islamic State and that the Jordanian government would not be able to handle it when its citizens returned to Jordan from Syria. Later in the conversation, Q.A. stated to the CHS, "When Laith and [R.A.] came… go, go, go, go, to be honest I was planning to go with them. I am supposed to go ahead of them. That was the intention. But I divorced and problems happened."

dd. On or about the evening of April 18, 2017, the CHS met with **ALEBBINI** and Q.A. During the consensually recorded conversation, **ALEBBINI** stated his father would not purchase a ticket for him to travel to Jordan, and **ALEBBINI** asked whether the CHS would give him money for a ticket. The CHS suggested that **ALEBBINI** get a credit card, or a loan from Q.A. or someone else, and the CHS could pay off the debt after **ALEBBINI** left the United States. **ALEBBINI** discussed the Islamic State and how 4,000 persons from Jordan were fighting with the Islamic State. **ALEBBINI** stated, "My goal is – my goal is not to go just to Al-Dawlah (ISIS). My goal is to be active in Al-Dawlah (ISIS)."

ee. On or about March 2, 2017, the FBI contacted **ALEBBINI** by phone after learning that **ALEBBINI**'s former residence in Virginia had been vacated. During the phone interview, **ALEBBINI** confirmed that he had moved from Virginia to Dayton, Ohio, and he provided his new address to the FBI. **ALEBBINI** told the FBI that he would be receptive to a follow-up interview, in person, if necessary. The FBI did not thereafter seek to contact **ALEBBINI**; however, on Saturday, April 15, 2017, **ALEBBINI**

contacted the FBI about the status of the FBI's investigation and asked about his ability to travel overseas. The FBI returned **ALEBBINI**'s call and left a voicemail telling **ALEBBINI** that the FBI's investigation did not prohibit **ALEBBINI** from traveling. On or about the evening of April 18, 2017, **ALEBBINI** told the CHS about his contact with the FBI.

ff.      On or about the evening of April 19, 2017, the CHS met with **ALEBBINI**. During the consensually recorded conversation, the CHS asked **ALEBBINI** how much money he needed and **ALEBBINI** stated that he only needed enough for his ticket. With prior approval from the FBI, the CHS stated that he would give the money to D.E. as a bonus.[6] **ALEBBINI** said he was going to book the cheapest flight and stated that he was ready to travel. **ALEBBINI** indicated that he would book a flight from Cincinnati to Chicago, and then from Chicago to Jordan. **ALEBBINI** stated that if he was unable to get into Turkey, he would go to Jordan, and from there, his father could help him. **ALEBBINI** added that once he entered Jordan, he would not remain in his father's home until he is arrested, instead, he would flee to Sal (a village in northern Jordan). **ALEBBINI** suggested that he might be arrested at the airport.

gg.      On or about April 21, 2017, the CHS met with D.E., who stated that **ALEBBINI**'s family was now unwilling to purchase a ticket for D.E.

---

[6] D.E. has been employed at a business operated by the CHS since on or about March 16, 2017. D.E. had been employed by the CHS at the same business in prior years.

With prior approval from the FBI, the CHS discussed with D.E. a bonus of $1500, to be used to purchase two tickets on Turkish Airlines. The conversation was consensually recorded.

hh.    On or about April 22, 2017, the CHS met again with D.E. and, with prior approval from the FBI, gave D.E. $1500 (which funds the FBI provided). The CHS cautioned D.E. to not discuss the money with anyone because of what **ALEBBINI** was planning to do (i.e., traveling for the purpose of joining ISIS). D.E. acknowledged this and agreed. The conversation was consensually recorded.

ii.    On or about April 24, 2017, the CHS met again with D.E. During this meeting the CHS gave D.E. her final wages for her work, which included pre-payment for her scheduled hours on April 25, 2017. The CHS also gave D.E. a bonus of $200, as a going-away bonus for being a good employee. The CHS previously gave similar bonuses to D.E. and other employees in the past.

jj.    On or about April 25, 2017, the CHS met again with D.E. During the meeting, D.E. stated, "And I know whatever happens, I know I say…we're going together, uh, I don't know, but I know there are gonna be questions." D.E. then stated, "When Laith gets, cause he's not going to Jordan." D.E. then stated, "If they do though, I know I am supposed to ask for the Embassy, right? Yeah, that's the first thing I do, if I'm questioned, I will, talk to the Embassy. But if they do, I don't know nothing, I just, we planned on going together and then he just disappeared.

18

If I am questioned." The CHS then stated: "yeah if he gets down in Turkey, what are you going to tell them?" D.E. responded: "Mmm, hmm, that I don't know, like, we booked the tickets together and you know…" D.E. then stated that she would tell them that he watched YouTube videos. The CHS then asked D.E. if **ALEBBINI** told her to say that. D.E. responded, "mmm, Yes."

9. On or about April 24, 2017, I received information from the United States Department of Homeland Security showing that tickets have been issued in the name of "Lath Alebbini" and in D.E.'s name for travel as passengers on flights from and to the following locations on the following dates: (1) from Cincinnati-Northern Kentucky International Airport to Chicago O'Hare International Airport on April 26, 2017 (Turkish Airlines Flight 9576 operated by United Airlines under Flight 1560); (2) from Chicago O'Hare International Airport to Ataturk International Airport (Istanbul, Turkey) on April 26, 2017 (Turkish Airlines Flight 6); and (3) from Ataturk International Airport to Queen Alia International Airport (Amman, Jordan) on April 27, 2017 (Turkish Airlines Flight 812). Records indicate that the tickets were purchased using a Visa card under D.E.'s name, and that the purchaser provided a telephone number and email address associated with D.E. in connection with the reservation.

10. On or about April 26, 2017, at approximately 2:00 p.m., **ALEBBINI** and D.E. left their residence and traveled to the Cincinnati/Northern Kentucky International Airport. D.E.'s relative drove them to the airport. **ALEBBINI** and D.E. proceeded to the United Airlines ticket counter, where they obtained their boarding passes. After **ALEBBINI** obtained his boarding passes and walked towards TSA security, law-enforcement officers arrested him. Law-enforcement officers advised **ALEBBINI** of his Miranda rights after his arrest.

19

11.     Law-enforcement officers subsequently sought to interview **ALEBBINI** at FBI's office in Cincinnati.  The interview was video and audio recorded.  **ALEBBINI** once again was advised of his Miranda rights.  **ALEBBINI** expressed an understanding of his rights and agreed to speak with law-enforcement officers.  He signed a Miranda-waiver form.  During the interview, **ALEBBINI** admitted that he intended to travel to Turkey and then join and fight for ISIS.

12.     Based on the foregoing, I believe there is probable cause to believe that on an exact date that is unknown, but at least by on or about April 26, 2017, in the Southern District of Ohio and elsewhere, **ALEBBINI** attempted to provide material support or resources to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B.

Respectfully submitted,

Michael Herwig
Special Agent, FBI

Subscribed and sworn to before me on April 27, 2017.

Hon. Michael J. Newman
United States Magistrate Judge