UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | CASE NO. 3:17-cr-071-WHR |
| | : | |
| Plaintiff, | : | GOVERNMENT RESPONSE IN |
| | : | OPPOSITION TO DEFENDANT'S |
| v. | : | MOTION TO REVOKE DETENTION |
| | : | ORDER PURSUANT TO 18 U.S.C. § |
| **LAITH WALEED ALEBBINI,** | : | 3145(c) |
| | : | |
| Defendant. | : | |
| | : | |

The United States of America, through undersigned counsel, respectfully submits the Government Response In Opposition to the Defendant's Motion To Revoke Detention Order Pursuant To 18 U.S.C. § 3145(c).[1] The Court should order Laith Waleed Alebbini ("Alebbini") to remain detained pending trial pursuant to 18 U.S.C. §3142. That order would be consistent with the statutory presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community" when defendants are charged with attempting to provide material support to designated foreign terrorist organizations like the Islamic State of Iraq and al-Sham ("ISIS"). *See* 18 U.S.C. § 3142(e)(3). For the reasons stated below, this Court should deny the defense motion and order Alebbini to be detained pending trial.

---

[1] While defendant's motion refers to 18 U.S.C. § 3145(c) (governing appeals of detention orders pursuant to 18 U.S.C. § 3143, which, in turn, governs release or detention of a defendant pending sentence or appeal, a circumstance not present here), the government's motion in opposition assumes throughout that defendant's motion is in fact pursuant to 18 U.S.C. § 3145(b) (governing reviews of detention orders by the courts of original jurisdiction).

**BACKGROUND**

On April 26, 2017, Alebbini drove to Cincinnati-Northern Kentucky International Airport for the purpose of traveling overseas, joining ISIS, and fighting on behalf of ISIS.[2] The FBI, however, arrested Alebbini before he could board a plane and provide himself as material support to ISIS. Months earlier, on January 10, 2017, Alebbini traveled to the Turkish Embassy in Washington, D.C., where he was arrested for unlawful entry.[3] Complaint, ECF No. 1, at 4. Following his arrest, Alebbini refused to explain why he was at the Embassy, but, when being escorted off the property, Alebbini said, "you are going to regret this." *Id.* Soon after Alebbini's removal from the Embassy, the FBI interviewed Alebbini, who told the FBI that the security at the Turkish Embassy was lax, adding"[i]f I had a bomb on me, I swear to God, three embassies would have gone down." *Id.* at 5.

After Alebbini's arrest in Washington, D.C., he attempted to travel with Raid Ababneh ("R. Ababneh") to Turkey.[4] *Id.* at 4. Alebbini and R. Ababneh arrived in Turkey, and Turkish authorities allowed R. Ababneh to enter the country. *Id.* But Turkey refused entry to Alebbini, because Alebbini's passport had expired. *Id.* So Alebbini returned to the United States. *Id.* On January 23, 2017, the FBI conducted a voluntary interview with Alebbini. *Id.* at 5. He admitted traveling to Turkey, expressing pro-ISIS sentiment, and posting pro-ISIS content on his

---

[2] Alebbini is a citizen of the Kingdom of Jordan. On or about April 8, 2014, Alebbini became a legal permanent resident of the United States. Immigration records indicate that Alebbini initially arrived in the United States on or about July 24, 2011. He subsequently left the United States, and then returned to the United States on or about August 6, 2014. Complaint, ECF No. 1, at 4.

[3] The unlawful-entry charges against Alebbini were dismissed. Complaint, ECF No. 1, at 4.

[4] R. Ababneh is an associate of Alebbini. Like Alebbini, R. Ababneh is a citizen of the Kingdom of Jordan and became a legal permanent resident of the United States. In March 2017, R. Ababneh traveled to Jordan without Alebbini and did not return to the United States. Complaint, ECF No. 1, at 7.

Facebook account. *Id.* During the interview, Alebbini suggested he would be an ideal recruit for ISIS, and he explained his preference for ISIS's vision of a unified Middle East. *Id.*

Following Alebbini's voluntary interview with the FBI, he moved to Dayton, Ohio, with his purported wife—Destiney Eshelman.[5] *Id.* Soon afterward, Alebbini began talking with a Confidential Human Source ("CHS") about ISIS. In March 2017, Alebbini told the CHS that he watched ISIS videos on the internet. *Id.* at 6. On March 9, Alebbini watched one ISIS video with the CHS, and Alebbini expressed support for ISIS killing individuals who are not part of ISIS. *Id.* at 6-7. Alebbini told the CHS, "[y]ou need a regime like the regime of [ISIS] right now. They come to exterminate the old regime. They don't leave anyone . . . Allah willing, when [ISIS] comes, it will cut off the head of King Abdullah. Then it will go free Palestine. Things will be back to normal." *Id.* at 7. On March 19, Alebbini told the CHS that he went to a mosque and found anti-ISIS literature being distributed, and that he took the brochures to his car and then threw them in a garbage can. *Id.* at 8.

Alebbini then began engaging in tradecraft when meeting with the CHS, R. Ababneh, and Qasim Ababneh ("Q. Ababneh"), who also considered traveling to Syria with Alebbini.[6] Alebbini, for example, advised the CHS that they should hide their phones in another room, or talk in a car without the presence of phones when they meet to talk about ISIS. *Id.* At one meeting, Alebbini told the CHS that the CHS should join ISIS. *Id.* at 7-8. Alebbini told the CHS

---

[5] Alebbini and Ms. Eshelman claim to have been married by an Imam in a private ceremony. They may have requested a marriage license from the Commonwealth of Virginia. But there is no evidence that Virginia issued a marriage license, or marriage certificate, to Alebbini and Ms. Eshelman. Complaint, ECF No. 1, at 5.

[6] Like Alebbini and R. Ababneh, Q. Ababneh is a citizen of the Kingdom of Jordan. He entered the United States on a student visa, which the United States revoked in April 2017. Complaint, ECF No. 1, at 4. The United States deported Q. Ababneh to Jordan in May 2017, and Q. Ababneh has not returned to the United States.

that he watches ISIS videos all the time and considers ISIS the "right group." *Id*. at 8. On March 27, 2017, Alebbini explained, "[t]he best choice is the Islamic State, best choice for Muslims. The Islamic States and the Mujahid in Syria." *Id.* at 10. He vowed to throw away his Permanent Resident "Green Card" because he believed he was living among apostates who kill Muslims and that his card would be used against him on judgment day. *Id*. Alebbini lamented to the CHS that others were joining the fight with ISIS, "while we are sitting here." *Id*. at 11.

On March 29, 2017, Alebbini met with the CHS and discussed his plans to join ISIS. Alebbini planned to purchase an airline ticket to Amman, Jordan, where he could continue his journey to Syria and fight. *Id*. at 12. Alebbini told the CHS that his family knows about his desire to join ISIS, but that his family objects to him doing so and refused to support him. *Id.* The CHS asked whether Alebbini was afraid of being questioned upon crossing the border into Syria; Alebbini responded no, "because Abu Bakr al-Baghdadi called."[7] *Id*. at 11. On March 29, Alebbini further explained to the CHS that he plans to fight for ISIS against the Syrian leadership. He observed, "Our duty is to support the Islamic State. Those are the words, what is your duty? Jihad. A person is supposed to stay away from the people of sins . . . and what happens, happens . . . caught? Let them arrest you, then, let them arrest me. This is the true conversation." *Id*. at 12-13.

In early April 2017, Alebbini continued planning his route to ISIS. He told the CHS that he planned to book a Turkish airline flight to Jordan going through Turkey. *Id.* at 14. Then, during the layover in Turkey, instead of boarding the flight to Jordan, "you take yourself and leave." *Id.* Alebbini said that if he joins ISIS and only fires a couple shots before being killed, it would be good because he would be inciting the faithful. *Id*. at 14. He claimed that Ms.

---

[7] Abu Bakr al-Baghdadi is ISIS's self-proclaimed leader. Complaint, ECF No. 1, at 11 n.5.

4

Eshelman also would travel to Jordan to raise their son, stating "If I die, [Ms. Eshelman] does not want to be divorced in America . . . Because . . . to be honest, before I was planning anything, I decided to go fight in Jihad … I do not want to just support fighting the oppressors, we want to fight with weapons, with tongue, and we want to protect the Muslims." *Id.*

By the evening of April 19, 2017, Alebbini's travel plans began to solidify. He told the CHS that he would book a flight from Cincinnati to Chicago, and from Chicago to Jordan. *Id*. at 18. Alebbini intended to enter Turkey and skip his flight to Jordan. *Id.* But, if he could not do so, he would travel to Jordan and make his way to ISIS from his family's home in Northern Jordan. *Id.* On or about April 24, the FBI learned from the United States Department of Homeland Security that "Lath Alebbini" and Ms. Eshelman were booked as passengers on flights from the following locations:

1. From Cincinnati-Northern Kentucky International Airport to Chicago O'Hare International Airport on April 26, 2017;

2. From Chicago O'Hare International Airport to Ataturk International Airport, which is located in Istanbul, Turkey, on April 26, 2017; and

3. From Ataturk International Airport to Queen Alia International Airport, which is located in Amman, Jordan, on April 27, 2017.

*Id*. at 20.

On April 26, 2017, Alebbini and Ms. Eshelman traveled to the Cincinnati-Northern Kentucky International Airport. *Id.* They obtained their boarding passes, and walked toward airport security, where the FBI promptly arrested Alebbini. *Id.* On May 11, 2017, the Grand Jury indicted Alebbini after finding probable cause that he attempted to provide material support to ISIS, in violation of 18 U.S.C. § 2339B.

After a hearing on May 2, 2017, the Magistrate Judge ordered Alebbini detained pending trial. Since that time, Alebbini has continued talking with Ms. Eshelman about his intention to

travel overseas and engage in violence.[8] For example, in June 2017, Alebbini informed Ms. Eshelman, ". . . look, look, I will not stay. I will not stay. I, I didn't talk this thing as a joke . . . Assad will not stay alive. That's it." Alebbini later told Ms. Eshelman in or around early September 2017, "I'm still gonna go. Because if I don't go, I'm not gonna be me . . . Of course I'm never going to stop until my mission is complete." Alebbini also stated, "You know what I'm gonna, you know what I'm gonna do when I get out. I'm going to go fight al-Assad."

Alebbini's proclivity for violence is not limited to "Assad." Indeed, Ms. Eshelman said to Alebbini, "You're going to get out and treat me the same way. You're going to hit me, you're going to talk to me, you're going to call me names, just like you did earlier, man." And in September 2017, Alebbini told Ms. Eshelman: "Why do you make me punch you? Why do you make me beat you up? You just, you just haven't been beaten in a while. That's all." Again, in October 2017, Alebbini threatened Ms. Eshelman: "Look bitch, I'll slap the shit out of you. Don't say shit then say I don't know. I'm tired of this, I'm tired of this."

Beyond Alebbini's uncompromising desire to complete his "mission" by traveling overseas to kill Assad, and his willingness to physically assault Ms. Eshelman, Alebbini is eager to leave the United States because of its culture:

> If you burn somebody that burns you, like if I burn your hand, you can burn my hand. And, that pilot [referring to the Jordanian pilot burned by ISIS] burned some people so the Islamic State burned him because he burned some people. So when you look at it and you look and see is different from how I feel. The United States of America has burned a lot of people. The United States of America has burned the most people out of anybody in the world. You know how? In the culture. They burn people from the inside out.

Rather than expose his children to the United States, Alebbini would like them to be mujahideed: "Look, and all of them. I'm going to make them soldiers for Allah. They all gonna fight in the

---

[8] Alebbini's post-arrest communications referenced herein have been provided to defense counsel in the course of discovery and are available to the Court upon request.

sake of Allah.  They all going to be mujahideen." Alebbini told Ms. Eshelman that he wants "martyrdom" for their son, who, at that time, was one-month old.

And while, in his motion, Alebbini seeks to distinguish the concept of an Islamic State from ISIS (asserting that he sought to support the former, not the latter), Alebbini's own words belie any contention that ISIS can be distinguished from the Islamic State.  In a phone call between Alebbini and Eshelman on June 5, 2017, Alebbini refuted Eshelman's assertion that there is a difference between ISIS and the Islamic State:

| | |
|---|---|
| Alebbini: | "And also, we have they saying that the Islamic State also is a foreign terrorist organization.  But, the Islamic State is not a foreign terrorist organization.  It's a country and a state now.  And by American law.  By the American law.  By the American law.  By the American law you can not, by the American law you cannot have a law that incriminates a lot of people.  Now you have a huge amount of people in the Islamic State and overseas and the law is incriminating them and that's not legal." |
| Eshelman: | "Well, there's a difference between the Islamic State and ISIS." |
| Alebbini: | "No, there's not." |
| Eshelman: | "Ok." |
| Alebbini: | "What's the difference?  Ok, tell me." |
| Eshelman: | "Islamic State's bad, er, ISIS is bad. And they're taking claims, and, and they're bad people. Islamic State's not bad." |
| Alebbini: | "Why? What's the difference between the Islamic State and …?" |
| Eshelman: | "Islamic State, good guys.  ISIS, bad guys.  They're taking (inaudible) saying, oh yeah, we did this, we did this." |
| Alebbini: | "What is ISIS?" |
| Eshelman: | "Islamic State of Iraq and Syria." |
| Alebbini: | "Of Levant, yes, ISIL" |
| Eshelman: | "Yeah." |

7

| | |
|---|---|
| <u>Alebbini</u>: | "Ok, same thing." |
| <u>Eshelman</u>: | "No. Nope, in my mind, no, I don't see it the same. I think there's good people and then there's bad people." |
| <u>Alebbini</u>: | "Habibi, but they are the same people though." |
| <u>Eshelman</u>: | "No." |
| <u>Alebbini</u>: | "How you know?" |
| <u>Eshelman</u>: | "Because." |
| <u>Alebbini</u>: | "Because why?" |
| <u>Eshelman</u>: | "I don't know, I just. It's my opinion." |
| <u>Alebbini</u>: | "Your opinion. Our opinion do not matter." |
| <u>Eshelman</u>: | "Well, it…" |
| <u>Alebbini</u>: | "It's what's there." |
| <u>Eshelman</u>: | "…makes sense." |
| <u>Alebbini</u>: | "You see, Destiney, it does not, well it makes sense. Islamic State is something great. But America, because America, look, after World War Two when Britain gave away all the bases…" |
| <u>Eshelman</u>: | "I know…" |

Now, Alebbini moves this Court to release him into the community pending trial, and the government asks the Court to deny Alebbini's motion.

## ARGUMENT

Alebbini is charged with attempting to provide material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B. The statutory maximum for individuals convicted of violating Section 2339B is 20-years imprisonment. The detention statute sets forth a presumption of detention for individuals indicted for violating a terrorism-related offense that carries a potential sentence of more than 10 years. 18 U.S.C. §3142. The

8

Magistrate Judge detained Alebbini, consistent with the statutory presumption, because no combination of conditions reasonably can assure that Alebbini will not flee the jurisdiction (he already traveled overseas on an expired passport), or harm the community (he frequently talks about his support for ISIS—an organization that kills innocent civilians—and about wanting his children to become martyrs). This Court should order Alebbini to remain detained pending trial.

### A. The Court Should Detain Alebbini Consistent with the Statutory Presumption

Whether a defendant should be detained before trial is governed by a number of factors listed in 18 U.S.C. § 3142. Critically, there is a presumption in favor of detention, when a "judicial officer finds that there is probable cause to believe" that a defendant attempted to provide material support to a designated foreign terrorist organization. 18 U.S.C. § 3142(e)(3) ("Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community . . ." if the defendant violated the material-support statute.); *see also United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). "A grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged . . . Thus, when the government presents an indictment including [material-support] charges . . . it has fulfilled its burden to establish the presumption in favor of detention." *Stone*, 608 F.3d at 945.

Here, the Grand Jury indicted Alebbini with attempting to provide material support to ISIS, thereby establishing that the statutory presumption in favor of detention applies in this case.[9] That indictment is the probable-cause finding necessary for the application of the

---

[9] Alebbini argues that the government's case is "deficient" in material respects. Docket No. 19, pp. 9–10. This merits-based argument, however, is not relevant to (or appropriate for) the defense motion to revoke the Magistrate Judge's detention order. A federal grand jury indicted Alebbini for violating a

9

presumption. The application of the presumption, together with the evidence of Alebbini's risk of flight and danger to the community, supports detaining Alebbini.

### B. The Defense Did Not Present Sufficient Evidence To Overcome the Statutory Presumption Favoring Detention

The defendant can overcome the statutory presumption by introducing evidence that Alebbini does not pose a danger to the community, or a risk of flight.[10] Alebinni, however, presented nearly no such evidence, offering only "letters submitted from [Alebbini's] family and friends attest[ing] to his character and non-violent nature." ECF No. 19, at 3. But the letters do not outweigh the significant evidence establishing Alebbini's true violent nature—that is, Alebbini's desire to join a terrorist organization that readily accepts responsibility for the death of innocent civilians around the world, and his willingness to physically assault and harm his purported wife.

In addition to the statutory presumption favoring detention, the Court should consider the following factors when deciding whether to detain an individual pending trial:

1. the nature and circumstances of the offense charged, including whether the offense is a federal crime of terrorism;

2. the weight of the evidence against the person as it relates to dangerousness and risk of flight;

---

federal terrorism offense. The defense can challenge the indictment through other pretrial litigation, or trial. But arguing for the release of Alebbini at this point requires actual evidence that overcomes the statutory presumption and the weight of the government's evidence relating to Alebbini's risk of flight and dangerousness.

[10] Even if the defense could present evidence to overcome the statutory presumption of detention, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Stone*, 608 F.3d at 945 (stating "[t]he presumption remains as a factor because it is not simply an evidentiary tool designed for the courts.").

3. the history and characteristics of the person, including a number of factors such as the defendant's mental condition and length of residence in the community; and

4. the nature and seriousness of the danger to the community that would be posed by the defendant's release.

18 U.S.C. § 3142(g); *Stone*, 608 F.3d at 946. These factors—together with the statutory presumption favoring detention of individuals indicted on terrorism-related offenses, Alebbini's history and proclivity for violence, and his attempted overseas travel on an expired passport—demonstrate that detaining Alebbini pending trial is lawful and appropriate. Accordingly, the Court should deny the defense motion and order the continued detention of Alebbini.

> **1. Alebbini should remain in detention given the nature and circumstances of the charged offense.**

The charges and potential penalties in this case are among the most serious in federal law. Alebbini is charged with attempting to provide material support and resources to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B. The seriousness of this charge accentuates Alebbini's dangerousness and risk of flight.

Alebbini's attempt to fight for ISIS constitutes a crime of terrorism—a crime that is inherently dangerous. As the Sixth Circuit has explained, "[i]n terms of dangerousness, Congress . . . thought it was especially significant if the charges include . . . a Federal crime of terrorism." *Stone*, 608 F.3d at 947. In *Stone*, the Sixth Circuit concluded that pretrial detention was warranted after the defendants acquired firearms and contemplated murdering Michigan civilians and law-enforcement officers. *Stone*, 608 F.3d at 943–44. The terrorism charge, combined with the defendants' dangerous nature, led the Sixth Circuit to conclude that no combination of conditions of release reasonably could assure the safety of the community. *Id*. at 954. There, the Sixth Circuit explained that it "routinely affirms, on dangerousness grounds, the

11

pre-trial detention of run-of-the-mill drug dealers, even without any indication that the defendant has engaged in violence." *Stone*, 608 F.3d at 947 n.6.[11] Indeed, the Sixth Circuit recognized that terrorism-related offenses are far more dangerous than ordinary drug cases—a reality acknowledged by Congress through the statutory presumption.

While drug distribution is a serious crime, it does not pose the immediate risk of violence that terrorism-related offenses often present. ISIS, for example, repeatedly has called on its followers to engage in barbaric violence. On September 21, 2014, ISIS released a speech by Sheikh Abu Mohammad al-Adnani ("Al-Adnani"),[12] who explained:

> [I]f you can kill a disbelieving American or European . . . including the citizens of the countries that entered into a coalition against the Islamic State, then rely upon Allah, and kill him in any manner or way however it may be. Smash his head with a rock, or slaughter him with a knife, or run over him with your car, or throw him down from a high place, or choke him, or poison him. . . . rise and defend your state from your place where you may be.

Al-Adnani's calls for violence have been widely distributed on social media by ISIS supporters. Within the last two years, ISIS has claimed responsibility for multiple attacks carried out in Europe (*e.g.*, Belgium, United Kingdom, Germany, France), the Middle East, and the United States, where the attacks targeted civilians located at large pedestrian gatherings. Those attacks killed hundreds of people and seriously injured many more. Alebbini is charged with attempting to join and fight with this terrorist group.

---

[11] The Court cited to several cases involving drug-related offenses where courts detained defendants pending trial. *See id.* at 947 n.6, citing *United States v. Hinton,* 113 Fed. App'x 76 (6th Cir. 2004) (unspecified drug trafficking charges); *United States v. Ortiz,* 71 Fed. App'x 542 (6th Cir. 2003) (conspiracy to distribute and possess over five kilograms of cocaine); *United States v. Miller,* 39 Fed. App'x 278 (6th Cir. 2002) (conspiracy to possess with intent to distribute marijuana); *United States v. Lattner,* 23 Fed. App'x 363 (6th Cir. 2001) (unspecified "drug trafficking charges"); *United States v. Gray,* 20 Fed. App'x 473 (6th Cir. 2001) (conspiracy to possess with intent to distribute seven kilograms of cocaine, testimony from family members insufficient to overcome the presumption)).

[12] From about August 2014 to about August 2016, Al-Adnani served as ISIS's official spokesman and a senior leader under Al-Baghdadi.

And Alebbini's own potential for violence—and, therefore, dangerousness—is real. Alebbini has talked about dying for ISIS—indeed, Alebbini told the CHS that even if he fires a few shots before being killed, it would be good because he would be inciting the faithful. Alebbini told the CHS, "[y]ou need a regime like the regime of [ISIS] right now.  They come to exterminate the old regime.  They don't leave anyone."  What is more, Alebbini explained, "I do not want to just support fighting the oppressors, we want to fight with weapons . . . ."  That Alebbini is willing to fight and die for ISIS speaks volumes of his dangerousness to the community.

Alebbini also is a flight risk because of the serious nature of the charged offense.  Even before the Grand Jury indicted Alebbini with attempting to provide material support to ISIS, he flew overseas on an expired passport and tried to enter Turkey.  Now, with the prospect of twenty-years imprisonment, and no family in Ohio except for his purported wife and child, Alebbini has no reason to remain in Ohio and far more reason to leave the jurisdiction.  That is a compelling reason to flee a country he loathes.[13]

Simply, the nature and circumstances of the charged offense—providing material support to ISIS—strongly weighs in favor of detaining Alebbini.  And detaining Alebbini is consistent with "Congress's substantive judgment that particular classes of offenders"—expressly including individuals charged with terrorism-related offenses—"should ordinarily be detained prior to trial."  *Stone*, 608 F.3d at 945.

---

[13] Although Alebbini argues that similarly-situated defendants often receive sentences below the statutory maximum, defendants are sentenced individually and only after they are convicted.  Alebbini faces twenty years in a United States prison if convicted for attempting to provide material support to ISIS.

13

### 2. Alebbini should remain in detention given the weight of the evidence against him fleeing the jurisdiction and causing harm to the community.

The weight-of-the-evidence factor "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948.  The weight of the evidence of Alebbini's dangerousness is substantial.  The government's case is comprised of months of Alebbini's recorded conversations, a number of his recorded prison calls, and his own statements to federal law-enforcement officers.  In the recorded conversations, Alebbini made clear that he is familiar with ISIS, in part because he reads the organization's publications—Dabiq and Amaq—and supports ISIS.  Alebbini discussed ISIS's violence (*e.g.*, burning captured pilots, beheading soldiers, killing individuals), its use of firearms and tunnels, and its success at wreaking "havoc" at length with the CHS.

Armed with this knowledge, Alebbini strived to join ISIS and fight for the organization.  He characterized ISIS as the "right group" and the "best choice" for Muslims.  He hoped that ISIS would decapitate the King of Jordan, and lamented that he was not yet fighting and killing on behalf of ISIS.  And when Q. Ababneh doubted ISIS's abilities for even a moment, Alebbini screamed in its defense.  Complaint, ECF No. 1, at 16.  Adding to his dangerousness, Alebbini made efforts to avoid detection.  When Alebbini thought the CHS was a United States citizen who may be working for law-enforcement officers, Alebbini downplayed his support for ISIS, only to revert to his full support upon learning that he was mistaken of the CHS's citizenship.  *Id.* at 8-9.  And Alebbini asked the CHS to engage in tradecraft when he thought appropriate, suggesting that they not speak in the presence of cellular phones when discussing ISIS.  Alebbini's lust for fighting, paired with his guile for deception, is a dangerous combination.

Notably, detaining Alebbini has not extinguished his interest in fighting.  In Alebbini's recorded prison calls with Ms. Eshelman, he continues to vow that he will travel to fight for ISIS,

displaying a total lack of regard for the legal processes aimed at stopping him from doing just that. From June through September 2017, Alebbini detailed his urge to fight for ISIS, his repugnance for America, and his abuse of Ms. Eshelman. In fact, as recently as this month, Alebbini threatened to "slap the shit" out of his purported wife.

      Finally, Alebbini's own statements demonstrate his dangerousness. During the FBI's initial investigation into his trespass on the Turkish Embassy, Alebbini's innate reaction was to think of how a bomb could have blown up national embassies, stating "[i]f I had a bomb on me, I swear to God, three embassies would have gone down." And he recently told Ms. Eshelman, "I will not stay. I will not stay . . . Assad will not stay alive." Considered together, the evidence against Alebbini demonstrates his marked dangerousness, thereby warranting his detention pending trial.

      The defense, however, fails to address any of this evidence. Instead, the defense highlights that Alebbini once told law-enforcement officers that he did not condone ISIS's violence. But the Court's analysis is not done in a vacuum. Instead, it should consider the panoply of statements Alebbini made regarding ISIS's violence, his desire to join the terrorist organization that kills civilians, and his potential to kill people and destroy embassies. Doing so makes clear that Alebbini did not only condone ISIS's violence, he wished to be a part of it.

      **3. Alebbini should remain in detention given his history and personal characteristics.**

      Alebbini's history and characteristics also favor his continued detention pending trial. Alebbini's conviction to commit violence in the name of ISIS, his support for ISIS's brutality (even against citizens of Jordan, his own country), and his abuse of his purported wife all bespeak an aggressive nature at best, and a fiercely malicious one at worst. Regardless,

15

Alebbini's proclivity to conduct violence is not only borne out in his words, but also in how he treats those around him.

Further, Alebinni has no reason to remain in Ohio let alone the United States. He has nearly zero ties to the community. He is unemployed, only recently moved to Dayton, and has extensive family networks in Jordan. Although Alebbini notes that his newborn son is here, Alebbini has said in recorded prison calls that he wants his children to serve God through martyrdom. And, for Alebbini, it is mission over family. "Of course I'm never going to stop until my mission is complete. My point is that, even if went and fought al-Assad, that doesn't mean I can't be with you until I die, or kill al-Assad." Simply, Alebbini's devotion to violence transcends any familial or community ties.

### 4. Alebbini should remain in detention given the nature and seriousness of the danger to the community.

The dangerousness of releasing Alebbini is difficult to overstate and weighs heavily in favor of detention. Alebbini argues that he lacks a criminal history and, as mentioned earlier, presents letters from family and friends purporting to describe Alebbini as non-violent. These self-serving letters pale in comparison to the plethora of evidence demonstrating Alebbini's drive to commit violence in the name of ISIS and urge to physically and emotionally abuse his purported wife. The Sixth Circuit commonly affirms pre-trial detention for defendants accused of less serious crimes, "even without any indication that the defendant has engaged in violence." *Stone*, 608 F.3d at 947 n.6 (citing cases). Such detention, then, is clearly appropriate here, where the defendant stands accused of a statutorily-identified crime of terrorism and confronts an abundance of evidence reflecting violent tendencies.

Alebbini also stresses that he has no passport. This fact, however, should provide no comfort to the Court for two reasons: (1) it does not guarantee that Alebbini will be unable to

16

travel, and (2) it may lead him to commit an act of violence within the United States.  First, Alebbini is highly motivated to serve what he believes is his religious duty to fight for ISIS abroad.  He continues to preach about his "mission" during prison calls and tells Ms. Eshelman that his duty to kill is more important that his family obligations.  Alebbini will not store his strong beliefs while waiting for trial.  He already successfully traveled overseas on an expired passport, reaching Turkey before finally returning to the United States.  Alebbini's motion for revocation does not address how any conditions of supervised release will prevent him from fleeing to conduct violence when even his current detention has not ebbed in any way his desire to do so.

Second, and arguably more important, releasing Alebbini may compel him to commit an act of violence within the United States.  Assuming the defendant is correct that lacking a passport will prevent Alebbini from traveling abroad, this geographic limitation does nothing to eradicate his religious drive to fight for and serve ISIS.  Alebbini, in recorded conversations, described his disgust with living among apostates in the United States whom he believes is responsible for killing Muslims.  In fact, Alebbini admitted that he preferred ten years in prison than one year in America while living among nonbelievers.  Complaint, ECF No. 1, at 10-11.  These statements demonstrate both Alebbini's dedication to ISIS and his disgust with the United States.  What is more, ISIS repeatedly has celebrated its soldiers that attack citizens and law-enforcement officers with knives and vehicles—all targets and items easily found around the community.  In light of ISIS's public calls for attacks on American citizens, Alebbini—out of jail but stuck among the citizens of the United States—may shift his cross-hairs and violent tendencies to those around him.

17

Further signaling the dangerousness of releasing Alebbini is the fact that his charge triggers the statutory presumption for detention.  As described above, this presumption represents Congressional findings that terrorism offenders are dangerous and likely to continue engaging in criminal conduct, undeterred by federal charges, penalties, or conditions of release.  The Sixth Circuit made clear that, to rebut the presumption, the defendant should present special features of his case that take it outside this congressional paradigm.  *Stone*, 608 F.3d at 945.  Alebbini has failed to do so.  Aside from noting that he has no criminal history, and no passport, Alebbini's only argument is that the discovery in the current case is complex, therefore warranting his release.  But that is not so.  In terms of discovery, this case is no more complex than any other terrorism case.  And if discovery-related inconveniences alone were sufficient to release terrorism defendants, that exception would swallow the very rule Congress passed to favor detention for terrorism defendants.

At bottom, Alebbini has not presented anything new to this Court that warrants his release from detention.  This case is the exact type of case Congress identified as appropriate for pretrial detention.  The government respectfully requests that this Court hold as such and, thus, deny the defense motion to release Alebbini.

## CONCLUSION

For the foregoing reasons, this Court should not release Laith Waleed Alebbini pending trial.

Respectfully submitted,

BENJAMIN C. GLASSMAN
United States Attorney


/s/ Vipal J. Patel
VIPAL J. PATEL (CA 156212)
First Assistant United States Attorney
DOMINICK S. GERACE (OH 0082823)
Assistant United States Attorney
200 West Second Street, Suite 600
Dayton, Ohio 45402
Office: (937) 225-2910
Fax: (937) 225-2564
vipal.patel@usdoj.gov
dominick.s.gerace@usdoj.gov

JUSTIN SHER (DC 974235)
Trial Attorney
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20004
Office: (202) 353-3909
justin.sher@usdoj.gov

## CERTIFICATE OF SERVICE

This is to certify that on this 31st day of October, 2017, I served upon defense counsel, Thomas Anderson, a copy of the foregoing *Government Response In Opposition to the Defendant's Motion To Revoke Detention Order Pursuant To 18 U.S.C. § 3145(c)*, by electronic delivery.

/s/ Vipal J. Patel
VIPAL J. PATEL (CA 156212)
First Assistant United States Attorney