**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 3:17-cr-071-WHR |
| | : | |
| Plaintiff, | : | GOVERNMENT RESPONSE IN |
| | : | OPPOSITION TO DEFENSE MOTION |
| v. | : | FOR AN ORDER TO PRODUCE |
| | : | INFORMATION RELATIVE TO CIPA |
| LAITH WALEED ALEBBINI, | : | SECTION 4 |
| | : | |
| Defendant. | : | |
| | : | |

## INTRODUCTION

The defendant's Motion For An Order To Produce Information Relative To CIPA Section 4, filed March 1, 2018, was a surprise. Up until the filing of the motion (and a concurrently delivered letter that parallels, in large part, the motion), the government was not aware of any dissatisfaction with its discovery productions in this case. Since the filing of charges, the government has been conducting its due diligence with respect to discovery, with earnest effort, determination, and success. Indeed, the government has been diligently complying with the discovery rules, on its own accord, even absent a formal Rule 16 "request" from the defendant. *See* Rule 16(a)(1)(A) ("Upon a defendant's request, …"). For instance, without request from the defendant, the government has produced, *inter alia*, more than 130 discs, which collectively contain hundreds of hours of audio recordings and tens of thousands of pages of material. Those discs include information referring and relating to the following categories of information, among others:

- Audio of jail calls involving the defendant;
- FBI Form 302's documenting witness interviews;
- Search-warrant affidavits;

- Information provided to the government in response to search-warrant affidavits;
- Audio recordings of consensual meetings between the defendant and the Confidential Human Source;
- Surveillance reports conducted by the FBI;
- Results of subpoenas;
- Translations and transcripts of consensual recordings and jail calls;
- The Confidential Human Source reports of consensual meetings;
- Information provided by other government agencies, including the Department of Homeland Security and the Commonwealth of Virginia;
- Post-arrest interview of the defendant (video and audio);
- Interview of Qasim Ababneh (video and audio); and
- Forensic analysis of electronic devices.

The government also produced information to the defense through several letters and emails from the government, including information about Qasim Ababneh's deportation status. The government has provided a "sit-down" review of its evidence as well.

The defendant's motion, however, goes too far and asks for too much. The defendant asks the Court to: (1) order the government to produce *any* communications of defendant that were intercepted under FISA, Title III, or any other authority, and (2) allow him to participate in the CIPA Section 4 *in camera* hearing. The Court should deny the defense motion, except that it should allow the defense to file its own *ex parte* submission with the Court. In fact, the government—during two separate status conferences with the Court and the defense— (and the Court as well) suggested to the defense that it may and should file its own *ex parte* and *in camera* submission to assist the Court.

The government understands and takes seriously its discovery obligations, and it will produce all discoverable information to the defense unless otherwise ordered by the Court—as it must in all criminal cases. But, the defense's suggestion that the government must produce or identify *all* of defendant's statements regardless of relevance or helpfulness finds no support in the law. The defense's request to intervene in the government's review of information for discovery, and to prevent the government from using the well-settled *ex parte* process, likewise

2

lacks support and is simply not appropriate. The government has no objection to—and indeed encourages—the defendant to file his own *in camera* submission. For these reasons, the motion should be denied in part and granted in part.

## BACKGROUND

### A. The Defendant's Attempt To Travel Overseas and Join ISIS

On April 26, 2017, the defendant, Laith Waleed Alebbini ("Alebbini"), drove to the Cincinnati-Northern Kentucky International Airport for the purpose of traveling overseas, joining the Islamic State of Iraq and al Sham ("ISIS"), and fighting on behalf of ISIS.[1] Alebbini made his intentions clear when discussing his plans with a Confidential Human Source ("CHS"). On April 18, 2017, mere days before Alebbini's flight overseas to Turkey and Jordan, Alebbini confirmed his intentions, telling the CHS: "My goal—my goal is not just to go to the [Islamic] State. My goal is to be active in the [Islamic] State." But, Alebbini never had the opportunity to be active in the Islamic State because the FBI arrested Alebbini at the airport.

### B. Alebbini Supported ISIS's Violent Beheadings and Its Killing of Military Personnel and Civilians

The government has produced significant amounts of discovery to the defense, including the many statements from Alebbini that demonstrate his proclivity for violence and his support for ISIS's illegal violent acts. The defense assertion that "Laith expressly denounced any violence perpetrated by ISIS" (R. 25, Motion at 192) simply is wrong. For instance, in the months preceding Alebbini's attempt to join ISIS, Alebbini began talking with a CHS about ISIS. In doing so, Alebbini expressed support for ISIS's violent actions against military

---

[1] Alebbini is a citizen of the Kingdom of Jordan. On or about April 8, 2014, Alebbini became a legal permanent resident of the United States. Immigration records indicate that Alebbini initially arrived in the United States on or about July 24, 2011. He subsequently left the United States, and then returned to the United States on or about August 6, 2014.

3

personnel and civilians alike.  For example, in March 2017, Alebbini told the CHS that he watched ISIS videos on the internet and said "I do not blame" ISIS for burning a captured Jordanian pilot.  That pilot—the Jordanian pilot captured by ISIS members in Syria—was alive when ISIS set the pilot on fire and allowed him to burn until his death.  What is more, Alebbini sought to justify ISIS's decision to burn the Jordanian pilot alive, stating "I do not blame" ISIS for burning a captured Jordanian pilot because "that pilot burned some people so the Islamic State burned him because he burned some people."

On March 9, 2017, Alebbini watched an ISIS video with several people, including the CHS, and Alebbini expressed support for ISIS beheading soldiers in the Jordanian Army and killing individuals who are not part of ISIS.  Alebbini told the CHS, "[y]ou need a regime like the regime of [ISIS] right now.  They come to exterminate the old regime.  They don't leave anyone . . . Allah willing, when [ISIS] comes, it will cut off the head of King Abdullah.  Then it will go free Palestine. Things will be back to normal."  Later, in March 2017, the CHS learned that Alebbini visited a local mosque and became angry when he saw anti-ISIS pamphlets.  Alebbini took the pamphlets and threw them in the garbage.

### C. Alebbini Engaged in Tradecraft When Talking with Potential Coconspirators About ISIS

Alebbini began engaging in tradecraft when meeting with the CHS, Raid Ababneh ("R. Ababneh"), and Qasim Ababneh ("Q. Ababneh").[2]  Alebbini, for example, asked everyone to

---

[2] R. Ababneh is an associate of Alebbini.  Like Alebbini, R. Ababneh is a citizen of the Kingdom of Jordan and became a legal permanent resident of the United States.  In March 2017, R. Ababneh traveled to Jordan.  He has not returned to the United States.

Q. Ababneh also is a citizen of the Kingdom of Jordan.  He entered the United States on a student visa, which the United States revoked in April 2017.  Q. Ababneh was detained on the same date that Alebbini was arrested.  After providing notice to the defense in this case, the United States deported Q. Ababneh to Jordan in May 2017, and Q. Ababneh has not returned to the United States.

4

turn off their cellular telephones when meeting with Alebbini to discuss ISIS-related topics. Alebbini also would meet with R. Ababneh, Q. Ababneh, and the CHS outside of their homes as part of his tradecraft.

> **D.     Alebbini Consistently Spoke About His Intention To Engage in Violent Jihad While Fighting for ISIS Against Bashar Al-Assad**

On March 29, 2017, Alebbini explained to the CHS that he planned to fight for ISIS against the Syrian leadership. Indeed, less than one month before Alebbini's flight overseas, he told the CHS: "I am a man who hates Bashar and wants to go fight Bashar. The Islamic State is fighting Bashar and I will fight with the Islamic State to fight Bashar . . . I want to fight Bashar because, to be honest, I am with the Islamic State." Alebbini continued, "[o]ur duty is to support the Islamic State. Those are the words, what is your duty? Jihad. A person is supposed to stay away from the people of sins . . . and what happens, happens . . . Caught? Let them arrest you, then, let them arrest me. This is the true conversation." Separately, Alebbini told the CHS that the CHS should join ISIS.

Alebbini also told the CHS that he watches ISIS videos all the time and considers ISIS the "right group." Alebbini explained, "[t]he best choice is the Islamic State, best choice for Muslims. The Islamic States and the Mujahid in Syria." Alebbini vowed to throw away his Permanent Resident "Green Card" because he believed he was living among apostates who kill Muslims and that his card would be used against him on judgment day. Alebbini lamented to the CHS that others were joining the fight with ISIS "while we are sitting here."

In early April 2017, Alebbini planned his route to ISIS. He told the CHS that he would book a flight on Turkish Airlines to Jordan with a layover in Turkey. Then, during the layover in Turkey, instead of boarding the flight to Jordan, "you take yourself and leave." Alebbini said that if he joins ISIS and only fires a couple shots before being killed, it would be good because

5

he would be "inciting the faithful" and "I do not want to just support fighting the oppressors, we want to fight with weapons, with tongue, and we want to protect Muslims."

### E. Alebbini Asked the CHS for Money So that He Could Purchase an Airline Ticket

On April 4, 2017, Alebbini met with the CHS and discussed airline flights. Alebbini asked the CHS for a loan to help Alebbini purchase the plane ticket. Alebbini told the CHS that he asked his cousin for help, but his cousin would not provide any money to Alebbini. On April 18, 2017, the CHS met with Alebbini and Q. Ababneh (in March 2017, R. Ababneh traveled to Jordan on his own). Alebbini told the CHS and Q. Ababneh that his father would not purchase a plane ticket for him, and Alebbini again asked whether the CHS would give him money for a ticket. The CHS suggested that Alebbini apply for a credit card.

On April 19, 2017, after being asked for money again, the CHS agreed to give Alebbini money. Alebbini told the CHS that he would travel from the Cincinnati area to Chicago, and from Chicago to Jordan (on Turkish Airlines). Alebbini intended to enter Turkey and skip his flight to Jordan. But, if he could not do so, he would travel to Jordan and make his way to ISIS from his family's home in Northern Jordan. The CHS did not purchase the airline ticket for Alebbini; rather, Alebbini (or his purported spouse), decided to use the money given to them by the CHS to purchase a plane ticket to Jordan.

On April 24, 2017, the FBI learned from the United States Department of Homeland Security that "Lath Alebbini" was booked as a passenger on flights from the following locations:

1. From Cincinnati-Northern Kentucky International Airport to Chicago O'Hare International Airport on April 26, 2017;

2. From Chicago O'Hare International Airport to Ataturk International Airport, which is located in Istanbul, Turkey, on April 26, 2017; and

6

    3. From Ataturk International Airport to Queen Alia International Airport, which is located in Amman, Jordan, on April 27, 2017.

On April 26, 2017, Alebbini traveled to the Cincinnati-Northern Kentucky International Airport, obtained a boarding pass, and walked toward airport security, where the FBI arrested him. During Alebbini's post-arrest, *Mirandized* interview, Alebbini discussed ISIS. The Grand Jury indicted Alebbini after finding probable cause that Alebbini attempted to provide material support and resources to ISIS in violation of 18 U.S.C. § 2339B. Following Alebbini's arrest, the FBI executed search warrants on Alebbini's cellular telephone, residence, luggage, and online accounts, through which the FBI learned that Alebbini conducted more than 300 searches for ISIS-related news and propaganda.

    **F.    Alebbini Still Intends To Join ISIS**

After Alebbini's arrest, the Magistrate Judge ordered Alebbini detained pending trial. Since that time, Alebbini has continued talking with his purported spouse and others about his intention to travel overseas and engage in violence. For example, in June 2017, Alebbini told his purported spouse during one phone call from jail, ". . . look, look, I will not stay. I will not stay. I, I didn't talk this thing as a joke . . . Assad will not stay alive. That's it." Alebbini later told his purported spouse, "I'm still gonna go. Because if I don't go, I'm not gonna be me . . . Of course I'm never going to stop until my mission is complete."

Beyond Alebbini's uncompromising desire to complete his "mission" by traveling overseas to join ISIS, Alebbini also discussed his eagerness to leave the United States because of its culture:

> If you burn somebody that burns you, like if I burn your hand, you can burn my hand. And, that pilot [referring to the Jordanian pilot burned by ISIS] burned some people so the Islamic State burned him because he burned some people. So when you look at it and you look and see is different from how I feel. The United States of America has burned a lot of people. The United States of America has burned

7

> the most people out of anybody in the world. You know how? In the culture. They burn people from the inside out.

Rather than expose his children to the United States, Alebbini preferred they become mujahideed: "I'm going to make them soldiers for Allah. They all [referring to his children] gonna fight in the sake of Allah. They all going to be mujahideen." Alebbini told his wife that he wants "martyrdom" for their son, who, at that time, was one-month old.

### G. Procedural History Relating to the Government's CIPA Section 4 Filing

On October 10, 2017, the government filed a motion for a pretrial conference pursuant to CIPA Section 2, notifying the Court that it anticipated possible issues relating to classified information, particularly concerning discovery, and requesting that the Court establish a January 31, 2018, deadline for filing a CIPA Section 4 motion. On January 11, 2018, the government requested an extension up to and including March 1, 2018, by which to make a CIPA Section 4 filing. The Court granted the extension on January 16, 2018. On February 16, 2018, the Court held a telephone conference during which it scheduled an *in camera* hearing for March 15, 2018, with respect to the government's anticipated CIPA section 4 filing. The Court also instructed the defense that it could make its own *ex parte* filing, by March 1, 2018, as well.

On March 1, 2018, the government filed its CIPA Section 4 motion and provided notice of that filing. On the same day, the defense filed its Motion for an Order to Produce Information Relative to CIPA Section 4. Contemporaneously, the defense also served the government with a discovery letter requesting, among other things,

> All recorded and/or monitored statements that the government obtained via electronic and/or recording devices, including but not limited to the following methods: telephone wiretapping pursuant to state or federal court authorization; telephone wiretapping don without court approval; wired informant(s); and/or law enforcement officer(s), and/or agents of law enforcement officer(s); surreptitious monitoring and/or recording by electronic equipment wherever utilized.

**ARGUMENT**

Defendant argues that that the Court should: (1) order the government to produce any communications of defendant that were intercepted under FISA, Title III, or any other authority, and (2) allow the defense to participate in the CIPA Section 4 in camera hearing. As explained below, defendant's argument misconstrues the process under CIPA and the government's discovery obligations under governing rules and case law. The motion should largely be denied, although, as also explained below, one component of the motion should be granted.

### A. Communications of Defendant that were Intercepted under FISA, Title III, or Any Other Authority: The Government Will Produce All Discoverable Information to the Defense—Just as It Does in Every Criminal Case

Production of defendant's statements: Rule 16: Federal Rule of Criminal Procedure 16 identifies specific categories of information that must be produced to the defense in a criminal proceeding. The rule includes "any *relevant* written or recorded statement by the defendant" and documents or objects in the government's possession if it is "material to preparing the defense . . . or the item was obtained from or belongs to the defendant." Fed. R. Crim. P. 16 (emphasis added.) In this case, the government reviewed the information in its possession and identified whether any information was discoverable under Rule 16. To the extent the government identified discoverable information subject to Rule 16—such as relevant statements of the defendant—the government produced (or will produce) such statements. No rule, however, requires the government to produce *all* statements—i.e., to include irrelevant statements— uttered by a defendant. *See United States v. Yunis*, 867 F.2d 617, 624 n. 10 (D.C. Cir. 1989); *United States v. Disston*, 612 F.2d 1035, 1037 (7th Cir. 1979).

Production of defendant's statements: *Brady* and related authorities: The government also must produce information that is favorable to the accused, including information that is

9

material to the accused's guilt or innocence, the credibility of any government witness, or punishment of the accused (should there be a conviction). *See*, *e.g.*, *Brady v. Maryland*, 373 U.S. 83 (1963); *Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *Jencks v. United States*, 353 U.S. 657 (1957); 18 U.S.C. § 3500. These extensive discovery obligations apply even though there is no constitutional right to discovery. *See*, *e.g.*, *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one."). Rather, the government's discovery obligations derive from jurisprudence and the Federal Rules of Criminal Procedure. The government understands—and has been complying and will continue to comply with—these discovery obligations. These discovery rules apply in all criminal cases, regardless of whether any classified information exists.

Production of defendant's statements: Classified Information. The Sixth Circuit has already considered the application of the Classified Information Procedures Act ("CIPA") to discovery in criminal cases. *United States v. Amawi*, 695 F.3d 457 (6th Cir. 2012). Indeed, the Sixth Circuit has adopted the analysis and standard set out in *Yunis,* 867 F.2d 617, for the discovery of classified information. *Amawi*, 695 F.3d at 470 ("we now apply the *Yunis* 'relevant and helpful' standard"); *United States v. Hanna*, 661 F.3d 271, 295 (6th Cir. 2011). Other circuit courts have done the same. *See*, *e.g.*, *United States v. Mejia*, 448 F.3d 436, 455-57 (D.C. Cir. 2006); *United States v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004); *United States v. Klimacvicius-Viloria*, 144 F.3d 1249, 1261 (9th Cir. 1998); *United States v. Varca*, 896, F.2d 900, 905 (5th Cir. 1990).[3]

---

[3] The defense refers to classified information being "privileged under the 'state secrets privilege.'" (R. 25, Motion at 194.) The state-secrets privilege is a civil concept and should not be confused with the classified-information privilege, which applies in criminal cases. Only one circuit court applies the state-secrets privilege in criminal cases involving national security. *See United States v. Aref*, 533 F.3d 72, 78 (2d Cir. 2008). And several circuit courts appropriately have disagreed with the *Aref* holding. *See*, *e.g.*, *United States v. El-Mezain*, 664 F.3d 467, 520 (5th Cir. 2011) (discussing the separate

The *Yunis* relevant-and-helpful standard adopted by the Sixth Circuit involves a three-step analysis. First, the information must be relevant. Second, the court must determine whether the government asserted a colorable claim of privilege over the information. *See Hanna*, 661 F.3d at 295 ("[A] protective order will only issue against disclosure of classified information . . . that has been determined by the United States Government . . . to require protection against unauthorized disclosure for reasons of national security."). Third, the court must find the information to be actually helpful to the defense because "classified information is not discoverable on a mere showing of theoretical relevance." *Amawi*, 695 F.3d at 469-470; *Yunis*, 867 F.2d at 621.

The defense incorrectly refers to the three-part analysis as a "low hurdle" before classified information should be produced to the defense. R. 25, Motion at 194. The "low hurdle" relates only to step one—that is, the information must be relevant. *Amawi*, 695 F.3d at 470 (stating "[f]irst, the court must assess whether the information 'crosses the low hurdle of relevance'" before identifying the remaining two steps in the *Yunis* analysis) (quoting *Yunis*, 867 F.2d at 623). But, even when classified information crosses the "low hurdle" relevance threshold, it need not be produced unless it also is more than theoretically relevant. Simply, the government's discovery obligations with regard to classified information extend only to that which is actually relevant and helpful to the preparation of the defense. The government must review the information in its possession, custody, and control, and it must identify discoverable information for production to the defense—just as it does in all criminal cases. The government complied with its discovery obligations in this case.

---

bases for the state-secrets privilege and the classified-information privilege); *United States v. Rosen*, 557 F.3d 192, 198 (4th Cir. 2009) (refusing to apply the state-secrets privilege to criminal cases).

11

What is more, the defense asserts, "[i]t is hard to imagine anything more essential to a defense of an attempt crime than the actual recorded words of the defendant intercepted by the government." (R. 25, Motion at 195.) The government takes no position on what category of information is most "essential" to the defense. But "the actual recorded words of the defendant" must be produced—as required by Rule 16 and potentially *Brady* and other jurisprudence—only when "the actual words of the defendant" are actually relevant and helpful to the preparation of the defense. *See* Fed. R. Crim. P. 16 (stating, in part, "**any relevant** written or recorded statement by the defendant . . . ." (emphasis added). *See also Amawi*, 695 F.3d at 470 (requiring the production of information that is actually relevant and helpful to the preparation of the defense). Indeed, as the Court in *Yunis* recognized, although the statements of a defendant may qualify for a "near presumption of relevance," that near presumption:

> is only that—a near presumption and not an absolute one. The very use of the adjective "relevant" as a modifier of the nominative "written or recorded statements made by the defendant" in Rule 16(a)(1)(A) necessarily implies the existence of irrelevant statements by the defendant.

867 F.2d at 624 n.10. Simply, the defense is not entitled to any and all information in the government's possession merely because the government decided to prosecute an individual for attempting to join a terrorist organization that kills civilians. The defense is entitled to information that is discoverable—as that term is defined by statute, rules, and case law.

The defense also takes issue with the government's role in deciding what information is relevant and helpful, and therefore discoverable. But, in every case, the government makes discovery determinations without involving the court, or the defendant:

> Ordinarily, the government alone determines whether material in its possession must be turned over to a defendant. When the defendant requests exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963), for example, the government decides which information must be disclosed. [ ] Unless the defense

12

>counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final.

*United States v. Campa*, 529 F.3d 980, 995 (11th Cir. 2008). And, even when the Court becomes involved in discovery decisions (e.g., in a CIPA *ex parte* or *in camera* review), that does not mean the defendant becomes involves in those decisions as well. "When a court (rather than the prosecutor alone, as is ordinarily the case) reviews evidence in camera to determine whether it constitutes a witness statement subject to disclosure under the Jencks Act . . . or exculpatory material subject to disclosure under *Brady*, the defendant is likewise 'not entitled to access of any of the evidence reviewed by the court . . . to assist in his argument' that it should be disclosed." *Mejia*, 448 F.3d at 458 (quoting *United States v. Carson*, 2002 WL 31246900 at *1 (D.C. Cir. 2002); *see also United States v. El-Hanafi*, 2012 U.S. Dist. LEXIS 23403, 2-3 (S.D.N.Y. 2012) ("The Court recognizes that Defendants and their counsel are in the best position to know whether information would be helpful to their defense, but notes that in the ordinary course of proceedings, neither defense counsel nor the Court would be reviewing materials that the Government believes are not discoverable.").

Indeed, defendant's motion fails to recognize that the CIPA processes used by the government exist precisely so courts may ensure that both defendants' constitutional rights and classified information are protected. Here, unlike the ordinary discovery process in criminal cases, the government provided the Court with certain materials pursuant to CIPA Section 4. The Court has the opportunity to review the government's discovery decisions. Following the Court's *ex parte* and *in camera* review of the government's filing, there can be no doubt that the defense receives greater procedural protections in this case than it receives when the government—in any case—produces unclassified discovery without involving the court.

To the extent the defense argues that Alebbini's own statements cannot be classified—that simply is not the case. As the court recognized in *Yunis*, the government may have an interest in protecting the source and means of surveillance that goes beyond protection of the actual contents of an intercepted conversation. *See Yunis*, 867 F.2d at 623 ("Things that did not make sense to the District Judge would make all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence-gathering capabilities from what these documents revealed about sources and methods."); s*ee also El-Mezain*, 664 F.3d at 522 (rejecting defendant's arguments that one's own statements cannot be classified); *United States v. Abu Ali,* 528 F.3d 210, 253 (4th Cir.2008) ("[W]e have no authority to consider judgments made by the Attorney General concerning the extent to which the information in issue here implicates national security.").

Identification of defendant's statements not produced. Relatedly, the defendant argues that the government should, at minimum, "disclose the existence of any of Laith's intercepted communications to at least allow the defense an opportunity to be heard on whether the *in camera* hearing set for March 15, 2018 should be *ex parte*." (R. 25, Motion at 197); *see also* R. 25, Motion at 195 ("the government should confirm or deny the existence of intercepted communications.").) As explained above, the government is not required to *produce* any and all of defendant's statements regardless of relevance or helpfulness. Similarly, the government is not required to *identify* any and all of defendant's statements regardless of relevance or helpfulness. The defendant has not pointed to any authority to support his request, and the government is not aware of any such authority. As stated, the government is aware of its discovery obligations. But, the government's discovery obligations are not limitless and do not extend to identifying statements of the defendant irrespective of relevance or helpfulness. As

14

such, the government should not be compelled to produce or identify any and all intercepted communications, or to "confirm or deny" anything.

Moreover, each of the statutory regimes for interception mentioned by the defendant in his motion—Title III and FISA—contain their own notice requirements that obligate the government to provide notice of interception under enumerated circumstances. *See, e.g.*, 18 U.S.C. § 2518(8)(d) (Title III); 50 U.S.C. §§ 1806(c), 1825(d), and 1845(c) (FISA); *United States v. Thomas*, 201 F. Supp. 3d 643, 647 (E.D. Pa. 2016) ("the fact that a defendant was surveilled pursuant to FISA is not something the Government must disclose unless several statutory criteria have been met."); *In re: Sealed Case*, 310 F.3d 717, 741 (U.S. Foreign Intelligence Surveillance Court of Review 2002) ("FISA does not require notice to a person whose communications were intercepted unless the government 'intends to enter into evidence or otherwise use or disclose' such communications in a trial or other enumerated official proceedings."). If the criteria for notification under any of these statutory regimes were present in this case, the government would be obligated to provide notice in this case. The government has not provided notice pursuant to these provisions in this case. Further, courts have rejected defendants' attempts to require the government to confirm or deny information related to various surveillance techniques. *E.g.*, *United States v. Shelton*, 30 F.3d 702, 707-08 (6th Cir. 1994) (rejecting defendant's argument that government was required to affirm or deny electronic surveillance under Title III); *Thomas*, 201 F. Supp. 3d at 650 (rejecting defendant's argument that she was entitled to notice and discovery of all classified surveillance programs used by government). This case is no different.

15

B.  **Participation in the CIPA Process: The Sixth Circuit Expressly Permits CIPA Proceedings To Be Conducted *Ex Parte* and *In Camera*, and the Court and the Government Previously Told the Defense—On the Record—that the Defense Could File Its Own Submission with the Court Ex Parte and In Camera**

Both CIPA and Rule 16(d)(1) authorize the United States to submit *ex parte* motions seeking *in camera* review of classified information and to engage in *ex parte* hearings—both before and during trial—as part of the CIPA process.[4] The Sixth Circuit held district courts may use the *ex parte* process during its consideration of the relevance, use, and admissibility of classified information. *Amawi*, 695 F.3d at 472-73. The Sixth Circuit explained, "every court that has considered this issue has held that CIPA permits *ex parte* hearings." *Amawi*, 695 F.3d at 472.

The Sixth Circuit further recognized the value in allowing the *ex parte* submission of written products and *ex parte* hearings. "To the extent that the defendant is asserting that the government is limited to written submissions and affidavits to be considered *in camera*, rather than an *ex parte* hearing, such an argument would raise form over function, to the detriment of the defense." *Amawi*, 695 F.3d at 472. The Sixth Circuit continued, "[t]he district court's role in determining whether any classified information is 'relevant and helpful' could only be aided—for the benefit of the defense—through the court asking probing questions of the government, rather than relying only on written submissions." *Amawi*, 695 F.3d at 472. The purpose of CIPA

---

[4] Section 4 of CIPA requires no particular showing by the government before the court may grant a request to proceed *ex parte* and *in camera*. Section 4 states a district court, "upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove." 18 U.S.C. App. III, § 4.

Rule 16(d)(1) contains a similar provision to that found in CIPA Section 4: "At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect *ex parte*."

16

is to "provide a means for the courts to oversee the government's authority to delete evidence from discovery. To permit defense counsel to participate in such a hearing would frustrate the aim of CIPA." *Amawi*, 695 F.3d at 472.

The D.C. Circuit came to the same conclusion in *Mejia*. There, the D.C. Circuit refused to find error where the defense was not allowed to participate in the district court's *ex parte* and *in camera* inspection of classified documents. The defense argued that CIPA contemplates *inter partes* judicial determinations regarding the disclosure of classified information. *Mejia*, 448 F.3d at 457. The defense also argued that its Sixth Amendment right to confront witnesses was "eviscerated by the denial of an opportunity to review the materials." *Id*. at 458. The D.C. Circuit, however, disagreed. The D.C. Circuit relied on the Supreme Court's holding that "the right to confrontation is a trial right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination," and it does not create a right to pretrial discovery. *Id*. at 458 (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987)).

The Fourth Circuit likewise found "[a] defendant's right to see the evidence that is tendered against him during trial, however, does not necessarily equate to a right to have classified information disclosed to him prior to trial." *United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008).

The *ex parte* nature of CIPA Section 4 has been upheld without exception as the proper practice. *See*, *e.g.*, *Abu Ali*, 528 F.3d at 246 ("Section 4 allows the United States to request such an authorization by *ex parte* written statement."). "The right that section four confers on the government would be illusory if defense counsel were allowed to participate in section four proceedings because defense counsel would be able to see the information that the government asks the district court to keep from defense counsel's view." *Campa*, 529 F.3d at 995. In this

17

case, the Court should conduct the CIPA Section 4 process in an *ex parte* manner, just as the Sixth Circuit found to be proper and, without exception, given that "every court that has considered this issue has held that CIPA permits *ex parte* hearings." *Amawi*, 695 F.3d at 472.

The defense asks the Court for permission to present the Court *ex parte* and *in camera* with "reasons why categories of potentially classified evidence may be relevant, material, and/or helpful to the defense in this case." (R. 25, Motion at 196-97.) The government has no objection to the defense making its own *ex parte* and *in camera* presentation to the Court. In fact, the government—on two separate occasions during status conferences with the Court and the defense—suggested that the defense file *ex parte* and *in camera* its theory of the case, which might help the Court when reviewing the government's filing.

**CONCLUSION**

For the foregoing reasons, this Court should deny the defense motion, except that the defense should be allowed to present—*ex parte* and *in camera*—its theory of the case, including proposed categories of information it feels are relevant, material, and helpful to the defense.

Respectfully submitted,

BENJAMIN C. GLASSMAN
United States Attorney

s/Vipal J. Patel
VIPAL J. PATEL (CA 156212)
First Assistant United States Attorney
DOMINICK S. GERACE (OH 0082823)
Assistant United States Attorney
200 West Second Street, Suite 600
Dayton, Ohio 45402
Office: (937) 225-2910
Fax: (937) 225-2564
vipal.patel@usdoj.gov
dominick.s.gerace@usdoj.gov

s/Justin Sher
JUSTIN SHER (DC 974235)
Trial Attorney
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20004
Office: (202) 353-3909
justin.sher@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that this pleading was filed with this Court on this 9th day of March 2018, a process that automatically provides an electronic copy to all counsel of record.

                                            s/Vipal J. Patel
                                            VIPAL J. PATEL (CA 156212)
                                            First Assistant United States Attorney