**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| vs. | : | Case No. 3:17CR071 |
| LAITH ALEBBINI, | : | JUDGE WALTER H. RICE |
| Defendant. | : | |

<u>**SENTENCING MEMORANDUM OF DEFENDANT LAITH ALEBBINI**</u>

Now comes the Defendant, LAITH ALEBBINI, by and through counsel, and hereby submits this sentencing memorandum for the Court's consideration in sentencing.

**Introduction**

It is the rare case with unique facts and a particularly unusual defendant for the parties' sentencing recommendations to be so far apart. The Final Presentence Investigation Report recommends an aggregate term of 360 months - 30 years in federal prison for the two counts of conviction. The government is not satisfied with 30 years, however, and urges this Court to sentence Mr. Alebbini, a first time offender with no criminal history, to 240 months for each count of conviction to be run consecutively for a total of 480 months – 40 years in federal prison. After spending nearly two years with Mr. Alebbini and his family while the case was litigated, counsel states that a sentence not even one tenth that recommended by the Probation Department is necessary to comport with the statutory purposes of sentencing. Whatever the sentence imposed, Mr. Alebbini will certainly be removed from the United States and never permitted to return.

The attempt and conspiracy charges brought by the government were a preventative prosecution. Such prosecutions rest on inchoate steps that the government posits *could* have led

to acts of terrorism.  The government conceded as much when the lead FBI agent testified at trial that they were not going to arrest Mr. Alebbini until he actually took his boarding pass and began to make his way towards airport security, thereby establishing his actual intent to board the flight and thus taking a substantial step as required by law to support a conviction for attempt.  Had he turned around and walked out, the government said they would not have arrested him that day, nor could they have, because he had done nothing to violate the law.  The government simply had no evidence that he had contacted anyone from ISIS and certainly no evidence that he was planning any terrorist attack in the United States or abroad.

Mr. Alebbini exercised his right to trial before this Court because he maintains that he did not possess the requisite specific criminal intent to place himself under the direction and control of ISIS when he was arrested, and he believed the totality of circumstances could not support the finding that he took a substantial step.  He also contends he did not agree with his cousin Raid to place themselves under the control of ISIS, but rather he wanted to go see first if ISIS was the right group.  He does not dispute that he intended to get on the flight and make his way to Syria.  Mr. Alebbini argued to the Court that up to the very moment of his arrest he still had some doubt as to what was actually happening on the ground in Syria, and also what group was most effective fighting against al-Assad.  He maintains he could not have completed a substantial step until he ascertained for himself with his own senses what ISIS really was.  Up to this point, he had no firsthand knowledge of ISIS and instead relied solely on what he found on the internet.

He never communicated with anyone from ISIS, and he was travelling with only a few hundred dollars.  The only thing he was sure of was that he had to do something to fight the murderous Bashar al-Assad regime in Syria.  Counsel informed the Court in the opening statement that Mr. Alebbini was largely not disputing the government's evidence, but rather the issue at trial

2

was what that evidence meant in relation to the charged offenses and his specific intent. The government secured a conviction almost exclusively based on hours and hours of surreptitious recordings made by a cooperator, and the statements made by Mr. Alebbini to law enforcement about The Islamic State and how he had no choice but to get to Syria to help his fellow Muslims being slaughtered by Bashar al-Assad.

Mr. Alebbini respects the guilty verdicts delivered by the Court, and understands that his own words and actions may surely lead to the conclusion that he had made up his mind that the Islamic State was the right group. But the crucial issue the government ignores by recommending Mr. Alebbini's life essentially be forfeit is what Mr. Alebbini *believed the Islamic State actually was* at the time of his arrest. Mr. Alebbini believed that ISIS was a power for good, effectively fighting Bashar al-Assad in Syria and laying the foundations for a "United States of Arabia" – an ideal held by himself and many other Muslims around the world.

He felt he could take with him what he had learned about the federalist system in the United States and bring those lessons to the emerging caliphate. He thought the area controlled by ISIS in Syria and Iraq was filled with doctors and lawyers and engineers all united under a shared religious belief. He did not believe they were mindless killers perpetrating acts of terror. The Court heard hours of debates with his friends and family where he assured them they were wrong about ISIS, but that if he got over to Syria and realized The Islamic State were a group of immoral cold-blooded terrorists that he would fight against them. Those who knew him best were not afraid that he had become a radicalized murderer prepared to kill innocent people. To the contrary, they were concerned that his empathy and obsession with the Syrian civil war coupled with his compulsive use of marijuana and hours upon hours of internet searches had led him down a rabbit hole of ISIS propaganda. They were afraid not that he would hurt anyone, but that ISIS would kill

3

him if he made his way to Syria and refused to join them after he saw what they really were. He had bought into the ISIS propaganda that they had already returned the promised Islamic Caliphate and were under attack.

Dr. Vidino, the government's expert, testified at length about the unprecedented level of propaganda put on-line by ISIS to have this precise effect on Muslim men and women living in other parts of the world. A great deal of his testimony at trial was devoted to discussing how ISIS appropriated the Muslim belief in an Islamic Caliphate and invests an unprecedented amount of resources into their propaganda machine which, because of the internet, could be directly disseminated to troubled Muslims all over the world. Mr. Alebbini did not show the government informant ISIS beheading videos, or videos about perpetrating attacks against innocent civilians. He played one video that depicted a utopian version of the Islamic State. The Court heard his own words that he was confused by conflicting reports about ISIS and was desperate to find out for himself what was really happening in Syria.

In urging the Court to impose 40 years of incarceration, the government, having combed through hours upon hours of recorded conversations, tries to justify this absurd result by making the argument that a fraction of Mr. Alebbini's words suggest he *could* be capable of violence. Specifically, the government points to isolated statements that he wanted to be an inghimasi soldier, or that he wished destruction to King Abdullah of Jordan or any other government that threatened the existing Islamic Caliphate he believed The Islamic State had created. Here again, the government ignores the context of these statements just like they ignore the fact that Mr. Alebbini did not believe that ISIS were blood thirsty terrorists. Mr. Alebbini believed that the Islamic State had created a legitimate, geo-political territory. These alleged violent statements are his impassioned musings to friends that he would die to defend what he believed was a sovereign

4

territory possessing the right any legitimate nation state would have to protect itself against invaders.  These isolated statements are simply a tremendous stretch by an over eager prosecution and not evidence Mr. Alebbini is a monster that the Court needs to incarcerate for four decades.

Mr. Alebbini submits that an appropriate sentence in this case would be a sentence of time served.  This sentence would take into account Mr. Alebbini's good character, his lack of criminal record, the seriousness of the offense, and the sentences of similar defendants.

**Acceptance of Responsibility**

Mr. Alebbini raises one additional objection to the Presentence Report.  As noted in application note 2 to U.S.S.G. §3E1.1, "[i]n rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.  This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)".  Mr. Alebbini waived a jury and stipulated to nearly every piece of evidence offered by the government.  Additionally there were very few factual disputes.  The trial almost exclusively focused on the application of the undisputed facts to the law.  By all accounts, this was the first trial of its kind in the Southern District of Ohio.  Mr. Alebbini simply questioned whether the statute applied to his conduct in the absence of any evidence of contact with ISIS or any evidence he was involved in any way with terrorism.  He stipulated to most everything else to streamline the process as much as possible.  This is the rare case where acceptance should be given even after a trial.  While he may disagree that the case was proven beyond a reasonable doubt, he accepts the judgment of the Court.

Not to mention the government holds all of the cards in these prosecutions given the sentencing framework. When he refused to plead to the original one count indictment, the

government superseded by adding a conspiracy charge. No additional facts were alleged beyond those that were in the original criminal complaint. The alleged co-conspirator, Raid Ababneh, was in Jordan at the time. He was detained, and then subsequently released by the Jordanian authorities. He is now by all accounts living free in Jordan. Even had Mr. Alebbini plead to the one count indictment before the conspiracy charge was added, he was still likely facing an advisory guideline range of 292-365 months because of the possibility of the terrorism enhancement. While the government then offered to dismiss the conspiracy charge for a plea to the original attempt charge, this was hardly appetizing given the guideline range the government would undoubtedly seek for the attempt charge – 292-365 months *after* acceptance of responsibility. Although the guidelines are advisory, this is quite the scary potential starting point on a plea of guilty.

The lack of a reasonable plea offer was a significant factor in Mr. Alebbini's decision to take this case to trial. In essence, the government gave Mr. Alebbini little choice but to take this case to trial, or accept a sentencing recommendation of 30 years for what essentially is a thought crime. In a case as this, where the defendant does not dispute the underlying facts, but only disputes what those facts legally mean, acceptance of responsibility should be granted.

**The Terrorism Enhancement should not be applied in this case.**

The Probation department has calculated Mr. Alebbini's base offense level to be 26. Applying the Victim Related Adjustment for Terrorism ("terrorism enhancement") increases Mr. Alebbini's total offense level to 38 and his Criminal History Category from I to VI. The three level downward departure for Mr. Alebbini's acceptance of responsibility was not recommended. This yields a final offense level of 38, resulting in a recommended sentencing range of 360 - 480 months. Because the maximum term of incarceration for each count of conviction is 240 months, that becomes the starting advisory guideline sentence. Without this enhancement, the final offense

6

level without acceptance of responsibility is 26 with no criminal history for an advisory range of 63-78 months. Even if the Court applied the terrorism enhancement but granted a U.S.S.G. § 4A1.3(b) downward departure for over-representation of criminal history down to criminal history category I (which is clearly warranted) the advisory range would still be 235-293, basically the statutory maximum for all intents and purposes.

Mr. Alebbini has a pending objection to the terrorism enhancement characterized by the government as a "crazy play on words". Mr. Alebbini would not have been compelled to go to Syria if Bashar al-Assad was not murdering the Syrian people. The evidence shows this was the "but-for" cause of his actions. As noted above, the government has cherry picked portions of Mr. Alebbini's recorded conversations that he was prepared to defend the Islamic State against all enemies, including the United States. He made passionate boasts during arguments with friends and family that the Islamic State would eventually expand and he would be a soldier willing to die for the cause. But any such isolated statements arose from his erroneous belief that The Islamic State *were not evil terrorists* and had in fact established the legitimate Islamic Caliphate many moderate Muslims believe is forthcoming. His sole intent was to take out Bashar al-Assad and his government, a government the United States does not recognize as legitimate.

In deciding the application of such an important enhancement, the fact that the "government" at issue is condemned, illegitimate and unrecognized by the United States is no mere "play on words". Certainly, such a murderous regime was not what Congress had in mind in 1994 when it directed the Sentencing Commission to create a terrorism enhancement for those offenses "calculated to influence or affect the conduct of government". The evidence cannot support a finding that Mr. Alebbini intended to affect the conduct of "government" when that government is illegitimate. For this reason alone, the terrorism enhancement should not apply.

7

**Potential Constitutional Issue**

This enhancement has been the subject of much scholarly debate and courts have struggled with its application.  *See* James P. McLoughlin Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51 (2010). Available at: http://scholarship.law.umn.edu/lawineq/vol28/iss1/2  *See also Punishing Terrorists: Congress, The Sentencing Commission, The Guidelines, And The Courts,* 23 Cornell J.L. & Pub. Pol'y 517 (2014). (Attached as Exhibits A and B respectively).

In <u>McMillan  v.  Pennsylvania</u>, *477 U.S. 79, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986)*, the Supreme Court implied that sometimes a higher standard of proof beyond the preponderance of the evidence may be warranted in cases where the sentencing enhancement in question is "a tail which wags the dog of the substantive offense." *Id. at 88*.

As James McLoughlin noted in deconstructing this enhancement, the enhancement is draconian and represents the classic "tail wagging the dog" perspective.  *23 Cornell J.L. & Pub. Pol'y* at 535. The Due Process Clause of the Fifth Amendment and the Trial by Jury Clause of the Sixth Amendment requires a reasonable doubt finding after the *Booker* and *Blakely* decisions. This is especially true because this enhancement has become, in effect, mandatory in material support convictions. It is essentially the norm in all of these prosecutions.  *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011).  This enhancement essentially creates a separate offense, an offense that requires a separate finding of intent – specifically that Mr. Alebbini's actions were "calculated" to influence the conduct of government.  This – of all enhancements – must be what the Supreme Court envisioned in *McMillan* when it talked about the "tail which wags the dog of the substantive offense."  Here, where the enhancement raises the range from 63-78 months up to

8

360-480 months, the government should have to prove to this Court at sentencing that the terrorism enhancement applies beyond a reasonable doubt. The government cannot meet this burden.

### Policy Disagreements

Even if the Court does not grant this objection, the Court should conclude that the enhancement is inherently flawed, and refuse to apply it in this case. After *Kimbrough*, this Court is free to openly disagree and give this enhancement little or no weight. As noted by John McLoughlin, there was not much empirical data on terrorism sentences when the Sentencing Commission promulgated it. *23 Cornell J.L. & Pub. Pol'y* at 537. Additionally, Dr. Vidino was clear that ISIS presents new challenges in using the internet to recruit Muslims by using propaganda and perverting traditional ideals of the Islamic faith. Neither the Congress nor the Sentencing Commission could have envisioned how a group like ISIS would use the internet to ensnare individuals like Laith Alebbini in 1994 – thereby exposing young first time non-violent offenders to statutory maximum sentences. It is important to recognize that the internet as we know it did not exist at the time the Sentencing Commission promulgated this guideline.

ISIS' powerful ability to recruit American youth on social media is by now a well-documented phenomenon. *See, e.g.*, Lorenzo Vidino and Seamus Hughes, *ISIS in America: From Retweets to Raqqa*, Program on Extremism, The George Washington University (December 2015) ("U.S. authorities estimate that several thousand Americans consume ISIS propaganda online creating what has been described as a 'radicalization echo chamber.'"); Testimony of James B. Comey, Director, Federal Bureau of Investigation (FBI), Senate Select Committee on Intelligence, *Counterterrorism, Counterintelligence, and the Challenges of "Going Dark,"* July 8, 2015 ("Social media has allowed groups, such as ISIL, to use the Internet to spot and assess potential

recruits. With the widespread horizontal distribution of social media, terrorists can identify vulnerable individuals of all ages in the United States).

As noted by Lorenzo Vidino and Seamus Hughes, "In many cases examined by our research team [the Program on Extremism at George Washington University], an underlying sense of sympathy and compassion appeared to play an important role in initially motivating young Americans to become interested and invested in the Syrian conflict." *ISIS in America: From Retweets to Raqqa*, THE GEORGE WASHINGTON UNIVERSITY (2015) p. 15. *See also*, Testimony of Peter Bergen, Director, International Security Program, New America and Profession of Practice at Arizona State University, U.S. Senate Committee on Homeland Security and Governmental Affairs, *Jihad 2.0: Social Media in the Next Evolution of Terrorist Recruitment*, May 7, 2015 ("In the minds of ISIS' recruits, the group is doing something that is of *cosmic importance* that is sanctioned by Allah: defending Sunni Muslim civilians from the terrible onslaughts of the Assad regime, which has not hesitated to use chemical weapons in its war against its own people.")(emphasis in original).

The terrorism enhancement took effect nearly four years *before* the Islamic State of Iraq and the Levant was established in 1999. In the wake of September 11, 2001, the Patriot Act instituted a new base offense level for providing material support to a designated foreign terrorist organization. Any prison sentence imposed under these new guidelines is also subject to the terrorism enhancement. This is simply preposterous when applied to the facts that came out of this trial and it defies logic how one could argue an advisory range of 360-480 months is proper. ISIS did not declare they had formed the Islamic State until mid - 2014, and that is when ISIS began their on-line propaganda war using the Syrian civil war to recruit vulnerable Muslims all over the world.

10

Importantly, this draconian terrorism enhancement is not based on empirical data. *See* 23 Cornell J.L. & Pub. Pol'y at 537, *supra*. Nor has it evolved with the modern hyper-connected world of the internet that we now inhabit. The Court should not apply the terrorism enhancement to Mr. Alebbini, and the Court is free to disagree with the policy underlying this enhancement to achieve this result.

**Section 3553(a)**

Setting aside the *advisory* sentencing guidelines, the highly individualized assessment of the § 3553(a) factors should lead this Court to the conclusion that any sentence suggested by the guidelines is far greater than necessary to comport with the purposes of sentencing.  In fact, the pertinent factors suggest that a variance from the advisory guidelines without the terrorism enhancement is warranted.

**Nature and Circumstances of the Offense.**

The Court has had the advantage of reviewing all of the evidence introduced by the parties at the bench trial.  The Court gave a thoughtful explanation why the government met its burden in proving these inchoate crimes.  Yet, while the government seeks to portray him as a violent individual, Mr. Alebbini is not a violent man. The government could offer no evidence that Mr. Alebbini ever plotted, let alone committed, any acts of violence. There is no evidence that Mr. Alebbini had any contact with ISIS.  Nor is there evidence that he ever contemplate any violence against anyone other than Bashar al-Assad.

Mr. Alebbini loves to talk, and the government must rely on isolated alleged violent statements taken out of context to justify this prosecution and turn it into something it is not.  One shudders to think what the government would be able to do if they took every heated family argument as proof of intent to commit violence.  The undeniable fact is that he had no specific

11

plan, let alone the money necessary, to make this trek to Syria. And as Dr. Vidino opined, it is highly unlikely he would have made it through any meaningful ISIS vetting process. In fact, the likely outcome would have been that Mr. Alebbini would have been killed by ISIS on the spot.

As noted above, these ISIS Material Support cases involving younger defendants with no criminal record, who want to migrate to Syria, are a new phenomenon. Dr. Vidino opined that we are not doing nearly enough as a country to counter the ISIS propaganda that contribute to these new breed of defendants. Maybe that is because the current President has declared that ISIS is 100% defeated. This was not the case, however, prior to 2016.

In August 2011, President Obama signed the *National Strategy for Empowering Local Partners to prevent Violent Extremism in the United States* ("National Strategy"), which outlines a community-based approach to preventing violent extremists from inspiring, radicalizing and recruiting individuals in the United States.[1] The National Strategy includes the provision that the government strive to use a wide range of good governance programs including those that provide "social services" to prevent and address radicalization. *Id*. at 8. A few months later, in December of 2011, the White House released its *Strategic Implementation Plan for Empowering Local Partners to Prevent Violent Extremism in the United States* ("Strategic Implementation Plan"), in an effort to form a coherent method to implement the National Strategy.[2] The Strategic Implementation Plan identifies three priority areas of action: (1) enhancing Federal engagement

---

[1] Office of the President of the United States, *Empowering Local Partners to Prevent Violent Extremism in the United States*, August 2011, https://www.whitehouse.gov/sites/default/files/empowering_local_partners.pdf ("Communities are best placed to recognize and confront the threat [of radical ideology] because violent extremists are targeting their children, families, and neighbors. Rather than blame particular communities, it is essential that we find ways to help them protect themselves. To do so, we must continue to ensure that all Americans understand that they are an essential part of our civic life and partners in our efforts to combat violent extremist ideologies and organizations that seek to weaken our society.").

[2] Office of the President of the United States, *Strategic Implementation Plan for Empowering Local Partners to Prevent Violent Extremism in the United States*, December 2011, https://www.whitehouse.gov/sites/default/files/sip-final.pdf

with and support to local communities that may be targeted by violent extremists;[3] (2) building government and law enforcement expertise for preventing violent extremism; and (3) countering violent extremism propaganda while promoting our ideals. *Id*. The Strategic Implementation Plan tasks various federal agencies including the Department of Homeland Security, the Department of Justice, the Federal Bureau of Investigation, the State Department, and others with executing various CVE policies and programs.

On September 15, 2014, former Attorney General Eric Holder announced the DOJ's *Pilot Program to Counter Violent Extremists (*"DOJ Pilot Program").[4] In announcing the DOJ Pilot Program, Holder stated that the program seeks to "bring together community representatives, public safety officials, religious leaders, and United States Attorneys to improve local engagement; counter violent extremism; and—ultimately—to build a broad network of community partnerships to keep our nation safe." *Id*. Programs were subsequently launched in Boston, Los Angeles and Minneapolis.[5]

A few days later, on September 24, 2014, President Obama gave his speech at the United Nations imploring the international community to steps to "contest the space that terrorists occupy,

---

[3] The government's effort to enhance community outreach is not uncontroversial. The directive been criticized as a vehicle to exploit the communities for intelligence purposes. *See, Countering Violent Extremism (CVE): A Resource Page*, BRENNAN CENTER FOR JUSTICE, October 5, 2016, https://www.brennancenter.org/analysis/cve-programs-resource-page (collecting articles regarding the exploitation of community outreach for intelligence purposes).

[4] Department of Justice, *Attorney General Holder Announces Pilot Program to Counter Violent Extremists*, September 15, 2014, https://www.justice.gov/opa/pr/attorney-general-holder-announces-pilot-program-counter-violent-extremists

[5] *See*, US Attorney's Office, District of Massachusetts, *A Framework for Prevention and Intervention Strategies*, February 2015, https://www.justice.gov/sites/default/files/usao-ma/pages/attachments/2015/02/18/framework .pdf (developed by a collaborative of non-governmental and governmental stakeholders from the Greater Boston region); *The Los Angeles Framework for Countering Violent Extremism*, February 2015, https://www.dhs.gov/sites/default/files/publications/Los%20Angeles%20Framework%20for%20CVE-Full%20Report.pdf (developed by the Los Angeles Interagency Coordination Group in Collaboration with Community Stakeholders); *Building Community Resilience, Minneapolis-St. Paul Pilot Program, A Community-Led Local Framework*, February 2015, https://www.justice.gov/usao-mn/file/642121/download.

including the Internet and social media," noting that ISIL "propaganda" "has coerced young people to travel abroad to fight their wars, and turned students—young people full of potential—into suicide bombers. We must offer an alternative vision."[6]

To that end, in February of 2015, President Obama held *The White House Summit on Countering Violent Extremism*, which announced new steps to advance CVE efforts including appointing a full-time CVE Coordinator at the Department of Homeland Security, seeking additional funding to support DOJ CVE efforts, and establishing various domestic and international collaborative partnerships.[7] Later that same year, in September of 2015, the President again hosted a White House event focused on CVE—the *Leader's Summit on Countering ISIL and Violent Extremism*.[8] That same month, the Department of Justice launched another initiative focused on the CVE, the *Strong Cities Network to Strengthen Community Resilience Against Violent Extremism*.[9]

It appears our government was headed in the right direction in understanding this new emerging phenomenon and more importantly taking steps to fight this propaganda war. This took a sharp turn during the 2016 campaign, which saw Donald Trump's team rally against the Obama policies for countering violent extremism. *See* https://www.washingtonpost.com/opinions/global-opinions/trumps-plan-for-dealing-with-domestic-terror-is-missing-in-action/2017/11/12/d8f7eb2c-c65d-11e7-afe9-4f60b5a6c4a0_story.html?noredirect=on&utm_term=.6b42133942ca. Experts accused the new administration of "dismantling parts of the Obama-era initiative, especially those that involve

---

[6] *See* footnote 18, *supra*.
[7] https://www.whitehouse.gov/the-press-office/2015/02/18/fact-sheet-white-house-summit-countering-violent-extremism
[8] https://www.whitehouse.gov/the-press-office/2015/09/29/leaders-summit-countering-isil-and-violent-extremism
[9] https://www.justice.gov/opa/pr/launch-strong-cities-network-strengthen-community-resilience-against-violent-extremism

working with Muslim groups, without anything to replace them". *Id*. Even more disconcerting, while Homeland Security secretary, John F. Kelly shifted $10 million worth of grants under the DHS Office of Community Partnerships from community engagement toward law enforcement. *Id.* The approaches of the two administrations could not be more opposite.

When Donald Trump was elected, and made clear that ALL Muslims were the enemy with his travel ban, would any concerned Muslim not feel that the west had abandoned the Syrian people? Would someone not feel *more* compelled that he had to do something individually to defend these people?

Perhaps if the 2016 election went the other way, and these efforts continued, the Sentencing Commission would have reviewed the applicability of these guidelines to these ISIS propaganda cases. Maybe there would have been different directives from the Department of Justice on how to proceed with these cases. Nevertheless, it is clear that the nature and circumstances of this offense cannot support a sentence within the advisory guidelines and a significant variance is warranted.

**History and Characteristics of the Defendant.**

Provided separately are numerous letters by friends and family describing an intelligent, compassionate young man who became a father while incarcerated on these charges. His family believes he was suffering from depression and was abusing marijuana. This caused him, his family believes, to turn inwards, eventually leading him to become obsessed with the plight of his Syrian brothers and sisters. And, tragically, to fall victim to on-line ISIS propaganda.

Laith Alebbini was born in the village of Sal Jordan in the city of Irbed Jordan on June 28, 1990. He was middle class by Jordanian standards but poor by American standards. The village was Muslim, and he was raised Muslim but his family was not devoutly religious.

Like many young Arab men, he was fascinated by America and American culture. It was the land of freedom and opportunity. Mr. Alebbini began studying English in school in the fifth grade but really learned the language from repeatedly watching movies that were in in English. His English is so proficient he is able to understand complex legal opinions and had his criminal trial without an interpreter.

His paternal uncle came to the United States for business sometime in 2010 and met an American Muslim family with a daughter around Mr. Alebbini's age. Mr. Alebbini was introduced to this young woman through "Skype" and they developed a relationship through the internet. Eventually she came to Jordan and they were married. His new wife went back to America and began the paperwork to bring him over to the United States. Mr. Alebbini was not especially religious nor political, and he was about to start living his dream of coming to America and beginning a new life. In July of 2011, he arrived in Richmond, Virginia on a two-year green card. Unfortunately, the relationship with his wife quickly dissolved, and ended in divorce.

Mr. Alebbini found himself on his own with little or no support in America. He turned to his Muslim faith during this lonely time. At this point, in late 2011, Mr. Alebbini had begun to take his Muslim faith more seriously. Like many Arab Muslims, he believed that one day there would be a caliphate: an Islamic State under Muslim law. In 2011, he had heard about Abu Bakr al-Baghdadi fighting in Iraq and Syria and he had heard about ISIL. ISIL was not classified as a terrorist organization by the U.S. government at this time. He rediscovered the five pillars of Islam: faith, prayer, being charitable, helping the less fortunate, fasting, and making hajj – the pilgrimage to Mecca. He fumbled around Virginia working in various convenient stores but he eventually stopped because he did not want to sell liquor, which the Quran forbids.

16

In 2014, he landed a good paying job with Walmart in the warehouse-shipping department. He worked there until early 2016 when he was terminated over a dispute with another employee.

In April of 2016, he met his current wife Destiney Eshelman on a Muslim dating site. She moved to Virginia from her home in Dayton a month later and they were married shortly after. Having lost this job at Walmart, Mr. Alebbini and his wife moved in with his cousin Raid in Gordonville, Virginia. He did odd jobs and his wife obtained employment at Walmart.

Looking back, he was becoming more and more depressed as he saw the news of the atrocities being committed by al Assad in Syria. He firmly believed it was his purpose in life to fight in Syria. He became obsessed with what was happening there, and watched as much internet content as possible from every possible source. He was so concerned that in November 2016 he applied to join the United States Army. He also impulsively sought audience with the Turkish ambassador (without any appointment) by showing up at the Turkish Embassy, with the hopes of volunteering to fight with the Free Syrian Army. As the Court is aware, it was this trip to the Turkish Embassy that triggered the investigation into Mr. Alebbini. After his unsuccessful attempt to join the Free Syrian Army, Mr. Alebbini continued to obsess over Syria, and he spent countless hours on-line absorbing all of the information concerning Syria he could find. This information included ISIS propaganda videos, and Mr. Alebbini believed their propaganda. Mr. Alebbini was home alone with his computer; he was unemployed and he was using marijuana heavily on a daily basis.

Mr. Alebinni moved with Destiney to Dayton, where, as fate would have it, she introduced him to her former boss, who just happened to be from Jordan. He also happened to be a government informant. Seeing an opportunity, the informant went to the authorities and wore recording devices, which produced the bulk of the evidence in this prosecution. Mr. Alebbini befriended the

17

informant, which is his nature. He openly discussed his confusion and his emerging belief that the West was vilifying The Islamic State. He talked about things he saw on the internet touting ISIS success in Syria. He questioned whether ISIS had brought about the promised Islamic Caliphate. He became convinced that he had to make his way to Syria to help his people and that The Islamic State was the most successful group. He has been incarcerated for nearly two years. His son Waleed was born while he was in prison. He has never held his child.

### The Seriousness of the Offense, Respect for the Law, and Just Punishment.

Mr. Alebbini's crime is a serious offense that has already carried significant consequences for him and his family. In addition to being removed from his home and facing years in prison, Mr. Alebbin's offense has had significant collateral consequences for him and his family. Mr. Alebbini's actions have alienated him from his family, brought unwanted attention, hostility, and anguish upon them, and has permanently stigmatized himself, his parents, his siblings, and many other people who knew him. These consequences permanently affect Mr. Alebbini's friends and family here in the United States, in Jordan, and abroad, in the form of heightened scrutiny and likely interrogation. In addition, Mr. Alebbini has already missed the first critical years of his son's life. Mr. Alebbini's actions have also permanently altered what had been a very promising future. Prior to his involvement in this offense, Mr. Alebbini had a history of gainful employment and no criminal record. Going forward, he has undermined his prospects for a career and to provide for his family. He is a bright man who has dramatically altered his future. He will assuredly be deported and likely be on a permanent "watch list," never being allowed to enter the United States.

Mr. Alebbini, although exercising his Constitutional right to a trial, still does acknowledge the seriousness of his offense and respect for the law. The Court heard evidence that he told those closest to them that if he was wrong about ISIS, and they were indeed brutal terrorists, he would

fight against them.  Mr. Alebbini would be the first to agree that a person who knowingly attempts to support terrorists must be prosecuted.

A just punishment should take into account the fact that the views he held that led to this offense were the result of his sensitivity to the plight of the Syrian people, his heavy marijuana usage, and his susceptibility to the ISIS propaganda machine.  A needlessly long sentence will be ruinous and counterproductive.

**Deterrence and Protection of the Public.**

If released on the date of his sentencing, Mr. Alebbini will certainly be removed back to Jordan, where he may still face extrajudicial punishment.  It is noteworthy that his co-conspirator and fellow target of investigation Raid Ababneh was detained for a short time by Jordanian officials but is now free and living a productive life.  Mr. Alebbini presents no risk to commit future crimes or future acts of terror.   Once he is in Jordan, or even if he went to Syria, he would see for himself what the Islamic State truly is, and most importantly what it is not.

**Unwarranted Sentence Disparities.**

Section 3553(a)(6), directs district court judges to be mindful of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Mr. Alebbini submits that several recent cases, involving individuals who attempted to travel abroad to join a terrorist organization, constitute the most appropriate comparable sentencing outcomes and, therefore, support the sentence requested here.

The Obama administration was much more sensitive to the modern conundrum presented by ISIS propaganda.  Particularly, the government seemed very concerned with how young Muslims living in America may be especially vulnerable to this material given the atrocities perpetrated in Syria.  One very comparable case in the Northern District of Illinois demonstrates

how a very similar case was disposed of by a United States Attorney's office under the prior administration:

**United States v. Khan, 1:14 –CR -564 (N.D. Ill)**,

Mr. Khan was convicted of attempting to provide material support to ISIS. Khan attempted to travel overseas to fight for ISIS, and attempted to bring his two minor siblings with him, knowing it would likely mean their death. At the sentencing, Judge John J. Tharp, Jr., sentenced Mr. Khan to **forty months** imprisonment in the BOP with 20 years of supervised release. According to the plea agreement, the government, despite contending that the terrorism enhancement applied, recommended a sixty-month sentence to the judge in this case. According to the plea agreement, Khan had actually met with an ISIS recruiter online. (Exhibit C – Khan Plea Agreement). While the defendant did plea, and the government did indicate they would file a substantial assistance motion at the time of the plea, the difference in how these prosecutions unfolded remains striking.

It was reported that Mr. Alebbini was the first terrorism trial in the Southern District of Ohio, but Judge Sargus in case 2:16 CR 0222, recently sentenced Aaron Daniels, age 21, to 80 months in prison – a significant departure from the guidelines – for similar conduct. According to the DOJ press release, Mr. Daniels "met with an ISIS recruiter in December 2015 and sent funds to ISIS" before attempting to leave Columbus to join ISIS in Libya – conduct far exceeding what was proven in this case.

There is little other precedent in this district in terms of comparable cases for determining the relative seriousness of the conduct involved in Mr. Alebbini's case. The best comparisons are cases from the Northern District of Ohio related to a plan to detonate a weapon of mass destruction. In United States v. Wright, et. al., 1:12CR0238 (N.D. Oh.), the defendants were a terrorist cell in

the Cleveland area who conspired to attack financial institutions, bridges, and police in the Cleveland area. In carrying out their plans, the conspirators prepared over several months to blow up a bridge. The defendants purchased what they believed were explosives from an informant and actually placed the explosives at the base of the Route 82 Bridge outside Cleveland. The defendants then attempted to blow the bridge up with a detonator accessed via cellular phones. Thus, the defendants took all actions necessary to commit an act of terrorism through detonating a weapon of mass destruction, only to be foiled because they mistakenly had been given fake explosives. One defendant – Stafford – was convicted after trial and the remaining four defendants pled guilty. The above facts were taken from the Sixth Circuit's decision on Stafford's appeal, United States v. Stafford, 782 F.3d 786 (6th Cir. 2015).

Defendant Stafford, who went to trial, received a sentence of 10 years. The remaining defendants who pled guilty received sentences of 11.5 years, 9.75 years, 8 years and 1 month, and 6.75 years. Thus, the average sentence for the defendants in the terror cell was about 9.25 years. This for defendants who pulled the trigger to detonate a weapon of mass destruction and which would have killed an untold amount of people. Other recent Material Support cases include the following:

### United States v. Conley, 14-CR-163 (D. Colo. 2014).

Shannon Maureen Conley pleaded guilty to one count of conspiracy, in violation of 18 U.S.C. § 371, referencing 18 U.S.C. § 2339B, for having provided material support to Al-Qaeda and its affiliates, including ISIS. According to the plea agreement, Ms. Conley met her coconspirator, Yousr Mouelhi on the internet in 2014 and thereafter, discussed their mutual beliefs and support for violent Jihad. After Mouelhi advised Conley that he was an active ISIS fighter in Syria, she agreed to travel to Syria to assist. Thereafter, on September 7, 2013, Conley joined the

United States Army Explorers (USAE) in order to receive military training in tactics in firearms for the purpose of helping ISIS. On February 7-9, 2013, Conley traveled from Colorado to Texas to attend the USAE training. On March 29, 2014, Mouelhi purchased Conley an airplane ticket so that she could travel to Turkey. On April 8, 2014, Conley traveled to the Denver International Airport to fly to Turkey, but was apprehended before she could board the plan. *United States v. Conley*, 14-CR-163, Plea Agreement (Doc. 37), at 7-9 (D. Colo. Sept. 10, 2014).

When arrested, Conley was in possession of numerous items demonstrating proficiency and certifications of a number of specialized skills, including first aid/nursing certification, U.S.A.E. Certification, National Rifle Association certification and a first aid manual. *Id.* at 9. Agents also recovered DVDs of Anwar Al-Awlaki lectures, books about Al-Qaeda, its affiliates, and jihad, and shooting targets labeled with the number of rounds fired and distances. *Id.* Conley, who was 19 at the time of the crime, pleaded guilty and agreed to provide assistance to the United States. Her initial adjusted offense level was 35, based on the application of the terrorism enhancement. The district court sentenced Conley to 60 months imprisonment. *United States v. Conley*, 14-CR-163, Final Judgment (Doc. 79), at 7 (D. Colo. Jan. 26, 2014).

### *United States v. Wolfe*, 1:14-cr-213 (W.D. Tex. 2014).

Wolfe was charged with and pleaded guilty to one count of providing material support to a designated terrorist in violation of 18 U.S.C. § 2339B, based on his extensive efforts and planning to go to Syria to join ISIS for jihad. This planning included: (1) obtaining new, more durable eye glasses that would hold up on the battlefield; (2) researching airline itineraries to travel to Europe on January 4, 2014; (3) creating a ruse to disguise the actual nature of his travel; (4) planning to raise money to finance the travel; (5) obtaining special certifications for his and his family's birth certificates to facilitate travel; (6) requiring his wife and two undercover officers to watch a video

22

regarding foreign fighters in Syria in preparation for joining the fighting; (7) raising money to finance travel to Syria; (8) purchasing airline tickets to Denmark; (9) communicating in codes to disguise his intentions from authorities; (10) obtaining an address in Turkey to send an advance package; and (11) going to the airport in Houston, Texas, to board an international flight with the intent of joining a terrorist organization. *United States v. Michael Todd Wolfe*, 1:14-cr-213, Criminal Complaint, at 2-11 (W.D. Tex. June 6, 2014). During the planning of this trip, Wolfe showed he intended to bring his wife and two young children. Mr. Wolfe, who was 24 years old, pleaded guilty and received a sentence of 82 months.

### *United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014).

Pratheepan Thavaraja, a Sri Lankan native, was the principal procurement officer for the Liberation Tigers of Tamil Eelam ("LTTE"), a foreign terrorist organization. He was detained in Indonesia and extradited to the United States in 2007. In June 2009, he pled guilty to conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and conspiracy to bribe public officials. The district court applied the terrorism enhancement, elevating the defendant's base offense level to 40. Ultimately, although the suggested guideline sentence was 240 months, the district court sentenced him to 108 months imprisonment, a 55% downward variation from the Guidelines range. 740 F.3d at 257.

At the time of his apprehension, Thavaraja was 33 years old, had been engaged in a prolonged pattern of terroristic activity as the chief procurement officer of an entire terrorist organization, and attempted to bribe a public official when caught. In fact, the district court acknowledged that the defendant's "'function [in procuring arms for the LTTE] was critical and involved . . . procurement of deadly merchandise, almost inevitably used to injure, murder, maim, not only military but civilians.'" 740 F.3d at 258. As such, he was not only more deeply involved

23

in a terrorist organization than Mr. Alebbini was, but far more morally and criminally culpable. Despite his crimes, the court found the substantial downward variance was warranted because Thavaraja had no prior criminal record and "taught and worked with other inmates while in pretrial detention to the extent … the district court was convinced he was 'a person of substance and decency.'" 740 F.3d at 260.

**United States v. Warsame, 651 F. Supp. 2d 978 (D. Minn. 2009).**

In *Warsame*, the defendant – who was born in 1973 - was sentenced to 92 months imprisonment even though he traveled to Afghanistan before September 11, 2011, trained with al-Qai'da, and met and attended lectures by Osama bin Laden, continued to keep in contact with al-Qai'da after he returned to Canada and then moved to the United States. 650 F. Supp. 2d at 979-80. Warsame pleaded guilty to one count of conspiracy to provide material support to a designated foreign terrorist organization under § 2339B, and had the terrorism enhancement applied to his case, resulting in a base offense level of 35, criminal history category of VI, and a sentencing range of 292 to 365 months. Because he had no other criminal history, was not eligible for an enhancement for playing a leadership role or using a minor in the offense, and the government requested a downward variance from 180 to 150 months (defendant requested a sentence of 67 months), the court granted a 49% downward variance. *Id.* at 980-81.

The table below provides a summary of some of the above cases and other similar cases.

| Name/Case # | Location | Charge | Sentence | Prior Record |
|---|---|---|---|---|
| **Joshua Stafford** 1:12-cr-0238; U.S. v. Stafford, 13-4188 (6th Cir.) | Cleveland, NDOH | Conspiracy to use weapon of mass destruction (bomb); | **10 years** | |
| **Douglas Wright** 1:12-cr-0238; U.S. v. Stafford, 13-4188 | Cleveland, NDOH | Conspiracy to use weapon of mass destruction (bomb); | **11.5 years** | |

| | | | | |
|---|---|---|---|---|
| **Brandon Baxter** 1:12-cr-0238; U.S. v. Stafford, 13-4188 | Cleveland, NDOH | Conspiracy to use weapon of mass destruction (bomb); | **9.75 years** | |
| **Connor Stevens** 1:12-cr-0238; U.S. v. Stafford, 13-4188 | Cleveland, NDOH | Conspiracy to use weapon of mass destruction (bomb); | **8 years, 1 month** | |
| **Anthony Hayne** 1:12-cr-0238; U.S. v. Stafford, 13-4188 | Cleveland, NDOH | Conspiracy to use weapon of mass destruction (bomb); | **6.75 years** | |
| **Mohammed Hamzah Khan**, 1:14-cr-00564 | Chicago, ND Illinois | Attempt to provide material support to ISIS | **3.3 years** | |
| **Shannon Conley**, 1:14-cr-00163 | Denver, D. Colo. | Conspiracy to provide material support to ISIS | **5 years** | |
| **Michael Todd Wolfe** 1:14-cr-00213 | W.D. Tex. | Attempting to provide material support ISIS | **6.75 years** | |
| **Rahatul Ashikim Khan**, 1:14-cr-00212 | W.D. Tex. | Conspiracy to provide material support to ISIS | **10 years** | |
| **Joseph Hassan Alebbini**, 1:16-cr-00020 | E.D. Va. | Attempting to provide material support to ISIS | **8.5 years** | |
| **Nicholas Michael Teausant**, 2:14CR087 | E.D. Cal. | Attempting to provide material support to ISIS | **12 years** | |
| **Muhammad Dakhlalla** and **Jaelyn Young** 1:15CR00098 | N.D. Miss. | Attempting and conspiring to knowingly provide material support to ISIS | **8 years** and **12 years** | |
| **Adam Dandach**, 8:14CR00109 | C.D. Cal. | Material support to ISIS | **15 years** | |
| **Donald Morgan**, 1:14-cr-00414; 1:14cr194 | M.D.N.C. | Attempt to provide material support to ISIS; possession of firearm (assault rifle) by convicted felon | **20.25 years** | Prior felony for shooting into a habitation |

| | | | | |
|---|---|---|---|---|
| **Amine El Khalifi**, 1:12-cr-00037 | E.D. Va. | Attempting to use weapon of mass destruction against U.S. Capitol | **30 years** | Prior offenses from several jurisdiction including drug offenses and two prior assault convictions |
| **Michael Finton**, 3:10-cr-30215 | S.D. Illinois | Attempted use of weapon of mass destruction | **28 years** | Prior lengthy prison sentence for armed robbery and aggravated assault |
| **Leon Davis**, 1:15-cr-00059 | S.D. Ga. | Attempt to provide material support to ISIS | **15 years** | On parole at time of offense |

In comparing Mr. Alebbini to the above cases, it seems that a sentence of time served is not unreasonable, especially given the sentences imposed in Khan, Conley and Wolfe. In terms of relative culpability, Mr. Alebbini is likely most akin to the defendants in <u>Khan</u> out of N.D. Illinois and <u>Conley</u> out of the District of Colorado. The defendant in <u>Khan</u> planned to travel to fight and die for ISIS, and even planned to bring his two minor siblings along with him, and in <u>Conley,</u> the defendant was in contact with an ISIS operative and joined the U.S. Army explorers to be trained in U.S. military tactics and firearms to fight for ISIS as needed. These defendants are in the 4-5 years range in terms of sentence. These cases demonstrate the unreasonable nature of the government's 40-year sentence request. Not even convicted felons with weapons have typically received the sentence requested by the government in this case.

**<u>Conclusion</u>**

In sum, Mr. Alebbini submits that the aggregate term of 360 months recommended by the U.S. Probation Officer in the presentence report is far too excessive and inconsistent with the goals of sentencing set forth in 18 USC 3553(a). Counsel asserts that a sentence of time served would be appropriate. At a minimum, the terrorism enhancement should not be applied in this case, and, if the Court grants acceptance of responsibility, undersigned counsel suggests that the appropriate

26

advisory range should be 46-57 months.  But even this would be greater than necessary to comply with the purposes of sentencing.  Mr. Alebbini's is a life worth saving.  However confused or disillusioned he was with life in America, he has the family support and the intellect to do great things.  He is just simply not the monster the government thinks they prosecuted and seek to lock away for 40 years.

Respectfully submitted,

DEBORAH L. WILLIAMS
FEDERAL PUBLIC DEFENDER


s/Thomas W. Anderson, Jr.
Thomas W. Anderson, Jr (0073138)
Office of the Federal Public Defender
1 South Main Street, Suite 490
Dayton, Ohio 45402
(937) 225-7687
Thomas_Anderson@fd.org

Attorney for Defendant
Laith Waleed Alebbini


CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon Vipal Patel, Assistant United States Attorney, on the date same was filed.

s/Thomas W. Anderson, Jr.
Thomas W. Anderson, Jr.