## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO.  3:17-CR-71-WHR** |
| | : | |
| **Plaintiff,** | : | **UNITED STATES' SENTENCING** |
| | : | **MEMORANDUM** |
| **v.** | : | |
| | : | |
| **LAITH WALEED ALEBBINI,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

Table of Contents and Summary

1. Introduction ....................................................................................................................1

The case started and ended with action, not words.  Words played a significant part in this case and provided chilling insight into Alebbini's mindset.  "Just words," say Alebbini's family, though they cannot be expected to know Alebbini's deep-seeded commitment, willingness to engage in violence, and rationalization of ISIS' brutality, having been lied to and tricked by Alebbini.  Alebbini's family has been unable to stop him.  A sentence within the advisory Sentencing Guidelines range would stop him for at least 30-40 years.

2. Nature and Circumstances of the Offense ..........................................................................2

The nature of the offenses is terrorism.  Within the spectrum of terrorism offenses, the particular circumstances of Alebbini's offenses place this case towards the higher end.  Within the spectrum of terrorism offenses falling within the material support statute specifically and the applicable sentencing guidelines, the circumstances of Alebbini's offenses place this case even higher.  The circumstances of Alebbini's particular offenses, as highlighted in this section, set them the offenses apart from others treated equally by the statute and Sentencing Guidelines.

A. Illegal Entry into the Turkish Embassy ........................................................................3

B. First Attempt to Fight in Syria ....................................................................................4

C. Alebbini's Angry Confrontation at the Bellbrook Mosque and Trashing of the Anti-ISIS Brochures ....................................................................................................5

D. Alebbini Explained Why He Took Action .................................................................8

E. Alebbini's Communications Also Revealed What he intended to do for     ISIS .......11

F. "Just Talk" ..................................................................................................................19

3. History and Characteristics of the Defendant ..................................................................31

Alebbini is deeply committed to ISIS, passionate, and reflective.  He has an incredibly supportive family.  He reports no serious medical issues, and denies any role of marijuana in his offense.

4. The Seriousness of the Offense; Respect for the Law; Just Punishment; Deterrence; Protection of the Public; Educational, Vocational, and Medical Care and Treatment ......36

The offenses are amongst the most serious in the land.  A substantial sentence is essential to promote respect for the law and to afford just punishment.  The impact of specific deterrence is doubtful.  Physical incapacitation is the only effective deterrent in this case.  Protection of the

public is paramount.  Alebbini has educational and vocational skills but did not use them.  No need for medical care or treatment is evident.

   5. <u>Kinds of Sentences Available</u> ............................................................................................39

The sentencing options range from a time served sentence, to 40 years in prison, to be followed by a lifetime of supervised release.

   6. <u>Sentencing Guidelines</u> .......................................................................................................40

The Sentencing Guidelines advise a custodial sentence of between 360 months and life, "restricted" only by the statutory maximum.  The Terrorism adjustment applies.  Acceptance of responsibility does not.

   A. Terrorism Enhancement

   *United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003)
   *United States v. Fidse*, 862 F.3d 516 (5th Cir. 2017)
   *United States v. Elshinawy*, No. CR ELH-16-009, 2018 WL 1521876 (D. Md. Mar. 28, 2018)
   *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010)
   *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011)
   *United States v. Assi*, 428 Fed.Appx. 570 (6th Cir. 2011)
   *Colvin v. Syrian Arab Republic*, 2019 U.S. Dist. LEXIS 14641, Civil No. 16-1423 (ABJ) (D.D.C. January 30, 2019)
   *Roth v. Syrian* Arab Republic, 2018 U.S. Dist. LEXIS 168244, Civil No. 1:14-cv-01946-RCL (D.D.C. September 28, 2018)).
   *United States v. Van Haften*, 881 F.3d 543 (7th Cir. 2018)
   *United States v. Wright* , 747 F.3d 399 (6th Cir. 2014)
   *United States v. Benkahla*, 501 F.Supp.2d 748 (E.D.Va 2007)
   *United States v. Assi*, 586 F.Supp.2d 841 (E.D.MI 2008)
   *United States v. Elshinawy*, 2018 WL 1521876 (D. Md. Mar. 28, 2018)
   *United States v. Kaziu*, 559 F. App'x 32 (2d Cir. 2014)
   *United States v. Mohamed*, 757 F.3d 757 (8th Cir. 2014)
   *United States v. Tounisi*, 900 F.3d 982 (7th Cir. 2018)

   B. Acceptance of Responsibility.......................................................................................47

   7. <u>Avoiding Unwarranted Disparity</u>......................................................................................49

Adherence to the Sentencing Guidelines is the best way in which to avoid unwarranted disparity.  Alebbini's "compare and contrast" approach is a slippery slope.  His list of supposed comparable cases misses the mark.  To the extent any comparison is conducted, Alebbini should be compared to defendants who, like Alebbini, were willing to kill, behead, and burn other people.

   *United States v. Swafford*, 639 F.3d 265 (6th Cir. 2011)

ii

*United States v. Clark*, 540 Fed.Appx. 539 (6th Cir. 2014)
*United States v. Rayyan*, 885 F.3d 436 (6th Cir. 2018)
*United States. v. Simmons*, 501 F.3d 620 (6th Cir. 2007)
*United States v. Poynter*, 495 F.3d 349 (6th Cir.2007)
*United States v. LaSalle*, 948 F.2d 215 (6th Cir.1991)
*United States v. Parker*, 912 F.2d 156 (6th Cir.1990)
*United States v. Gessa*, 944 F.2d 265 (6th Cir.1991)
*United States v. Borho*, 485 F.3d 904 (6th Cir.2007)
*United States v. Husein*, 478 F.3d 318 (6th Cir.2007)
*United States v. Dowdy*, 216 Fed.Appx. 178 (3d Cir.2007)
*United States v. Saez*, 444 F.3d 15 (1st Cir.2006)
*United States v. Newsom*, 428 F.3d 685 (7th Cir.2005)
*United States v. McKnight*, 186 F.3d 867 (8th Cir.1999)
*United States v. Withers*, 100 F.3d 1142 (4th Cir.1996)
*United States v. Arlen*, 947 F.2d 139 (5th Cir.1991)
*United States v. Garza*, 1 F.3d 1098 (10th Cir.1993)
*United States v. Joyner*, 924 F.2d 454 (2d Cir.1991)
*United States v. Nelson*, 918 F.2d 1268 (6th Cir.1990)
*United States v. Guled Ali Omar, Abdurahman Yasin Daud, and Mohamed Abdihamid Farah*, No. 15-049 (D. Minn. 2016)
United States v. *Nader Elhuzayel and Muhanad Elfatih M. A. Badawi*, No. 8:15-cr-00060 (C.D.CA 2016)
*United States v. Pugh*, No. 15-cr-00116 (E.D.N.Y. 2017)
*United States v. Zea*, No. 2:13-cr-00072-SJF (April 2015, E.D.N.Y.)
*United States v. Saidakhmetov*, 15 Cr. 95 (WFK) (E.D.N.Y.)
*United States v. Alaa Sadeh*, 15 Cr. 558 (D.N.J.)
*United States v. Khan*, No. 14 CR 564 (N.D. Ill. 2016)
*United States v. Conley*, No. 14-cr-00163 (D. Col. 2014)

8.  Conclusion ....................................................................................................61

1.  <u>Introduction</u>.

This case started and ended with action, not words.  Beginning with Alebbini's surreptitious entry into the Turkish Embassy in Washington, D.C., continuing with his angry trashing of anti-ISIS brochures at the Bellbrook mosque, endless research and consumption of ISIS propaganda, deep reflection and prayer, prolonged rejection of efforts to dissuade him from joining ISIS, and sending of farewell messages, and ending with his arrival at the TSA checkpoint at the Cincinnati airport, boarding passes in hand and resolved to join, fight, and die for ISIS, Alebbini's actions put him on a collision course with violence.  But for the FBI's intervention, that violence would have included "picking up the gun," killing Muslims in Syria, shooting at the "Crusader" Americans, beheading people if called upon to do so, and even killing and maiming as many people as possible before ending his own life as an "inghimasi" soldier.

Alebbini's actions did not stem from fleeting thoughts, off-the-cuff rants, or "spur of the moment" impulse.  They were, in Alebbini's eyes, a *religious duty*, compelled under his deep-seeded, firmly held, but twisted view of Islam, as part of a broader mission to unite the Middle East into an Islamic Caliphate, fight the Syrian regime led by Bashar Al-Assad, and topple the Jordanian government (among other governments).  There was one and only one group that allowed Alebbini to check all of the boxes on his mission list, and that was ISIS.  So focused and committed was Alebbini in achieving his goals that he could rationalize ISIS's reign of terror, which Alebbini knew included burning people alive, beheadings, and mass executions, by telling himself and others that he would never harm the "innocent," but viewing the victims of ISIS's brutality as not truly "innocent" and thus deserving of the "justice" handed out by ISIS.

No doubt, words played a significant part in this case.  They provided insight into Alebbini's mindset.  Alebbini's words, particularly when coupled with his actions, proved chilling.

"Just talk," say Alebbini's family members (but not necessarily Alebbini himself).  Given the family's efforts in trying to convince Alebbini not to join ISIS, they understandably would again seek to protect him.  But, not having seen and heard the entirety of the evidence presented at trial, and having been repeatedly lied to and tricked by Alebbini, they cannot possibly know the depths of Alebbini's commitment, his willingness to employ violence, or his ability to harm.

Nor can Alebbini's family provide the level of surety needed to protect the public.  Notwithstanding taking measures such as stealing Alebbini's passport, enlisting a childhood friend to dissuade Alebbini, and pleading with Alebbini via emotional messages, Alebbini's family and friends were unable to change his mind.  Particularly given Alebbini's lack of acceptance of responsibility or remorse, no basis exists to conclude the results would be any different the next time.

His family and friends were unable to stop him.  Alebbini was fond of telling people around him that a prison term of "3 years" or even "10 years" would not stop him either, and that he will never stop until his "mission" is complete.  What will stop him, for at least the next 30-40 years, is a sentence within the advisory Sentencing Guidelines.

2.  The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1)).

The nature of the offenses is terrorism.  Terrorism offenses, along with crimes such as murder, rape, and child-exploitation offenses, are among the most heinous, reprehensible, and serious crimes in our nation's laws.  Terrorism strikes fear into the entire world.  It tears at the fabric and soul of a civilized society.  The ripple effect is boundless, from a seemingly

permanent change in the way in which we live and travel, to re-examined immigration practices and policies of governments, to a global machinery of terrorism response, including increased surveillance, policing, and warfare. Fear, anxiety, distrust, conflict, death, agony, pain and suffering, and, at times, disillusionment with government response to terrorism, are the hallmarks of current society. All, at its core, from terrorism, the hallmark trait of ISIS, the group Alebbini held in such high esteem and sought not only to join but actively support.

Within the spectrum of terrorism offenses generally, the particular circumstances of Alebbini's offenses place this case towards the higher end. While Alebbini did not set off explosives, or shoot or kill anyone, he was, according to the evidence, firmly heading in that direction. Within the spectrum of terrorism offenses falling within the material support statute specifically, 18 U.S.C. § 2339B, and the corresponding sentencing guideline, U.S.S.G. § 2M5.3, the circumstances of Alebbini's offenses place this case even higher. Alebbini sought to support *ISIS*, the "fringe of the fringe of the fringe" of terror groups. Alebbini sought to support ISIS as a *fighter*, an inghimasi soldier even. This is the "exacta box" of material support, which distinguishes the offenses here from the wide spectrum of terrorism offenses falling within the same material-support statute and Sentencing Guidelines range.

The circumstances of Alebbini's particular offenses set him apart. In this case, the circumstances are extensive and revealed by the voluminous trial record, highlights of which are set forth below.

### A. Illegal Entry into the Turkish Embassy.

After spending years researching both ISIS and the conflict in Syria, Alebbini took action. On January 10, 2017, Alebbini drove from his residence in Gordonsville, Virginia, to the Turkish Embassy in Washington, D.C. As Alebbini explained to the CHS, it was "illegal to enter

the Embassy compound in your car," but "I drove in anyway" and "got in a fight with the Ambassador." (Govt. Ex. 3e1 at 37-38.)

### B. First Attempt to Fight in Syria.

Days later, Alebbini was on a plane heading to Turkey. Adhering to his cover story, Alebbini initially told the CHS that the purpose of the trip was to "join the revolution, I mean, the whatchamacallit, the Turkish Revolution. I wanted to join the uh – Turkish Syrian Revolutionary factions." (Govt. Ex. 3ed1 at 37; *see also* with respect to the cover story: Govt. Exs. 3i1 at 8 ("my father is telling me, "You should go over there? You're going to tell them… don't tell them you are with the State; don't tell them you are with such. Tell them what they like to hear." I told him, "Fine father, I will tell them what they like to hear. I'll tell them what they want."), 3i1 at 20 ("Firstly, because when you say you actually like, you want to go fight Bashar al-Assad, no one says anything to you like when you say you want to go to The State."), 5s1 at 9 ("Hossam: Do not mention the State, do not say that. If you're going to tell them 1, 2, 3 and so on, just say "I want to go fight Bashar"--Alebbini: [OV]--you idiot, I know what to say, I know what to say. Yes, I know what to say and I know what to say).) Alebbini later acknowledged to the CHS that it was simply a cover story:

| | |
|---|---|
| Alebbini: | Yeah, By God. Everything is monitored and you need to be always careful. |
| CHS: | True, I once saw, they say that if even if you turn off the phone they can still hear you. |
| Qasim: | [OV] [UI] |
| Alebbini: | The phones, the phone was originally made, the phone was designed to be a listening device and for monitoring. |
| CHS: | So why are we talking while the phones are with you? |
| Alebbini: | If asked, we can say that we are talking about opposition and a revolution. To be honest, usually when we start talking like this we hide the phones. When we are sitting talking amongst us, we put our phones in a different room. We get in the car and the phones are out, and we talk. |
| CHS: | Ah! |
| Alebbini: | By God. God willing, if you want we can sit down later and talk about the subject and hide our phones. |

4

(Govt. Ex. 3d1 at 95.)

Alebbini did not make it far. Family members had taken Alebbini's current passport to prevent him from going, thereby leaving Alebbini to travel on an expired passport. Turkish authorities denied Alebbini entry into the country and sent him back to the United States. When U.S. law-enforcement agents interviewed Alebbini days later about the incident at the Turkish Embassy and inquired about Alebbini's prior travel, Alebbini withheld mention of his recent attempted trip to Turkey. Alebbini did, however, tell the agents that he would be the "perfect recruit" for ISIS, that he "was a supporter of the Islamic State" (Govt. Ex. 5l1 at 4), and, mocking the security at the embassy, that if he had a bomb on him, he could have taken down three embassies.

> C. *Alebbini's Angry Confrontation at the Bellbrook Mosque and Trashing of the Anti-ISIS Brochures.*

On March 17, 2017, shortly after arriving in Dayton, Alebbini would take action once again. That was the day of the Bellbrook mosque incident, when Alebbini "started to fight" with "the man in charge there" over what Alebbini's considered "un-Islamic pamphlets." (Govt. Ex. 3f1 at 20-21.) Alebbini later told both the CHS and his wife about what he did (trashed the anti-ISIS pamphlets) and why he did it (because he felt they were "full of lies"):

| Alebbini: | By God. I grabbed them all and went and placed them in the car and dumped them in the garbage and I fought with the mosque's Imam. I told him how, how do you cooperate like this in betrayal against the Muslims; publicly like this! My brother, if someone wants to wage jihad, he wants to lift the oppression, he wants to kill Bashar, he wants to kill the, the Shiites who kill us and destroy us, do you go and do this to them? |
| --- | --- |

(Govt. Ex. 3d1 at 90-91.)

MR. ALEBBINI:  I've been to the new mosque, and there was a table full of pamphlets, and then I looked at the table, and I saw ISIS, ISIS propaganda.  So I took them, and throwed them in the trash.  And then the FBI agents even knows about it, see what I'm saying?

MS. ESHELMAN:  Yeah.  But why would you throw that in the trash?

MR. ALEBBINI:  Why would I throw it in the trash?

MS. ESHELMAN:  Yeah.

MR. ALEBBINI:  Because it's full of lies.

MS. ESHELMAN:  How is it full of lies?

MR. ALEBBINI:  It's full of lies.

(Govt. Ex. 7zf2 at 19.)

The pamphlets that Alebbini viewed as "un-Islamic," as "full of lies" and "propaganda," and worthy only of trashing?  The anti-ISIS brochures the Bellbrook mosque had received and commendably laid out for all to see, read, and absorb:





(Govt. Ex. 2a.)

D. *Alebbini Explained <u>Why</u> He Took Action*.

Alebbini's communications with the CHS, his family members, his friends, and, even upon his arrest, with the FBI, provide an understanding as to why Alebbini would engage in such action and his level of commitment to ISIS. For example, he had this to say to the CHS:



And this to his childhood friend, Hussein Ababneh:

| Alebbini: | Hussein, now you're telling me… I am going to join those people because they are right. You say they are not right. Do you know what the problem is, Hussein? It's that you're telling me those people are wrong when I am one hundred per cent positive and I know and I've seen through evidence and proof that they are right. The problem, now, *cousin*, is that you will either let me show you my proofs and you can dismiss them as refutable and possibly falsified or-- |
|---|---|
| Hussein: | [OV] That's what I'm telling you. That's what I've been doing for the last two hours. My throat is sore talking to you. |
| Alebbini: | Okay *cousin*. This is what I want to tell you now. I used to think the same, that it's all fake. Later, we were sitting, I, Khalid, Hossam, Raid and Qasim. I showed the guys the videos. They watched and said "These are the people of truth, the people of the Islamic State". |

(Govt. Ex. 5o1 at 111.)

What is the source of this level of commitment? A command from God:

| Hussein: | [OV] But why, why did you attach yourself to them when you have million opportunities, other than this opportunity? Why did you attach yourself to them? |
|---|---|
| Alebbini: | Because this is a command from my God. Because Hussein-- |
| Hussein: | [OV] God commanded million things. You left everything else and stopped at this one? |
| Alebbini; | No Hussein. When Almighty Allah ordered jihad as a mandatory duty, He ordered us to fight. Everything else follows. Once you're done with jihad, you pray. Once I'm done with jihad I go do, whatever, pray on time in the middle of the night. I can't be saying that I want to go to Haj, you see, when I have a burning front, because at the frontline…it is said that one hour of jihad is better than sixty years of worship. |

(Govt. Ex. 5o1 at 154; *see also* Govt. Ex. 3d1 at 85 ("Our Lord's religion says to be with the…with the Islamic State"); Govt. Ex. 3i1 at 14 ("It's our, it's our duty is to support the Islamic State. This is the statement… What's our duty? Jihad."); Govt. Ex. 3i1 at 12 (CHS asks Alebbini: "I am asking you, when you join the Islamic State, will this be to satisfy God or Raid? Alebbini responds: "For God.").)

Alebbini's religious-based commitment to ISIS is consistent with his belief in ISIS's leader, the supposed "Caliph," Abu Bakr al Baghdadi. A person whose "ancestry is written," according to Alebbini. (Govt. Ex. 5o1 at 32.) As Dr. Vidino explained, only true supporters of ISIS accept Baghdadi's supposed ancestry to the Prophet Muhammed. Other groups, including designated terrorist groups such as Jabhat Al Nusra, as one example, do not.

Alebbini's admiration of Baghdadi continued throughout his hours-long call with Hussein, and it continued following his arrest by the FBI. Alebbini told SA Herwig about how Baghdadi earned a Ph.D, and how Baghdadi memorized the Quran. (Govt. Ex. 8a at 24.) Alebbini believed Baghdadi to be a "good leader." (Govt. Ex. 8a at 28.) Alebbini spoke glowingly of the self-declared Caliph, calling him "something huge." (Govt. Ex. 8a at 90.)

So strong in conviction and so firm in commitment was Alebbini that he wanted divine forgiveness for his childhood friend who had some choice words for the supposed "Caliph." (Govt. Ex. 5o1 at 31.) Not surprisingly, then, when Baghdadi "called" on the people to migrate, Alebbini heard the calling and felt compelled to seek to comply:

| Hossam: | I don't understand brother. Since you were convinced of the idea, why didn't you act on it right away? |
|---|---|
| Alebbini: | Because, Hossam, God- God Almighty says the matter requires preparations, because-- |
| Hossam: | [OV] what preparations? Where are your preparations? What did you prepare from that day till now? |
| Alebbini: | Finish-you have to sort out things, your debts, taking care of matters here, getting ready and that's it. Getting ready to migrate. I am now ready to migrate. I will migrate with my wife. We will migrate for the sake of God, out of the land of infidels. Whether I'll be imprisoned for the sake of God, jailed, killed, anything that will happen to me *cousin,* that's God's will for my destiny, but I will have done what I'm supposed to do. I am a person who surrenders, a Muslim for God, I surrender my face for the sake of God, the Lord of the Worlds. I follow the rules dictated by God Almighty. I do not recognize democracy nor any-any of the idols of this world [UI]-- |

(Govt. Ex. 5t1 at 6.)

10

*E.  Alebbini's Communications Also Revealed <u>What</u> He Intended To Do for ISIS.*

After being "called" to ISIS by Baghdadi, Alebbini intended to "bear arms:"

| | |
|---|---|
| Alebbini: | That means the solution-- |
| Hussein: | Laith, Laith. |
| Alebbini: | [Excited] is to bear arms, is to bear arms brothers. The successful way-- |
| Hussein: | [OV] bear arms against who? Against who and with who? That's my problem. That's my problem. |
| Alebbini: | I, I will tell you with who and against who. Okay? With the people of the Sunnah. We, the State Organization, are the only people of the Sunnah. Every Sunni, |

(Govt. Ex. 5o1 at 94.)  His preference was to give his life for ISIS.  For example, Alebbini

wanted to be an inghimasi soldier:

| | |
|---|---|
| Alebbini: | That's true, but the Islamic State is fighting a survival war. They asked people to migrate to the State. When migrants get there they ask them what they learnt, what they studied and they will assign them accordingly to a diwan or a district or they will recruit them as inghimasi. I, *cousin*, want to go be an inghimasi soldier! |

(Govt. Ex. 5o1 at 129.)  As Dr. Vidino explained, an "inghimasi" soldier is a soldier who

maximizes death and destruction by killing as many people as possible during the course of a

suicide attack before detonating himself for the purpose of killing even more people.

Notably, the term "inghimasi" soldier is not common.  Hussein did not know what it was

when asked about it during trial.  Alebbini's cousin, Muhammad, did not understand the term

when asked about it during the sentencing hearing in March 2019.  (Tr. 3/8/19 at 54.)  Dr. Vidino

explained the term is not well known even among violent extremists.  Dr. Vidino—who has

spent considerable time studying and analyzing ISIS—knew what it meant.  (Tr. 11/20/18 at 93-

96.)  So too did the other ISIS expert:  Alebbini.

11

An attack by an inghimasi soldier is a particularly ruthless form of attack that maximizes death and destruction. But that is what Alebbini wanted; that was his intention—to give his life to ISIS by serving as an inghimasi soldier. That Alebbini was willing to die for ISIS shows just how strong his commitment to the organization was. Dr. Vidino explained that not everyone wanted to die for ISIS, and that ISIS needed people for many different tasks. But so committed was Alebbini that he was willing to, and indeed, wanted to, make the ultimate sacrifice, in a way that killed as many people as possible.

Alebbini understood how ISIS functioned and how it used its people, and he knew that once he reached ISIS, he would be assigned to a specific role. Alebbini's role, he knew, was a fighter:

> Islamic leaders. However, when Laith-Laith goes, he in effect will be a soldier in a trench at the border. I do not have an excuse.

(Govt. Ex. 5m1 at 16.)

| Alebbini: | Yes. That's it, I'm not working so I'm a person…a burden. What benefit someone like me is expected to offer the community? The best thing for someone like me is to be a soldier because man… you can be a nurse, my paternal uncle Yusuf can be |
| --- | --- |
| | 9 |
| Audio File: | 24-S9372382604_20170426143340_00336 |
| Date of Call: | 04/26/2017 |
| Duration of Call: | 18 minutes |
| | ALE-00029105 |

| | a doctor, others with high degrees can be… I… what can I do? I protect the soldier, you understand? [Yells] Don't you see that we need soldiers now, don't you want a soldier? |
| --- | --- |
| Hossam: | What? |
| Alebbini: | That's it. I'm a soldier. |

(Govt. Ex. 5t1 at 9-10.)

| Alebbini: | Very well, very well. Listen, let me tell you this. Let's assume that you, Hussein, are the King of Jordan. Okay? [Pause] Let's say that Hussein, the son of Abu Nihad, is the King of Jordan. Good? I came to you, I am your relative from your tribe, I came to you and asked you to give me a job. What job would you give me? Tell me what job you would give me. |
|---|---|
| Hussein: | What will I give you to do? I would appoint you Spokesperson! |
| Alebbini: | [Yells out loud] Spokesperson! You will appoint me Spokesperson? Based on what credentials? You will appoint me Spokesperson when you have doctorate professors in Jordan? You should tell me "Laith, you can only be a soldier. Go serve at the borders and position yourself in a trench there!" When you can have a Spokesperson like my uncle Yusuf who has a Ph.D. from Britain and speaks English very well -- |

(Govt. Ex. 5o1 at 127; *see also* Govt. Ex. 5o1 at 109 ("in the case when America fights us, I can't tell you that we should bring…No! We should send Latih, the dirty and the stupid, to the battle fronts to fight them."); Govt. Ex. 3i1 at 13 ("Long time ago, Raid and I, before we were thinking about this thing, I told him, I told him, "Raid, tomorrow you and I will go, and God willing it will be to the front; if God desired Jihad for us, I will be…One of us will be sitting this way, next to the other or if one receives a bullet…I told him…").)

Alebbini believed his goal of trying to obtain the Caliphate—the "United States of Arabia" he called it—could be achieved only through violence. The Caliphate no longer was obtainable—according to Alebbini—through political discourse or peaceful means. Those methods, he believed, had been tried and failed:

13

| | |
|---|---|
| Alebbini: | [OV] Let me finish, let me finish. So, *cousin*, whether we are terrorists or not terrorists, they are going to fight us. By God, by God brothers, no matter what or who we are, America will not let us be. We elected Mursi and we saw what America did to us. Erdogan was elected, America turned against him but praise God, the coup failed and it is known by all indications and proofs that the coup was sponsored by America. What I want to say, Hussein, is that we have gone through all peaceful methods, prayers and supplications. It's been a while that we're going through the Muslim Brotherhood experience. The Muslim Brotherhood are educated people-- |
| Hussein: | [OV] So this means, listen, listen, they were successful in Egypt, in South Sudan and in all the countries but they are unable to defeat one person with 300 followers? |
| Alebbini: | Yes. |
| Hussein: | That's what I want to put across to you. |
| Alebbini: | Yes. |
| Hussein: | That's what I want to put across to you, Laith. |
| Alebbini: | And that's what we want to get to. |
| Hussein: | Laith |
| Alebbini: | That means the solution-- |
| Hussein: | Laith, Laith. |
| Alebbini: | [Excited] is to bear arms, is to bear arms brothers. The successful way-- |
| Hussein: | [OV] bear arms against who? Against who and with who? That's my problem. That's my problem. |
| Alebbini: | I, I will tell you with who and against who. Okay? With the people of the Sunnah. We, the State Organization, are the only people of the Sunnah. Every Sunni, |

(Govt. Ex. 5o1 at 93-93; *see also* at 160 (Alebbini asking Hussein "what else other than terrorism actually worked?").) Alebbini said the same to SA Herwig after being arrested: "And this is why the Islamic State, no matter what you do, it is have a proven to the Arabian countries that if you want a revolution, you want to build a country, just go to the guns, cause the guns will get you the good thing what you want." (Govt. Ex. 8a at 90.) Not only was Alebbini's conclusion that violence is the only answer, he believed the violence must be directed against the United States and anyone else who stands in ISIS's way:

| Alebbini: | I, I will tell you with who and against who. Okay? With the people of the Sunnah. We, the State Organization, are the only people of the Sunnah. Every Sunni, Sunni citizen, Muslim, Christian, peaceful, okay, living under the State, every Shia individual who does not bear arms, who want to live respectfully with us the people of the Sunnah are welcome to do so, but the rule will be for the people of the Sunnah.  We, the regime in Jordan, we do not have anything such as Sykes and Picot. What we have is, you as a Muslim citizen, you can drive from your house in Morocco to Yemen, you can buy any land or property and live in it, as the case is in America. Those are who we are with. Who are we against? We are against any regime that follows the US government and does not want this accomplished. Anyone who prevents us from building a State like America, in the form of united Arab states with a federal Islamic government, where every city, every state-- |
|---|---|
| Hussein: | Where, where is your State from all this? Are they making demands for this? |
| Alebbini: | That's the State, that's what the State is demanding. |

(Govt. Ex. 5o1 at 94.)  Notably, at this point, just a few days prior to his travel, Alebbini expressed his firm commitment to ISIS, identifying himself by his use of "we" as part of ISIS. He would do the same when speaking to SA Herwig.

When asked whether Alebbini could kill, Alebbini comfortably talked about beheading people whom Alebbini considered not to be peaceful, telling Hussein mere days before his attempted travel:

| Alebbini: | Listen to what I will do. I will lay him on the ground and I will tape a beheading video, one that you will like, and who will be the executer? I will be that. I cut his head off and listen… not only that I will go to sleep, I will sleep comfortably, if he were a bastard… because they are the ones raping our sisters. |
|---|---|
| Hussein: | [Spits] Fuck you! May Allah disgrace your fucking honor! |
| Alebbini: | [Chuckles] Yes. |
| Hussein: | May Allah disgrace your fucking honor! |
| Alebbini: | [Yells] Someone who's raping the Syrian women, man, I will cut his head off. |

15

(Govt. Ex. 5o1 at 94.) When Hussein asked "[w]hy don't you go to help the homeless," Alebbini responded with a chuckle while relying on religious justification from "Allah" to behead people:

| Hussein: | [OV] Why don't you go to help? Why don't you go to help *the homeless*? |
|---|---|
| Alebbini: | By God Hussein-- |
| Hussein: | [OV] The ones you see out in the snow, why don't you go and warm them up? If they ask you why you're doing that, tell them Islam ordered you to do that. |
| Alebbini: | [Chuckles] Yes, it's because Allah ordered me to do jihad, and I love martyrdom. |

(Govt. Ex. 5o1 at 62.)

One constant throughout the circumstances of the offenses was that Alebbini frequently turned to religion to justify his approval of horrific and gruesome actions by ISIS, including the act of beheading someone:

| Alebbini: | Hussein, my dear, listen, I did not say the Islamic State does not cut off heads. The Islamic State is the beheader and throat cutter. The Islamic State is the one that beheads and cuts throats. I agree with you on that Hussein, but they still treat captives well. The captive, before he is beheaded, is treated well, but when it's time to behead him, he will be beheaded. I am with you, I won't lie to you. The Islamic State, the Islamic State beheaded and killed-- |
| Hussein: | When did the Messenger, when did the Messenger, let alone cut off a head, but when did the Messenger threaten a hostage with a knife? When? |
| Alebbini: | *Cousin*, when did the Messenger? If you go back to the Sunnah, our Prophet Muhammad cut off the heads of people while they were holding to the drapes of al-Ka'ba, as they held on to the drapes of al-Ka'ba, he cut off their heads, during the conquest of Mecca. |

(Govt. Ex. 5o1at 120.) Even after his arrest, when talking with the FBI, Alebbini acknowledged and sought to justify the beheadings. (Govt. Ex. 8a at 75.)

He turned to his twisted views of Islam to justify terrorism itself:

| | |
|---|---|
| Alebbini: | First of all, our religion of Islam is a religion of terrorism. |
| Hussein: | [SC] I ask Almighty Allah for forgiveness. |
| Alebbini: | We, we, yes… first of all I did not say our religion is not a religion of terrorism. Our religion is a religion of terrorism. We terrorize the enemy. Any enemy who comes to occupy our land, we terrorize them. That's an order from Almighty Allah. We must terrorize the enemy, to scare them off, so we don't get screwed-- |
| Hussein: | [SC] I seek refuge in God for He is the ultimate protector. |
| Alebbini: | [SC] We must have terrorism. We must be terrorist people in order to terrorize any enemy who comes near us-- |
| Hussein: | [SC] So now the Christian has become an enemy? |
| Alebbini: | [SC] Muhammad said "I have been made victorious by terror". You've got to terrorize the enemy, *cousin*-- |

(Govt. Ex. 5o1 at 139.) This twisted view enabled him to rationalize and justify the burning of the living Jordanian pilot:

```
about feeling.  Look, when ISIS burned that pilot,
everybody felt oh, they burned him.  They burned
him.  They burned him.  Then I was, like, man, we
cannot just go by this (unintelligible), so I
opened Google, and I looked it up.  Is it in Islam,
could we burn somebody?
                    MS. ESHELMAN:  No.
                    MR. ALEBBINI:  ISIS, no.  I can't.
But in one case if you burn somebody that burns
you, like, if I burned your hand, you can burn my
hand.  And, that pilot, burned some people, so the
Islamic State burned him because he burned some
people.  So when you look at it, and you look and
see is different than how I feel, the United States
of America have burned a lot of people.  The United
States of America have burned the most people out
of anybody in the world.  Do you know how?  In the
```

17

(Govt. Ex. 7p1 at 17; *see also* Govt. Ex. 3i1 at 24 ("after they burned al-Kasasbah, when al-Kasasbah got burnt, the people…and you know people have weak faith, … But brothers, it is al-Kasasbah who brought it this thing unto himself"); Govt. Ex. 3i1 at 25 ("the one who burnt al_Kasasbah was one of the emirs of a sector that was being bombed by the Crusader Alliance, er, and Jordan. And this person came under the banner of the Cross. He came openly under the banner of the Cross. So, I felt like going to Jordan, to announce at the mosque that I want to go, that the State is right, and that al-Kasasbah is wrong. This is so the people of Sal…I mean when God willing, the Islamic State comes in, they won't say…I mean that they will not have any remaining grudges against the Islamic State.").)

And the use of children as suicide bombers too. It is here—in the context of suicide child bombers—that Alebbini finds the inspiration to characterize ISIS as good and just, telling Hussein: "Goodness and justice are with the Islamic State." (Govt. Ex. 5o1, page 41.) Outraged, Hussein rightfully and logically asked:

| Hussein: | Where are goodness and justice? Where are goodness and justice, where? |
|---|---|
| Alebbini: | Hussein-- |
| Hussein: | [OV] Where are goodness and justice, where are goodness and justice? |
| Alebbini: | Goodness and justice are with the Islamic State-- |
| Hussein: | [OV] Goodness and justice Laith-- |
| Alebbini: | [OV] but there are sons of bitches, Hussein-- |
| Hussein: | [OV] What goodness and justice are there in sending a 10 year old with an explosive belt and calling him a Bird of Paradise-- |
| Alebbini: | [OV] they don't-- |
| Hussein: | [OV] Is that goodness and justice? |

(Govt. Ex. 5o1 at 41.) Rather than agreeing with Hussein or otherwise acknowledging the fundamental wrongfulness of the use of children in war crimes, Alebbini missed the mark and instead disputed the age at which children lawfully can die in suicide missions on behalf of ISIS:

| Alebbini: | *Cousin*, Hussein, it's 14 years old, anyone below 14 years is not allowed to join jihad with the Islamic State. That is the State's law. It looks like you don't know what you're talking about-- |
|---|---|
| Hussein: | That's what, that's what they tell me. |
| Alebbini: | *Cousin* – |
| Hussein: | That's what they tell me. That's what they tell me. |
| Alebbini: | *Cousin*, By God, by God. |

(Govt. Ex. 5o1 at 42.)

Alebbini's apparent willingness to use children as vehicles of death is not limited to children he does not know. He was willing—in fact desired—martyrdom for his infant son, the subject of a plea for lenience from Alebbini's spouse. (*See, e.g.*, Letter from Destiney Eshelman).) Yet, this is what Alebbini had to say, months after his arrest, about the child his spouse says "needs his dad:" "He's going to be a martyr . . . look, we're all going to die." (Govt. Ex. 7zh2 at 20-21.) And, after learning from his spouse that his son was "1 month old exactly today," Alebbini responded: "grant him martyrdom in his future." (Govt. Ex. 7o2 at 5.)

F. "*Just Talk*"

"Just talk," say Alebbini's family members. Given their efforts in trying to convince Alebbini not to join ISIS, their desire to protect him yet again is understandable. But Alebbini lied to and tricked his family, repeatedly:

> after that, are we supposed to say "Well, I cannot engage in jihad because there is no legal guardian?" Should I wait for King Abdullah [OV] the one who killed...
>
> Mohammad: [OV] [UI] didn't you say a couple of days ago that you wanted to go to study law?
>
> Alebbini: Lies--
>
> Mohammad: [OV] [UI]
>
> Alebbini: --*cousin*, these are all lies. I got my passport man, and when I received my passport I said that's it, now I have my passport. My parents had stolen my passport, but when I tricked them and told them those lies they returned it to me.
> Now my friend I want to go, but I have two problems. The problem that my

(Govt. Ex. 5m1 at 6.)

> Mohammad: You told me that you inter--interviewed, you told me that you interviewed.
>
> Alebbini: These are all--these are all stories brother that I told in order to hide things from people and… But this is all lies. It is all, it is all *cousin*. All this stuff that I was telling you are basically things that are untrue [Noise]. I, *cousin*--I, *cousin*, that is it; I am not going to work anymore for infidels, I am not going to work anymore for infidels who collect a tax that they go and bomb Syria and Iraq with. When I will arise on judgement day when I die, I would've been with the Crusader alliance against Muslims. I would be killing Muslims--

(Govt. Ex. 5m1 at 2.) Having been lied to and tricked by Alebbini, his family cannot possibly be expected to know the full extent of Alebbini's commitment to ISIS, his desire to serve it as a fighter, or his rationalization of ISIS's brutality.

Additionally, Alebbini's family did not sit through the entire trial and did not see and hear the entirety of the evidence. So, Alebbini's justification of ISIS's burning alive of the Jordanian pilot came as a "great surprise" to his cousin, Mohammad. (*See* Tr. 3/8/19 (Sentencing Hearing) at 53-54.) When his sister-in-law writes, "Do I believe Laith had intent of joining ISIS? I honestly do not," she could not have known this was exactly Alebbini's intent. When Alebbini's younger sister writes she was worried, after taking a class, that he was "pro ISIS," but that he assured her he "will never be one of them," she could not have known that in

20

Alebbini's mind, as revealed by his actions and words to others, he already was. When Alebbini's mother pleas for lenience due to the lack of evidence of direct contact between her son and an ISIS member in Syria, she could not have known her son purposefully avoided making contact as part of his operational security:

> push my thoughts, no. It's the fact, it's a matter of simple pure fact. You want to break it to that (unintelligible) for the American people at all.
>
> MR. HERWIG: So you can only get these facts from, you know, people who are there now, like, maybe they will talk?
>
> MR. ALEBBINI: No. No. I always avoid people from there.
>
> MR. HERWIG: Because, what, it wouldn't be safe to talk from here to there?
>
> MR. ALEBBINI: Yes. And also it would, then they will say that got connections with them. I didn't want connections, you know, because --
>
> MR. HERWIG: Until you get there and are actually there?
>
> MR. ALEBBINI: Well, yeah. Yeah. I don't want to twist it, it's like that --

(Govt. Ex. 8a at 91.) Nor could she have known that most ISIS "travelers" do not make contact with ISIS prior to actually joining. (*See* Tr. 11/20/18 at 96 (Q. Dr. Vidino, must one have contact with the Islamic State before in fact travelling overseas? A. No, not necessarily. Q. Do

the majority of people within the United States who attempt to join the Islamic State or in fact join the Islamic State have contact with members of the Islamic State? A. No. Statistically, the majority did not.").)

When Alebbini's younger brother states in his letter that everything began to go downhill when Alebbini lost his job at Walmart, "which he loved," perhaps Alebbini's brother, who was present for part but not all of the trial, was unaware of how Alebbini despised working for American companies because they were, in his view, "infidels," using his tax money to fight and kill Muslims. (Govt. Ex. 5m1 at 1-2.) Or, perhaps Hossam forgot his earlier conversation with Alebbini on the subject:

| Hossam: | Apply at *Walmart*, go and work at *Walmart* [Echo]. |
| Alebbini: | I don't want to. |

(Govt. Ex. 5f1 at 13.) Similarly, when Alebbini's younger brother states in his letter that Alebbini "has never contacted anyone in Syria nor does he know anyone in Syria, Iraq, Turkey, or any other Arab country except Jordan," and that "[t]he FBI['s] claim[] that Laith contacted someone in Syria" is "completely false," he presumably was unaware that Alebbini had been in contact with persons in Syria, namely, Raid's friends. (*See* Govt. Ex. 5o1 at 24) ("I talked to Syrians, Raid's friends in Syria [who] asked me 'so you want to join the jihad and you are a decent man?' I said 'yes'.).)

But, Alebbini's younger brother is in a different category. He is someone who, before Alebbini's arrest, commendably tried to talk Alebbini out of joining ISIS, perhaps understandably coached Alebbini on what to do to avoid being caught and what to say if caught, but, following his arrest, not-so-commendably coached Alebbini to lie. For instance, Alebbini's younger brother urged Alebbini to lie about his true travel intentions:

22

**89 LAITH:**

يا عيني عليك، بدي أياها. لأن هم هنا قالوا شو "الأف بي أي" أنه هسه، كيف بدهم يثبتوا أنه أنا حاولت؟ بدهم يقولوا أنه أنا ليث كنت مسافر على تركيا و رايح عليهم. و هذا أعتبروه "السابستانشيال ستيب" يعني أنه أنا كنت متحرك، شو قالوا يعني أنت يا ليث أنت أتحركت. فاهم شو. فبدي أقولهم لا يا أخوين الشرموطه أنا حاجز على الأردن و بقيت رايح على الأردن ، ما أحجزش حتى على تركيا. بس أنتوا لما بلغتوا عني بالأردن و أنا مش عامل إشي ، بطلت أروح على الأردن. فملشان أبعمسه لل "الأف بي أي" و أنيك أخواتهم كلهم اخوان الشرموطه هذولا أقلهم هاي مش "السابستانشيال ستب" أنه رحت على تركيا. أنا رحت على تركيا لأنكوا أنتوا غدرتوا في. أنتوا لأنكم رحتوا علي الأردن و بلغتوا عني و إبن خالي راح انحبس بالأردن و بقي يتعذب بالأردن. فأنت شو. علشان يثبتوا للقاضي أن ليث و الله فعلا أنه مش أنه ليث بس بقى يحكي بدهم يقولوا ليث حرك. علشان يقولوا أنه حرك... بدهم يقولوا، إنه يثبتوا إنه حرك رح يجيبوا التذكرة عشان يثبتوا تركيا و مسكوني على باب المطار. أني بدي أقولهم لأ و هاي أنا حاجز رايح على الأردن و بدي أروح أقرأ في الأردن محاماة و في عندي مليون خطة بالأردن أسويها. و كنت بدي أحكي مع أهلي، فمكنتش متحرك ، مكنتش محرك. بعدني مش [لفظي] مفرك بالتحريك،بعدني أني بفكر و أنت لو تتذكر أبوي قالي تعال و أنا بقنطه وكنا بدنا نروح نعيش غاد وأدرس محاماة و أصير أنا أدافع عن الدولة الإسلامية زي أمجد اللوفتاوي كمحامي، صح؟

---

Great man, I want it. Because the *FBI* is saying now, how would they prove that I attempted? They want to say that Laith was going to Turkey then going there. And this is what they consider a *substantial step*. Meaning that I was moving, they want to say that you Laith moved. Do you understand, so I want to tell them you brothers of bitches I booked to Jordan, I did not even bookit on the Turkish. But when you reported me to Jordan when I did nothing, I stopped going to Jordan. So to beat the *FBI* and to fuck all of their sisters, the brothers of bitches, I did not take *substantial step* by going to Turkey, going to Turkey was because you betrayed me. Because you went to Jordan and reported me and my maternal cousin was jailed in Jordan and he was tortured in Jordan. You see. For them to prove to the judge that Laith actually…not only that Laith talked, they want to say Laith moved. To say that I moved …to prove that he moved they should provide the ticket on the Turkish and that they arrested me at the door of the airport.
I want to tell them no, my ticket is going to Jordan, and I want to go there to study Law in Jordan and I have a million plan in Jordan, and I was talking to my family, so I did not take a step, I did not take a step. I was just thinking, and if you remember my father told me come, and I wanted to go for good to study Law, and become

10

23

| | | | |
|---|---|---|---|
| | | | a defender of the Islamic State like Amjad al-Liftawi as a lawyer, correct? |
| 90 | HOSAM: | اهم. | Ah huh. |
| 91 | LAITH: | مظبوط هذاهو ، فا... بدي أَقولهم هاي الأدلّة هه بس أنتوا لما صرنا بالأردن بلغتوا عَني بالأردن و أنا مش عامل إِشي. وأنا بس بحضر فيديوهات، أه بلغتوا عَني و انمسك إِبن خالي وانسرقَت فلوسه و اتعذب و صار فيه الأفاعيل قلت أنا خلص أنا بروح على تركيا و من هناك بشوف شو بسوي و أنا قايل لسُهير ، أنا قايل لِدستني ... الحمد الله | Exactly, what I want to tell you that these are the evidence, but when they reported me to Jordan and I was doing nothing...I was just watching the videos...huh, when you reported me, my cousin was arrested and his money was stolen and got tortured and so on. So I said okay, I will go to Turkey and from there I will see what I will do. And I told Sohair... I told Destiney...praise be to Allah. |
| 92 | HOSAM: | قلبحت معك أخي قلبحت معك. [غير مفهوم] [تداخل حديث]. | You got confused brother...you got confused, brother [UI]. |
| 93 | LAITH: | هاها. إسمع و أنا قايل لِدستني... | Ha-ha listen and I told Destiney... |
| 94 | HOSAM: | هذا غلطة خيو... دقيقة هاها خلينا نشوف الموضوع هاذ، دقيقة. | This is a mistake brother...ha-ha... let's see what's behind this mistake, the subject.... ha-ha. Wait a minute, wait a minute |
| 95 | LAITH: | في حد بيسمعني ؟ | Anyone listening to me? |
| 96 | HOSAM: | لا. | No. |
| 97 | LAITH: | مليح. هاها. إسمع ما بدريش خلص. المهم يا معلم ... | Great. Ha-ha. Listen I don't want to. Anyway boss. |
| 98 | HOSAM: | هاهاهاهاها يخرب عرضك. | Ha-ha-ha-ha-ha. Ruin your honor, man. |
| 99 | LAITH: | وشرفي، تعرف لو غلطت هاي الغلطة قدامها ؟ كانت فضحت عرضي. | You know if I did this mistake in front of her? She would raise hell over me. |
| 100 | HOSAM: | فظيع أنت . | You are bad. |
| 101 | LAITH: | فا شو يا معلم. شو كنت أقول أنا ؟ أه و كنت قايل لِدستني أنه رأح أجي أنا على الأردن بس رأح أجي من تركيا. يعني أعبر على سوريا و بعدها اجي من سوريا تهريب على الأردن. | So you see boss, what was I saying? Oh, yes. I told Destiney that I will come to Jordan but I will come from Turkey. So I will cross to Syria then I will be coming smuggling from Syria to Jordan. |
| 102 | HOSAM: | أنت ... أنت تقدر تكتب . تقدر تقول أنا [غير مفهوم]هذا أخو شرموطة علشان أخد منه "التكت" | You...you can lie. You can say that this is a brother of a bitch, just to take |

11

| | | |
|---|---|---|
| | بلاش لأن بدي أروح على الأردن. | the *ticket* from him for free because I wanted to go to Jordan. |
| 103 **LAITH:** | هاها ... أه بس... | Ha-ha…yes but…[OV] |
| 104 **HOSAM:** | أنت فاهم؟ قول أنا، أنا [غير مفهوم] عليه وهو، هو بقع في قلته احجز لي على الأردن و أنا [غير مفهوم]من هناك. | Do you understand? So just say that he kept convincing me…so I told him book it to Jordan and I [UI] from there. |
| 105 **LAITH:** | أوه... هاها. | Yes…Ha-ha |
| 106 **HOSAM:** | و الله لازم تستغل هذا الموضوع. | I swear to Allah, you have to use this matter. |
| 107 **LAITH:** | خلص، ماشي الحال، أنا رح أستغله. | I will use it…I will use it. |
| 108 **HOSAM:** | المهم. يا سيدي إنشاء الله خير. | Anyway. Allah willing it will be alright. |
| 109 **LAITH:** | [تداخل حديث] بدي شغله زي هيك ماتقوليش اياها على التيلفون يا حمار. شغلة زي هيك تتشفر. | And you, something like that you shouldn't tell it me over the phone you donkey. Something like that should be encrypted. |

(Govt. Ex. 6f2 at 10-12.) And that Alebbini should just blame it on the videos:

| | |
|---|---|
| Hossam: | We don't want to go to prison [Noise]. So shave your beard *cousin*, good? [Noise] And my dear, say, "I really used to watch some videos, but I do not have anything. What do you think?" |

(Govt. Ex. 5c1 at 8); not mention the State and say instead "I want to go fight Bashar" (Govt. Ex. 5s1 at 9); say: "My flight is to Jordan and I am going home to Jordan. Send me over to Jordan" (Govt. Ex. 5s1 at 10), and go on a hunger strike if they refuse. (*Id.*) The portion of his letter seeking to place blame on Alebbini's marijuana use, even calling it an "addiction," is particularly incredulous, given their post-arrest efforts falsely to introduce marijuana into the defense narrative:

| 55 | **HOSAM:** | على "الريكورد ... الريكورد" أنت كنت الزلمة هذا عاطيك حشيش و هو يقنعك. | On the *recorded...recorded*. This guy was giving you hashish while convincing you. |
| 56 | **LAITH:** | هه ؟ أه. أه. هاها ماشي الحال. | Huh? Oh yes. yes. Ha-ha. Okay. I understand you. |
| 57 | | شايف كيف؟ | You see how? |
| 58 | **HOSAM:** | فهمت كيف | Do you understand? That he was telling me and telling me and I was just saying yes you just... |
| 59 | **HOSAM:** | أنه يظل يقولي و يقولي و يقولي و أنا أقوله بس اقول له أه، يصير يسجل لي...؟ | That he was telling me and telling me and I was just saying yes you just... |
| 60 | **LAITH:** | ها... | Ha... |
| 61 | **HOSAM:** | بس. | That's it. |

(Govt. Ex. 6a1 at 7.)

Similarly, when Alebbini's father writes in his letter that "[t]here is no evidence to prove he was going to go to Syria in April 2017 because how could he have with only $80 to his name," Alebbini's father could not be expected to know that his son actually was traveling with a "few hundred dollars." (R. 74, Def. Sent. Mem. at 382.) Nor could he have known that his son did not believe he needed any money to get from Turkey to ISIS:

| | |
|---|---|
| Alebbini: | We were on the verge of Raid's travelling, or may have travelled already, I'm not exactly sure. |
| CHS: | He had travelled already. |
| Alebbini: | But I also was going to travel; and Qasim was-Qasim… there's a great possibility that Qasim wants to join us. There is a great possibility that Qasim wants to follow us, but he says "My position in America, leave me here for a little bit. You guys can go ahead and see how the path is like. When you make sure that the group is on the right path, let me know." |
| CHS: | Are you going to take money with you, or what? |
| Alebbini: | Yes, I have. I have. Over there, I, there, as you might say, one would need no money. |
| CHS: | Don't you need to get things done, and need money for transportation? |
| Alebbini: | I have, I have, I have. |
| CHS: | I'm talking about myself. |
| | [Noise] |
| Alebbini: | Do you need any? |
| CHS: | [Coughs] I have, but how much do you think I should take? |
| Alebbini: | How much do you want to take? See, if you get to Turkey, you won't need any; you won't need anything. |

(Govt. Ex. 3f1 at 29.)  Additionally, when Alebbini's father points to the gifts Alebbini and his wife were carrying at the time of Alebbini's arrest as "proof" that his son was traveling home to Jordan to visit family, not to Syria for the purpose of joining ISIS, presumably Alebbini's father was unaware of Alebbini's acknowledged plans to send his wife to Jordan while Alebbini stepped off the plane in Turkey and then went on to Syria to fight with ISIS.  (*See, e.g.*, Govt. Ex. 8a at 79-80) (Alebbini:  "Destiney didn't have a passport and all that stuff, so I had to go to all these stuff because Destiney was going to go to Jordan, and I was going to go to Turkey." … Herwig:  And then what?  You could go to the Islamic State and maybe come visit sometimes? Alebbini:  Exactly.  That was the plan.  That was the plan.").)

27

While the desire to advocate for and defend one's son is understandable, Alebbini's father knew of his son's intent to join ISIS, advised his son not to tell anyone that he (Alebbini) is with ISIS, and counseled Alebbini on what to say and what cloaking action he should take:

> **Alebbini:** Do you see? By God Almighty, so, I'm saying, I mean I'm saying, my father is telling me, "You should go over there? You're going to tell them… don't tell them you are with the State; don't tell them you are with such. Tell them what they like to hear." I told him, "Fine father, I will tell them what they like to hear. I'll tell them what they want." He told me, "Postpone it and don't come." I mean, I told him, "To postpone and not to go, I mean, I, frankly don't understand why not to go, I mean…" Then he tells me the prison sentence for it is three years; with hard labor. I mean I told him, "So what if I get three years in prison with hard labor! On the Day of Judgement, I will find these three years and God will compensate me for them." Today I was watching….My father is saying, "Uh, shave, shave the beard." Well my friend, I mean now, am I not a Sunni? Well, if I want to, uh….I swear to God, I swear to God, I…look, I thought, if I will lie, if I am a liar; I can now tell you a story and lie to you ten times in the story. Uh, this way or…?

(Govt. Ex. 3i1 at 8.)

> Put all the important stuff in Destiney's bag. Shave off your beard, erase all messages on your phone and may God bring all the good things your way. Tell Destiney she is going to Jordan with you for a visit, that she will be staying with you and she has nothing to do with all this, so the poor thing is not dragged into anything, so you will change your mind and come to us as soon as possible.

> Son, shave off your beard son.

> Wear shorts and put your things only in your bag because they will take your things to inspect them.

> It doesn't take a lot of courage. Just say you regret and you didn't do anything.

> Do it son. Depend on God and He will not let you down. You did not call upon anyone to adopt these ideas. It was just loneliness, having no job, and cigarettes. Just let us think this way.

> Alebbini, the Turkish government arrests 1000 people on suspicions that they are affiliated with the *Islamic State*.

(Govt. Ex. 9a.)

Not everyone shares the view that it was all "just talk." During his recent allocution, when addressing some of his prior statements about fighting the Syrian regime, Alebbini "doubled down," reaffirming his commitment to do so. When it came to his prior statements about joining ISIS, however, Alebbini took a different approach. In his view, the evidence presented at trial simply showed that he was merely thinking about *possibly* joining ISIS, and,

thus, that there was still reasonable doubt, not that it was "just talk," hardly the contrite, humble,

acceptance of responsibility so often expressed by defendants facing sentencing in this Court.

And, hardly the expression of "regret" Alebbini's wife believes her husband feels, as stated in

her letter. The only prior statements that *were* "just talk" according to Alebbini? Conveniently,

his vile, hate-filled, and expletive-replete statements against America and Americans:

| Alebbini: | --I will not come back to America and will not enter it anymore. I swear to God that I will not enter the United States of America except, God willing, as a conqueror. But in no way will I enter the United States of America, not through immigration or anything else. Those people are infidels and I have washed my hands of them, and God willing they will have nothing to do with me. I do not want to be with them, and-and I do not want them to be with me, and that's it. |
| --- | --- |
| *Govt. Exh. 5m1 (April 3, 2017), p. 17* | |
| Hussein: | How would you know who the group you're firing at belongs to or is affiliated with? |
| Alebbini: | This group, *cousin*, belongs to the Crusaders, belongs to America. You're fighting the Crusaders. *Govt. Exh. 5o1 (April 20, 2017), p. 34* |
| Alebbini: | Fuck America and fuck whoever brought us to America, man. Fuck this country and all who lives in it, man. Isn't it better that one becomes -- *Govt. Exh. 5m1 (April 3, 2017), p. 10* |
| Alebbini: *Govt. Exh. 3f1 (March 27, 2017), p. 36* | I swear to God, brother-brother Muhammad, the right thing is-the truth is if you look- if one looks with the eye of truth to the-to the system, I would rather be in prison, and I would rather spend ten years in prison than to stay one year in America in this system. At least, during these ten years in prison, I would say to God, "God I desired to support, but I was held back." Then, God would compensate me for these ten years, because He knows my intention. |
| Alebbini: | Yes! On Judgement Day, the Green Card will come out and testify against me. *Govt. Exh. 3f1 (March 27, 2017), p. 20* |

Alebbini's statements presented at trial were not "off-the-cuff" remarks. They were part

of a long line of consistent statements made by Alebbini, to several individuals, at varying

moments in time, all expressing his commitment to and desire to join ISIS, and his willingness to

fight and die as a soldier for ISIS:



Alebbini's commitment to ISIS is not something that came without deep thought, reflection, and consideration. Alebbini spent years reviewing information, watching videos, absorbing the news, and consuming ISIS propaganda. Propaganda that Dr. Vidino characterized as either "ultra violent" or utopian but still with the violent element always present. Even according to Alebbini, attributing his life-defining decisions just to watching too many ISIS propaganda videos misses the mark:

| Hussein: | You left all this because you believe the videos of the mother fuckers. |
| --- | --- |
| Alebbini: | I swear to God, it's not that I believe in few video. Hussein, if I were believing based on few videos I would have listened to what you told me, I would have understood that that the couple videos I watched-- |

(Govt. Ex. 5o1 at 156; *see also* Govt. Ex. 5o1 at 132.)

Alebbini instead spent years researching, praying, and reflecting over his decision to give his life to ISIS. He prayed because he learned that ISIS would lead him to killing all kinds of people—including Muslims. While knowing that he might cause the death of other Muslims caused Alebbini to think and pray, it did not cause him to change his mind, or modify his intentions. And after reading the Quran, after kneeling down to pray not once, but twice, Alebbini found comfort in making a decision. Alebbini's commitment towards ISIS and its brutal ways stems from a fundamental religious viewpoint, one which *compels* his joining of ISIS and fighting for it. The evidence revealed the exact opposite of "just talk." The evidence revealed Alebbini to be thoughtful and deliberate in his decision-making, resolute on the righteousness of those decisions, and firm in his willingness to do what is necessary for ISIS.

3. <u>The History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))</u>.

Alebbini portrays himself as a gullible, compassionate man who committed these offenses because he was duped by ISIS propaganda and concerned about Muslims in Syria. But the record demonstrates instead that Alebbini was a man of unwavering commitment to ISIS who—even when repeatedly confronted about the terror of ISIS by his friends, family, and anti-ISIS literature—believed that ISIS's vile methods were correct and necessary to bring about the caliphate that Alebbini desired so much that he was willing to kill (even Muslims in Syria: *see* Govt. Ex. 5o1 at 24), and be killed, if necessary. Far from being fooled by propaganda, Alebbini was fully aware of the reality of ISIS and was determined to commit violent acts on ISIS's behalf. (*See, e.g.*, *id*. at 132, 156 ("I swear to God, it's not that I believe in few video").) Any argument to the contrary ignores the reality based on the evidence before the Court.

The Court need only consider Alebbini's own words as just some of the evidence that contradicts the portrait that Alebbini attempts to paint of himself. On numerous occasions, Alebbini boasted of his superior knowledge of all things ISIS, discussing the hundreds of videos that he "watched and watched and watched and watched," and how he observed ISIS's progress over a four-year period. (*See, e.g.,* Govt. Ex. 5o1 at 106 ("I was keeping up with the people and seeing doubt and falsehood. I observed for four years, cousin, watching and seeing, until I became one hundred per cent convinced that they were right, after four years of watching an following them.").) Alebbini stated that he considered all sides of the argument during his years of observation and became convinced by ISIS. (*See, e.g., id.* at 132 ("I am a man who, when I saw this side and I saw that side, over the last four years, and I saw things with my own eyes and I listened to all parties, the truth was revealed to me.").)

These repeated statements demonstrate that he is not a defendant who was naïve, ignorant, and duped by optimistic propaganda. This is a defendant who carefully came to his own conclusions about ISIS after years of observation, and who had a very clear understanding that ISIS burns its enemies alive (*see, e.g.,* Govt. Ex. 3a1 at 51), conducts beheadings (*see e.g.,* Govt. Ex. 5o1 at 120), and enlists children as suicide bombers (*see e.g.,* Govt. Ex. 5o1 at 42). This is also a defendant who defended ISIS's revolting methods while acknowledging his own capacity and willingness to be an "inghimasi soldier" and to commit similar violent acts. (Govt. Ex. 5o1 at 129; *id.* at 60.) As Dr. Vidino testified at trial, a violent element was always present in ISIS propaganda, even in the more "positive" products. (*See* Tr. 11/20/2018 at 128.) Accordingly, Alebbini could not have been fooled into thinking that ISIS was anything but a violent, ruthless organization.

Alebbini also seeks to deflect responsibility by pointing to his marijuana use. However, Alebbini's own words debunk the assertion. In conversations with his brother, defendant expressly denied that marijuana (hashish) use had anything to do with his and Raid's convictions regarding ISIS. (*See, e.g.,* Govt. Ex. 5e1 at 12 ("I swear by God it is not under the influence of hashish. Man! Hossam! This is called faith. This is called conviction. I am a man who is convinced—"); Govt. Ex. 5t1 at 7 ("Okay, okay and the proof . . . the proof on what you say is that Raid did not smoke hashish. Raid did not smoke hashish . . . You, who of you all was influenced by me, who was it? It was Raid. No one else was influenced, but Raid. That's it, the matter is over. Raid didn't smoke hashish.").) And it is not surprising that Alebbini now raises marijuana as a contributing factor, given his post-arrest plotting with his younger brother to falsely introduce marijuana into the defense narrative. (*See* Govt. Ex. 6a2 at 7.) Alebbini's actions in this case were based on his absolute certainty regarding ISIS, not the use of marijuana.

Equally unavailing is Alebbini's suggestion that this case never may have materialized had the United States and other Western governments done more to counteract ISIS's propaganda. The reality is that no amount of counter-propaganda would have convinced Alebbini to change his views. Alebbini repeatedly was confronted with arguments against ISIS's terroristic methods by multiple sources. Still, Alebbini rejected those arguments at every turn because he was convinced that ISIS was employing the right methods to achieve its (and his) goals. For example, when Alebbini encountered anti-ISIS pamphlets in a mosque, he did not take time to consider the pamphlet's characterization of ISIS as "The Terrible Terror to the World." (Govt. Ex. 2.) Rather Alebbini, in his own words, "dumped them in the garbage and fought with the mosque's imam," later telling his wife—after his arrest—that those pamphlets were "full of lies." (Govt. Ex. 3d1 at 91; Govt. Ex. 7zf at 19.)

Additionally, this Court heard hours of testimony involving a phone call between Alebbini and his friend Hussein, who raised numerous examples of ISIS's terror and who repeatedly told Alebbini that ISIS propaganda was fooling Alebbini.  (*See, e.g.,* Govt. Ex. 5o1 at 59 ("Man, man.  Don't be fooled by those baits.  Those are baits, baits to improve their shitty, stinky reputation.").)  But even when confronted in this direct manner, Alebbini continued to defend ISIS's actions, claiming that it was Hussein who had been fooled by America and the West.  (*Id.* at 98 ("You are the fooled ones, you follow America and you follow the West who are fighting you."); *id.* at 159 ("You, man, are a person who follows America, the Western thinking and the infidels' thinking and you are fooled!  America fooled you and convinced you that America is good and that the mujahideen are traitors.").)  At one point during his conversation with Hussein, Alebbini acknowledged that the West had made efforts to brand ISIS's propaganda as "brainwashing media."  (*Id.* at 132.)  Nevertheless, Alebbini remained convinced that ISIS was the right group for him.

The upshot is that Alebbini's own words demonstrate that he was not an ill-informed do-gooder who was duped by drug use and optimistic ISIS rhetoric.  Alebbini considered all of the arguments and had several sources of information at his disposal that characterized ISIS as the terrorist organization that it is.  Alebbini simply rejected the anti-ISIS viewpoint because he agreed with ISIS's goals and was convinced by ISIS's methods.

Alebbini's express approval of ISIS's goals and violent methods contradicts his attempt to explain his conduct as merely an act of compassion toward Muslims being oppressed by the regime of Bashar Al-Assad.  As demonstrated at trial, Alebbini wanted to join ISIS because he had become convinced religiously that the hope of an Islamic caliphate rested in ISIS alone, (Govt. Ex. 5o1 at 129 ("I swear by God Hussein, if the Islamic States is defeated, then the

34

Islamic nation scheme is over)), and he believed that ISIS's violent methods were the only way to achieve that caliphate. And while Alebbini may consider his desire for a caliphate to be a common desire among Muslims, he is mistaken. It is one thing to desire an Islamic caliphate. It is another thing to believe that ISIS, and its murderous ways, are the legitimate route to that caliphate. In holding the latter belief, Alebbini was not espousing a common Muslim belief, but a belief that lies on the "fringe of the fringe of the fringe," as expressed by Dr. Vidino.

These extremist views were understandably upsetting to Alebbini's family. And unlike many of the defendants who appear before this Court, Alebbini appears to have grown up in a family that provided a good upbringing and stable support system. They provided Alebbini with an education and opportunity. (PSR at ¶ 72.) In his letter to the Court, Alebbini's father discusses how he sent Alebbini to the United States to give him "an opportunity that I didn't have." Unfortunately, Alebbini squandered that opportunity. Despite his education and language skills—and repeated urging by his family and Hussein to put those skills to good use in the United States—Alebbini chose to be unemployed while living in Dayton and had lost his previous job in Virginia due to attendance issues. (PSR at ¶ 73.) While in Dayton, he preferred to have his wife work, claiming that he did not want to work for U.S. companies who paid taxes that are converted to bullets by the "Crusaders." (*See, e.g.,* Govt. Ex. 3e1 at 27 ("These taxes, my brother, turns into a bullet in the chest of an Iraqi . . . . you end up a participant with the Crusaders in the wars without knowing.").) Alebbini had the opportunity to be a productive member of society and to work for good, as Hussein urged him, using his vocational and educations skills. But he threw the opportunity away based on his convictions regarding ISIS, convictions that his family could not change and convictions that will not change.

In sum, the record demonstrates that Alebbini is a well-informed and committed member of "the fringe of the fringe of the fringe," who was prepared to commit violent acts on behalf of ISIS.   And this despite being given the education and skills necessary to become a productive member of society.   Accordingly, his lack of a criminal history does not indicate that he poses less of a danger to the community, or risk of recidivism, than other individuals convicted of similar crimes.   *See, e.g.*, *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.").   A sentence within the applicable Sentencing Guidelines range appropriately would account for Alebbini's history and characteristics.

    4.   <u>The Seriousness of the Offense; Respect for the Law; Just Punishment; Deterrence; Protection of the Public; Educational, Vocational, and Medical Care and Treatment (18 U.S.C. § 3553(a)(2)</u>.

As noted above, Alebbini's offenses are among the most serious in our nation's laws, and a significant sentence is warranted to promote respect for the law and afford just punishment.

As for specific deterrence, given Alebbini's level of commitment, it is doubtful any sentence will deter him from seeking to achieve his goal.   Indeed, Alebbini has often stated that no term of imprisonment will break his will.   Only physical deterrence can stop Alebbini from joining the battlefield.

It is imperative that Alebbini and those like him be stopped from joining ISIS because ISIS remains one of the most serious threats to the security of the United States and the world. Although recent news reports indicate that ISIS has lost control over much of its previously-held geographical territory, by no means does that loss of territory signal the end of ISIS or its terroristic ideology.   As General Joseph Votel, commander of U.S. Central Command recently

36

told members of the House Armed Services Committee, "[r]eduction of the physical caliphate is a monumental military accomplishment but the fight against ISIS and violent extremism is far from over." *See* Ryan Browne, "Top US general in Middle East says fight against ISIS 'far from over,'" CNN.com (March 7, 2019)[1]; *see also* Felicia Sonmez, "'The ISIS threat will remain,' John Bolton says," The Washington Post (March 10, 2019).[2] General Votel went on to explain that, despite its loss of territory, ISIS will continue to fight using tactics like assassinations, IED attacks, and ambush-type operations. *Id.* Recent news reports confirm that those tactics are being actively employed by ISIS in Syria and Iraq. S*ee* PBS News Hour, "As caliphate collapses, new ISIS threats emerge in Syria," PBS News (March 19, 2019) (noting that ISIS has morphed into "an effective and deadly insurgency group" that has employed IED attacks and suicide car bombs).[3]

With ISIS fighters continuing to conduct terrorist attacks against coalition troops in Syria and Iraq, the organization also continues to grow in other regions, including Afghanistan. *E.g.*, Barbara Starr & Ryan Brown, "US officials warn ISIS' Afghanistan branch poses a major threat," CNN.com (February 19, 2019).[4] General Votel has described ISIS forces in Afghanistan (known as ISIS Khorasan or ISIS-K) as "a very sophisticated and dangerous threat" that is currently recruiting in Afghanistan using the same methods seen in Iraq and Syria,

---

[1] Article available at https://www.cnn.com/2019/03/07/politics/votel-isis-fight/index.html.

[2] Article available at https://www.washingtonpost.com/politics/the-isis-threat-will-remain-john-bolton-says/2019/03/10/8e28290c-4340-11e9-8aab-95b8d80a1e4f_story.html?utm_term=.aa353971f8de.

[3] Story and transcript available at https://www.pbs.org/newshour/show/as-caliphate-collapses-new-isis-threats-emerge-in-syria.

[4] Article available at https://www.cnn.com/ 2019/02/19/politics/isis-afghanistan-threat/index.html.

*including from schools and mosques, and on social media. Id.* ISIS affiliates like ISIS-K not only conduct terrorist attacks abroad, but continue to have a "mandate to attack across the Atlantic." *Id.*

And just as significant as its operations on the ground, ISIS's toxic and violent ideology continues—and will continue—to live on in the minds of ISIS supporters like Alebbini. One ISIS member recently interviewed in an internment camp justified ISIS's beheadings, burnings, and mass executions in a manner strikingly similar to the justifications supplied by Alebbini to his friends and family:

> Yes, they were terrifying and shocking . . . but that is the law of the Almighty. . . .
> All we know is the book and the law of the Almighty says whoever fights Sunnis,
> whoever kills Sunnis, whoever does not rule by the law of the Almighty, then
> that's it . . . .They must be slaughtered. That is the law of the Almighty. We can't
> change it.

*See* Ben Wedeman & Kareem Khadder, "The Islamic State is dying . . . but believers in its radical ideology live on," CNN.com (March 1, 2019).[5] It is this ideology that will never die, and that inspires unwavering devotion to the terrorist organization and its abhorrent methods. The evidence during trial demonstrated that Alebbini's mindset mirrors that of ISIS members. He has stated that he will not be deterred by a three- or even ten-year sentence. Given his absolute dedication to ISIS and its goals and methods, the only method to deter him from carrying out his mission is physical incapacitation for the term suggested by the sentencing guidelines.

General deterrence is different. A lengthy prison sentence here may very well not have any impact on a similarly situated individual equally resolved to join a terror group. However, for those with a lesser commitment, those truly just "thinking" about it, or those not nearly as

---

[5]    Article available at https://www.cnn.com/2019/03/01/middleeast/isis-true-believers-intl/index.html.

committed as Alebbini or others like him, a substantial sentence would serve the interests of general deterrence.

Such a sentence also would protect the public, perhaps the greatest single factor at issue in this case and discussed at length elsewhere in this memorandum.

Alebbini has significant educational and vocational skills, having studied in the medical-technician field and having obtained an Associate's degree in Anesthesia and Recovery.  He also received some vocational training in hospitals in Jordan.  He also has the skills to serve as a translator.  He discussed all of this.  And, he rejected all of it, in favor of becoming a fighter for ISIS.  Finally, as also discussed elsewhere in this memorandum, no evidence suggests any need for medical care or treatment.

     5.   The Kinds of Sentences Available (18 U.S.C. § 3553(a)(3)).

The kinds of sentences available to the Court in this case include imprisonment, supervised release, probation, and fines.  The statutory-maximum penalties are the same on each count of conviction, namely, 20-years imprisonment, a lifetime of supervised release, and a $250,000 fine.  No mandatory-minimum sentence applies, and the imprisonment and fines may, at the Court's discretion, run concurrently or consecutively, or part concurrently and part consecutively.

Alebbini has been in custody since the time of his arrest in this case on April 26, 2017, approximately 1 year and 11 months ago.  Effectively, then, the sentencing options available to the court range from releasing Alebbini with credit for time served, to imposing a 40-year term of imprisonment, a lifetime of supervised release, and $500,000 in fines, to points in between.  The special assessments amount to $200, $100 on each count.  In short, the Court has a wide range of sentencing options at its disposal.

6.  <u>The Sentencing Guidelines (18 U.S.C. § 3553(a)(4) and (5))</u>.

The United States concurs with the Probation Office's Sentencing Guidelines calculations, namely, that Alebbini's Total Offense Level is 38, and that his Criminal History Category is VI, which corresponds to an advisory custodial range of 360 months to life imprisonment.  Pursuant to U.S.S.G. 5G1.1(c) and the corresponding Commentary, the advisory range is "restricted" to 360-480 months due to the statutory maximum.

### A.  *The Terrorism Adjustment Applies*.

Alebbini objects to the inclusion in the calculations of the Terrorism adjustment set forth in U.S.S.G. § 3A1.4.  The Court should overrule Alebbini's objection.

Section 3A1.4 of the United States Sentencing Guidelines provides for a 12-level increase in the base offense level if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism."  Section 3A1.4 also increases Alebbini's criminal history category to Category VI.  As an initial matter, Alebbini's *Kimbrough*-based challenge is without merit.  Though the Terrorism adjustment significantly increases the base offense level and criminal history category for defendants convicted of terrorism-related offenses, "Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation . . . Considering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases."  *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003).

The government bears the burden of proof, by a preponderance of the evidence, with regard to the application of the Terrorism adjustment. *United States v. Wright*, 747 F.3d 399, 407 (6th Cir. 2014); *United States v. Fidse*, 862 F.3d 516, 523 (5th Cir. 2017) ("Fidse II"). "The terrorism enhancement can be applied to inchoate offenses, such as attempt and conspiracy." *Wright*, 747 F.3d at 407. This is "consistent with the text of § 3A1.4(a), which extends the enhancement to felonies 'that involved or [were] intended to promote a federal crime of terrorism' . . . ." *Id.* "Thus, even if a terrorist act was only contemplated, rather than executed, this may give rise to an inference of the requisite intent under § 3A1.4." *United States v. Elshinawy*, No. CR ELH-16-009, 2018 WL 1521876, at *4 (D. Md. Mar. 28, 2018), citing *United States v. Chandia,* 514 F.3d 365 (4th Cir. 2008).

Section 3A1.4 requires proof of three elements:

(1) the offense is a felony;
(2) the defendant must have been convicted of an offense that involved or was intended to promote a federal crime of terrorism; and
(3) the offense must have been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

U.S.S.G. § 3A1.4, app. 4.A (stating that the "federal crime of terrorism" is defined by cross-reference to 18 U.S.C. § 2332b(g)(5)). The offenses of conviction here, (i) Attempt to Provide Material Support or Resources to a Foreign Terrorist Organization, and (ii) Conspiracy to do the same, both in violation of 18 U.S.C. § 2339B, are felonies that involved, and were intended to promote, a federal crime of terrorism. Indeed, they *are* federal crimes of terrorism.

With respect to the first element, each offense carries a statutory maximum custodial penalty of 20 years. They are both felonies. Alebbini makes no claim to the contrary.

With respect to the second element, Alebbini was convicted of an offense listed in 18 U.S.C. § 2332(b)(g)(5) (listing § 2339B as a federal crime of terrorism). Thus, Alebbini was

convicted of an offense that "involved" a federal crime of terrorism. Alebbini does not challenge that the offenses of conviction involved federal crimes of terrorism.

Alebbini, however, challenges the third element. Alebbini argues the terrorism adjustment does not apply because his conduct was not "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." The argument is misplaced.

"The application of § 3A1.4 . . . does not require a finding that [the defendant] was personally motivated by a desire to influence or affect the conduct of government." *United States v. Awan*, 607 F.3d 306, 315-16 (2d Cir. 2010); *see United States v. Jayyousi*, 657 F.3d 1085, 1114-15 (11th Cir. 2011) ("[T]he Guidelines's precise language focuses on the intended outcome of the defendants' unlawful acts—i.e., what the activity was calculated to accomplish, not what the defendants' claimed motivation behind it was."). The claimed personal motive for the offense is "simply not relevant" to the intent inquiry. *United States v. Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011) (*quoting Awan*, 607 F.3d at 317). Influencing or affecting government need not be the defendant's "ultimate or sole aim." *Wright*, 747 F.3d at 408; *see Jayyousi*, 657 F.3d at 1114-15; *Awan*, 607 F.3d at 317.

During pretrial motions practice, and through allocution, Alebbini continued to discuss his disdain for Bashar al-Assad and the Syrian Government, and Alebbini suggested his motivations merely were to overthrow the Syrian Government and protect the Syrian people. Even if true (it is not), by seeking to accomplish these goals through supporting ISIS, Alebbini still violated federal law and is subject to the Terrorism adjustment. More important, however, the evidence makes clear that Alebbini's motivations extend far beyond his feelings toward al-

42

Assad and the Syrian Government. For instance, Alebbini also desired to overthrow the government of Jordan and to kill its leader, King Abdullah:

| Raid: | I hope we'll have another chance to get together if not here, then in the homeland, God willing! |
|---|---|
| CHS: | God willing! |
| Alebbini: | The man does not want to go back home now. |
| CHS: | I can't return. |
| Alebbini: | [OV] I hope that the Islamic State comes, when it exists, it smites king Abdullah's head off, and goes and frees Palestine. The situation will revert to be fine, good. |
| Qasim: | Good willing! |

131

Date of recording:     03/09/2017

(Govt. Ex. 3B1 at 131.)

| Alebbini: | I swear, I talked to my family the other day and I heard news, I put on the news, about the Islamic State that the Jordanian borders were with the opposition and are now with the Islamic State, and that Jordan is shitting in its pants because their borders with Syria are with the Islamic State. I said by God, hopefully soon. I spoke to my dad, and told him that the Islamic State will enter Jordan soon, God willing. |
|---|---|

(Govt. Ex. 3d1 at 31; *see also* Govt. Ex. 3i at 32 ("God willing a front will open in Jordan, and I will be one of those who, God willing, will screw King Abdallah's soldiers, and King Abdallah himself."); Gov. Ex. 5m1 at 17 ("God willing, if God enables me, I will not enter Jordan except as part of the conquering armies.").)

The evidence at trial showed that Alebbini attempted and conspired to join ISIS, in part, to promote an Islamic Caliphate that would stretch across the Middle East and replace the many foreign governments currently existing in the region:

| | |
|---|---|
| Alebbini : | When are you planning on going to Jordan ? |
| CHS: | What? When God makes it possible [Laughs] |
| Qassim: | When he gets the passport. When [UI] shows up. |
| CHS: | Like when some people tell you "God willing we'll see you", you'd want to say "man, for God's sake, don't wish me for that" [Laughs]. Let us first figure things out and then God will help. |
| Alebbini: | I say God willing, our countries will, little by little over the next ten years, go back like brand new. |
| CHS: | What countries? |
| Alebbini: | Our countries. |
| CHS: | God willing! |
| Alebbini: | There will be no Palestine, no Jordan, no Syria or Egypt. There will be an Islamic State-- |

(Govt. Ex. 3C1 at 88-89.)  Alebbini's desire for the Islamic Caliphate to replace foreign

governments in Jordan, Syria, Egypt, and elsewhere, shows his offenses were "calculated to

influence or affect the conduct of government by intimidation or coercion, or to retaliate against

government conduct."  In this context, "government" includes foreign governments.  *See United*

*States v. Assi*, 428 Fed.Appx. 570 (6th Cir. 2011) (holding the term "government" in §

2332b(g)(5)(A) extends to foreign governments).

That Alebbini attempted and conspired to join ISIS, a terrorist group engaged in brutal

and barbaric violence, including beheadings, mass executions, bombings, and burning of living

service members, among other heinous acts, necessarily entails a calculated effort to influence or

affect the conduct of government by intimation or coercion, and to retaliate against governments

for actions that Alebbini believes to be inappropriate.  Stated differently, Alebbini intended to

join an organization—ISIS—that has been designated by the United States Government as a

foreign terrorist organization, is an enemy of the United States Government and the civilized

world, and has battled the United States Government, along with many other governments.

44

Moreover, the evidence at trial showed that Alebbini vowed not to enter the United States except as a "conqueror:"  (Govt. Ex. 5m1 at 17.)  The idea of "conquering" the United States necessarily would require overthrowing the government of the United States.  Acts intended to overthrow the government necessarily affect the conduct of government.

For his part, Alebbini asserts that his offenses were not calculated to influence or affect the conduct of "government," or to retaliate against "government" conduct, because, according to him, he only sought to join ISIS in order to fight against the al-Assad regime in Syria.  He asserts that the United States no longer recognizes that regime as the legitimate "government" of Syria, and thus, so the argument goes, Alebbini's attempt and conspiracy to join ISIS could not have been calculated to influence or affect the conduct of "government."  While a clever play on words, the argument lacks substance.  First, the adjustment applies when the offense is calculated to influence "the conduct of government," not just the conduct of "governments politically recognized by the United States."  Whether the United States recognizes al-Assad's regime as the legitimate government of Syria, and whether the United States is seeking to put political pressure on the al-Assad regime by recognizing opposition groups as the legitimate representative of Syria (but, as noted in one of the articles cited by Alebbini, not necessarily conveying government status on those groups), the al-Assad regime is still engaged in the "conduct of government."

Indeed, the al-Assad government fields an army, is represented at the United Nations, interacts with other recognized governments, engages in governmental functions typical of an organization overseeing the affairs of large groups of individuals, and is held responsible under the Foreign Sovereign Immunities Act as a "state" in United States courts notwithstanding the severing of diplomatic relations (*see, e.g., Colvin v. Syrian Arab Republic*, 2019 U.S. Dist.

LEXIS 14641, Civil No. 16-1423 (ABJ) (D.D.C. January 30, 2019); *Roth v. Syrian* Arab

Republic, 2018 U.S. Dist. LEXIS 168244, Civil No. 1:14-cv-01946-RCL (D.D.C. September 28,

2018)). And, of course, absent the al-Assad regime engaging in government conduct, there

would be little reason for Alebbini's ire towards, or the United States' efforts against, the regime.

In short, even accepting the premise that Alebbini sought to join ISIS in order to fight the Bashar

al-Assad regime, and nothing more, he did so, by definition, to influence or affect the "conduct

of government."

Second, the premise that Alebbini sought to join ISIS only to fight the Bashar al-Assad

regime is, as noted above, faulty. The evidence at trial showed that an additional purpose behind

his attempt and conspiracy was to create an Islamic Caliphate, which would result in existing

governments in the region ceasing to exist. Alebbini also wished to destroy the government of

Jordan and its leader, King Abdullah. Alebbini likewise indicated he would only return to the

United States as a "conqueror."

These additional reasons for Alebbini seeking to join ISIS are best characterized as

calculated to influence or affect "the conduct of government." *See*, *e.g.*, *United States v. Van

Haften*, 881 F.3d 543 (7th Cir. 2018) ("A desire for safety and Islamic fellowship may have

contributed to Van Haften's decision to travel to Syria, but this innocent desire was not Van

Haften's sole, or even primary, motivation for attempting to join ISIS. The terrorism

enhancement applies so long as the defendant's conduct was 'calculated . . . to retaliate against

government conduct,' even if it was also calculated to accomplish other goals simultaneously.");

*United States v. Wright* , 747 F.3d 399, 408 (6th Cir. 2014) (stating ". . . a defendant who

provided material assistance to terrorist organizations, but claimed that his goal was to assist an

oppressed group of Muslims, is eligible for the enhancement regardless of his purportedly benign

motive"), citing *United States v. Jayyousi*, 657 F.3d 1085, 1114–15 (11th Cir. 2011).  In asking

the Court not to apply the terrorism enhancement, Alebbini effectively asks the Court to sentence

in a way that is contrary to the plain text of the Sentencing Guidelines and inconsistent with how

other courts have applied the Terrorism adjustment.  *See*, *e.g.*, *United States v. Benkahla*, 501

F.Supp.2d 748 (E.D.Va 2007), *aff'd* 530 F.3d 300 (4th Cir. 2008) (court applied the terrorism

enhancement after defendant was convicted after trial in case involving false declarations to the

grand jury, obstruction of justice, and false statements to the FBI); *United States v. Assi*, 586

F.Supp.2d 841 (E.D.MI 2008) (court applied terrorism enhancement after defendant pled guilty

to attempting to provide material support to terrorists when arriving at the airport with night-

vision goggles and other items for an FTO); *United States v. Elshinawy*, 2018 WL 1521876, at

*2 (D. Md. Mar. 28, 2018) (applying the terrorism enhancement following guilty plea); *United

States v. Kaziu*, 559 F. App'x 32 (2d Cir. 2014) (affirmed application of terrorism enhancement);

*United States v. Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014) (same); *United States v. Van

Haften*, 881 F.3d 543 (7th Cir. 2018) (same); *United States v. Tounisi*, 900 F.3d 982, 984 (7th

Cir. 2018) (same).

　　　In sum, the Terrorism adjustment applies because the offenses of conviction are (1)

felonies; (2) involved or intended to promote federal crimes of terrorism; and (3) calculated to

influence or affect the conduct of government by intimidation or coercion, or to retaliate against

government conduct.  U.S.S.G. § 3A1.4, app. 4.A.  Alebbini's objection to the terrorism

adjustment should be overruled.

　　　　　*B.  Alebbini Should Not Receive Any Credit For Acceptance of Responsibility.*

　　　Alebbini also asks for a reduction for acceptance of responsibility.  But, he has not

accepted responsibility, ever.  No adjustment is appropriate.

Despite already being convicted of attempting and conspiring to provide material support to ISIS, Alebbini continues to argue at sentencing that "he did not possess the requite specific criminal intent to place himself under the direction and control of ISIS when he was arrested, and he believed the totality of the circumstances could not support the finding that he took a substantial step." (R. 74, Def. Sent. Mem. at 382.) He continued with this theme at his allocution. Alebbini also disagrees that the government met its burden, despite the Court finding an "avalanche of evidence" of guilt. Nevertheless, Alebbini asks for a downward variance because he "accepts the judgment of the Court," stating:

> While [the defendant] may disagree that the case was proven beyond a reasonable doubt, he accepts the judgment of the Court.

(*Id*. at 385.) Yet, somehow, after expressly not accepting responsibility for his actions, and instead only accepting (seemingly grudgingly) the judgment of the Court, Alebbini asks the Court to give him credit for acceptance of responsibility because Alebbini chose not to dispute the authentication and foundation of the evidence in this case. (*Id*. at 385-386 (stating Alebbini "waived a jury and stipulated to nearly every piece of evidence offered by the government").)

In asking for acceptance-of-responsibility credit where Alebbini expressly did not accept any responsibility for his actions, Alebbini fails to provide any legal authority to support his request for credit after proceeding to trial, except for one cite to the Sentencing Guidelines. The cited provision states that "in **rare** situations," a defendant may receive credit for accepting responsibility even after proceeding to trial when the sole purpose of proceeding toward trial was to "preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)" (U.S.S.G. § 3E1.1 (emphasis added); R. 74, Def. Sent. Mem. at 385-386.)

Here, Alebbini proceeded to trial for the purpose of challenging "factual guilt."  He contested, as a factual matter, intent.  Alebbini, though, asserts that he "simply questioned whether the statute applied to his conduct" as a legal matter.  (*Id*.)  That assertion is not supported by the record.

Alebbini did not present any legal challenges during the pretrial and trial phases of this case.  Alebbini never challenged the sufficiency of the indictment.  He never challenged the constitutionality of the statute.  What he did challenge was the sufficiency of the evidence as to his intent.  He reiterated that at allocution, claiming there was still reasonable doubt as to his intent.  That he stipulated to the authenticity and admissibility of the bulk of the evidence introduced at trial, evidence that without question was authentic and admissible to begin with, adds little, if anything.  Alebbini wished to rely on the evidence too, and his stipulation helped ensure he would be able to do so without putting on a case himself.  Similarly, Alebbini waived trial by jury, presumably for strategic reasons, not as part of some legal challenge to the statute.

The Court rightfully concluded that the United States proved Alebbini's guilt beyond a reasonable doubt.  Alebbini's lack of remorse and unwillingness to accept responsibility, even now, suggests that this case does not present one of those "rare situations" in which a defendant who proceeded to trial also deserves the benefit of credit for accepting responsibility.

7.  Avoiding Unwarranted Sentencing Disparity (18 U.S.C. § 3553(a)(6)).

Alebbini makes considerable efforts to compare his criminal conduct to other defendants who violated counterterrorism laws.  In doing so, Alebbini argues that a substantial variance from the Sentencing Guidelines is necessary to avoid unwarranted sentencing disparities.  This "compare and contrast" to other cases approach is unproductive.  There simply is no way of knowing every factor that went into the ultimate sentence in other cases.  Pre-sentence

49

investigation reports are unavailable.  The entirety of the evidence before the sentencing court is similarly unavailable.  Records are sealed.  A vacuum necessarily exists.  The Sentencing Guidelines, then, provide the best vehicle to avoid unwarranted sentencing disparity, not an incomplete "compare and contrast" routine.  *See United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018) ("Rayyan points to another defendant sentenced by another judge (Judge Tarnow) for similar conduct to argue that the court abused its discretion by imposing a higher sentence on Rayyan. But § 3553(a)(6) concerns national disparities within a class of similar defendants, not disparities between one defendant and another….The district court was free to focus on the risks and circumstances of the defendant in front of him, not the one sentenced by another judge.") (Internal citation omitted); *United States v. Swafford*, 639 F.3d 265, 270 (6th Cir. 2011) ("[t]he point of the guidelines is to decrease sentencing disparities, an objective furthered by a within-guidelines sentence, as opposed to a sentence that varies above or below the advisory guidelines range," variances are "more likely to create disparities than eliminate them," and while "[t]here is nothing wrong, to be sure, with a below-guidelines sentence," "[i]t is just that a request for one should not turn on § 3553(a)(6)"); *United States v. Clark*, 540 Fed.Appx. 539, 543 (6th Cir. 2014) (§ 3553(a)(6) "not a directive to consider similarities between codefendants *or other specifically identified defendants*…") (emphasis added).

The Sixth Circuit explained "Subsection 3553(a)(6) is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct."  *United States v. Simmons*, 501 F.3d 620 (6th Cir. 2007), citing *United States v. Poynter*, 495 F.3d 349, 351-56 (6th Cir.2007); *United States v. LaSalle*, 948 F.2d 215, 218 (6th Cir.1991); *United States v. Parker*, 912 F.2d 156, 158 (6th Cir.1990).  "[Section] 3553(a)(6) is there to ensure nationally uniform sentences among like offenders so as to leave room to depart

50

downward for those defendants *who are truly deserving of leniency*." *Id*. (emphasis added),

citing *Poynter*, 495 F.3d at 351-56; *United States v. Borho*, 485 F.3d 904, 910 (6th Cir.2007);

*United States v. Husein*, 478 F.3d 318, 331, 333-34 (6th Cir.2007).

The Sixth Circuit recognized, however, that "[a] district judge [ ] may exercise his or her

discretion and determine a defendant's sentence in light of a co-defendant's sentence." *Id*.,

citing *United States v. Nelson*, 918 F.2d 1268, 1272-73 (6th Cir.1990). "That action, however,

would be a discretionary one because the district court is not required to consider that type of

disparity under § 3553(a)(6)." *Id*., citing *LaSalle*, 948 F.2d at 218; accord *Parker*, 462 F.3d at

277 ("[A]lthough § 3553(a) does not require district courts to consider sentencing disparities

among co-defendants, it does not prohibit them from doing so.").[6]

Alebbini has nonetheless entered the slippery slope of comparing himself to other

individual defendants. His list of supposed comparable cases, however, misses the mark.

Alebbini cites cases, where, in large part, defendants pled guilty, accepted responsibility for their

criminal conduct, often apologized to the courts, their families, and others, and agreed to

cooperate fully with the United States. In this case, however, Alebbini did not plead guilty (as

was his right), Alebbini did not accept responsibility for his actions even after his conviction

---

[6] The defense asserts that Ra'id Ababneh was detained but then released by Jordanian authorities and is "now by all accounts living free in Jordan." (R. 74, Def. Sent. Mem. at 386.) Ababneh, however, is not a co-defendant. The government does not know whether law-enforcement officials in Jordan are investigating Ababneh, or whether Ababneh is cooperating with the Jordanian government. Because Ababneh left so early in the investigation, the same level of insight into his mindset does not exist, and thus, whether Ababneh shares the same level of commitment and violent tendencies as Alebbini is unknown. Part of the impact of the defendant exercising his right to trial is that the Court and the public had an opportunity to consider the full record relating to Alebbini.

And without having answers to these important considerations concerning Ababneh, the parties here should not, and simply cannot, derive much value, if any, from Ababneh's status in Jordan as it relates to an appropriate sentence for Alebbini—who seems to have placed himself in the position of spokesperson for ISIS and its violence against all people who are not ISIS. Accordingly, even if the Court otherwise might be inclined to consider Ababneh when determining an appropriate sentence for Alebbini, it should not do so given the lack of information relating to Ababneh.

(including at the time of his allocution), he never apologized to the Court, his wife, his son, his family inside and outside of the United States, or anyone else (despite arguing with them for hours about his decision, without any care for how that decision might impact them, and despite pleas from his family to go home and not travel into Syria), and Alebbini has not cooperated with the government (despite having every opportunity to do so).

In addition to considering Alebbini's refusal to accept responsibility and his unwillingness to cooperate with the government, the United States respectfully submits that if the Court opts to consider the compare and contrast approach urged by Allebini, it should look at cases factually comparable to the defendant in this case. That is, defendants who expressed the desire and intention to engage in violent acts and kill people who do not agree with Alebbini's warped sense of Islam (*i.e.*: ISIS's view of Islam).

Alebbini made clear his acceptance, and even thirst, for violence in support of ISIS. And, if comparing Alebbini to other individual defendants, Alebbini should be sentenced consistent with those other defendants who expressed the same willingness to engage in violence, and consistent with other defendants who took action in support of ISIS. Alebbini does not deserve a lesser sentence merely because he failed where others succeeded. The only reason Alebbini is not credited with causing death, destruction, and blood to be spilled (likely American blood too) is that law-enforcement officers had the tools, diligence, and persistence to stop Alebbini from reaching his goal of joining ISIS on the battlefield and killing civilians who Alebbini deemed not to be innocent because of their refusal to accept ISIS as the one true Caliphate.

Alebbini should be compared to defendants who, like him, were willing to kill, behead, and burn other people. *See*, *e.g.*, Tr. 3/8/19, at 54-55 (where Alebbini stated he would behead people and sleep comfortably). That Alebbini can behead and, thereafter, sleep comfortably, is

telling and critical to any assessment of Alebbini's intentions, dangerousness, proclivity for violence, and commitment to ISIS. Not only would Alebbini behead people, he decided he would serve as an inghimasi solider—a term specific to ISIS and one that shows Alebbini to be part of the "fringe of the fringe of the fringe." Beyond beheading and killing as an inghimasi soldier, Alebbini also condoned the burning of so-called apostates, like Captain Muath Safi Yousef al-Kasasbeh. Alebbini's justification (religious duty) matches that of the Islamic State— and only the Islamic State—whereas other violent extremist groups, and people, including other extreme jihadists working for foreign terrorist organizations other than ISIS, condemned the burning of the pilot. *See* Tr. 11/20/18 at 67-68 (Dr. Vidino stating, "Here it seems Mr. Alebbini takes that position fringe of a fringe of a fringe [that] what the Islamic State did was Islamically the right thing."). The majority of Muslims condemned the burning of the pilot. Extremist ideologues condemned the burning of the pilot. Even many ISIS sympathizers condemned the burning of the pilot. But Alebbini and the Islamic State organization condoned it, supported it, and justified it.

Alebbini talked about the burning of the pilot, he opined about the burning of the pilot, and he justified the burning of the pilot under Sharia law. As if beheadings and the burning of living people were not enough to demonstrate Alebbini's violent tendencies and commitment to ISIS—a commitment Alebbini made clear would never cease—the Court should be concerned with Alebbini's approval and willingness to use children as suicide bombers in support of ISIS's terroristic goals. Alebbini condones the use of children as suicide attackers. (Govt. Ex. 5o1 at 41-42; Govt. Ex. 7zh2 at 20-21; Govt. Ex. 7o2, Page 5.)

All of this violence—Alebbini's willingness to cut off heads, to burn people, to use children as suicide soldiers, to use himself as an inghimasi soldier—all of this death, all of this

destruction, it all was for the Islamic State.  Because Alebbini thinks God commanded it.  There is no changing the mind of someone like Alebbini, who acts out of some warped sense that he is doing God's work.  To that end, the Court should sentence Alebbini to a term of incarceration consistent with the Sentencing Guidelines.

In doing so, again, to the extent the Court looks beyond the Sentencing Guidelines and to other individual cases, the Court can look to defendants who demonstrated the same commitment to ISIS, and who expressed the same willingness to kill in the name of ISIS.  To find those comparable defendants and comply with any requirements under the case law about avoiding national disparities, the Court should look to defendants convicted following trial, rather than plea, because only after a full trial—like the case here—can the Court and the public have the benefit of a robust and comprehensive factual record that truly enlightens us all to the real intentions of a defendant like Alebbini.

As a general matter, defendants convicted following trial of terrorism offenses have received sentences in excess of approximately 30 years, or more, in prison.  *See*, *e.g.*, *United States v. Guled Ali Omar, Abdurahman Yasin Daud, and Mohamed Abdihamid Farah*, No. 15-049 (D. Minn. 2016) (convicted by a federal jury of conspiring to commit murder in Syria on behalf of ISIS and to provide material support to the designated foreign terrorist organization; Omar also was convicted of one count of attempted financial-aid fraud, and Farah also was convicted of one count of perjury and providing a false statement; the Court sentenced Omar to 35-years incarceration, Daud to 30-years incarceration, and Farah to 30-years incarceration); United States v. *Nader Elhuzayel and Muhanad Elfatih M. A. Badawi*, No. 8:15-cr-00060 (C.D.CA 2016) (convicted by a federal jury of conspiring to provide material support to a foreign terrorist organization, as well as aiding and abetting codefendant's attempt to provide

support to ISIS, and for federal financial-aid fraud designed to generate funds for the scheme; the Court sentenced both defendants to 30-years incarceration).[7] *See also United States v. Pugh*, No. 15-cr-00116 (E.D.N.Y. 2017) (convicted by a federal jury for attempting to provide material support to the ISIS and obstruction of justice and sentenced to 35 years in prison).

In *Pugh*, the defendant traveled from Egypt to Turkey in an effort to cross the border into Syria to join ISIS to engage in violent jihad. Turkish authorities denied the defendant entry and returned him to Egypt. At the time of his detention, the defendant was carrying a laptop computer and four USB drives that he had stripped of their plastic casings in an effort to destroy their contents and thereby make them unavailable to investigators. The defendant also was carrying solar-powered chargers, compasses, a black balaclava, and clothing suitable for Syria. Foreign government officials quickly deported the defendant to the U.S., where the FBI closely monitored him, relying in part on a covert undercover employee who encountered the defendant at the airport.

The defendant's laptop contained Internet searches for "borders controlled by Islamic state," the ISIS propaganda video "Flames of War," as well as terrorist videos he had downloaded, including ISIS execution videos. In the months before he attempted to join ISIS, the defendant made statements to coworkers and on social media establishing his support for ISIS, including advising Facebook followers to "support [ISIS] with your bodies."

Shortly before he left Egypt for Turkey on his way to Syria, the defendant drafted a letter proclaiming, "I am a Mujahid. I am a sword against the oppressor and a shield for the oppressed. I will use the talents and skills given to me by Allah to establish and defend the Islamic State.

---

[7] The evidence at trial showed that Elhuzayel and Badawi used social media to discuss ISIS and terrorist attacks and made arrangements for Elhuzayel to leave the United States to join ISIS. Elhuzayel and Badawi also discussed how "it would be a blessing to fight for the cause of Allah, and to die in the battlefield," and they referred to ISIS as "we."

There is only 2 possible outcomes for me. Victory or Martyr."  Following a jury trial, the court sentenced Pugh to 35-years incarceration.

Moreover, even defendants who pled guilty to conspiring or attempting to travel overseas for the purpose of joining ISIS (like Alebbini) received the statutory-maximum sentence, consistent with the Sentencing Guidelines.  *See*, *e.g.*, *United States v. Zea*, Case 2:13-cr-00072-SJF (April 2015, E.D.N.Y.) (defendant sentenced to 25 years in prison following his guilty plea to attempting to provide material support to al-Qaeda in the Arabian Peninsula and obstruction of justice when defendant attempted to travel to Yemen to join al Qaeda in the Arabian Peninsula; the statutory maximum sentence for violating Section 2339B, at that time, was 15-years imprisonment); *United States v. Saidakhmetov*, 15 Cr. 95 (WFK) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15-years imprisonment for attempting to travel to Turkey to join ISIS); *United States v. Alaa Sadeh*, 15 Cr. 558 (D.N.J.) (defendant sentenced to statutory maximum of 15-years imprisonment for assisting another individual to travel to join ISIS overseas).

Rather than address the cases involving defendants who proceeded to trial and, following conviction, received lengthy sentences, or the defendants who pled guilty and still received statutory-maximum sentences, the defense only compares Alebbini to defendants who pled guilty, accepted responsibility for their criminal conduct, often apologized to the Court, their families, and others for their actions, and/or cooperated with the government.  Indeed, Alebbini identifies two individuals whom he believes to be "most akin" to him—that being, "the defendants in Khan out of N.D. Illinois and Conley out of the District of Colorado."  (R. 74, Def. Sent. Mem. at 406.)  Unlike Alebbini, however, both Khan and Conley pled guilty, accepted responsibility for their criminal conduct, and they cooperated with the government too.

In *Khan*, the defendant—a 19-year-old man who was only 16-months removed from high school—attempted to provide himself and others to ISIS. In doing so, the defendant researched ISIS online and coordinated the logistics of his travel from the United States to Syria. The defendant purchased airline tickets for himself and two other individuals, and the defendant traveled to the airport where the FBI arrested him. The government charged Khan by a one-count criminal complaint alleging that Khan attempted to provide material support to ISIS in violation of 18 U.S.C. § 2339B. Khan later was indicted by the grand jury.

At the most basic level, Khan compares favorably with Alebbini, *i.e.*: an individual who intended to join ISIS, arrived at the airport with that intention, and was stopped by law-enforcement officers before boarding the airplane. But Khan made the decision to accept responsibility for his illegal conduct, and he pleaded guilty to violating Section 2339B. Khan agreed to provide "complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding, including in the United States or any foreign prosecution." *United States v. Khan*, No. 14 CR 564 (N.D. Ill. 2016), Doc. 74, p. 9. True to his word, Khan participated in four extensive debriefings that amounted to nearly 20 hours of questioning. *Khan*, No. 14 CR 564, Doc. 95 at p. 3.

Because of Khan's cooperation, the government told the Court that it "benefitted from information provided by Khan that furthered criminal investigations of two ISIL fighters and recruiters. First, Khan provided extensive information about his communication with and recruitment by an ISIL recruiter and fighter . . . Khan's information benefitted search warrants for approximately 16 [different accounts]." *Khan*, No. 14 CR 564, Doc. 95 at pp. 3-4. What is more, Khan "provided information about another ISIL fighter and recruiter" and, if arrested,

Khan would have testified in that trial. *Id*. The government explained, "Khan not only attempted to cooperate against Individuals 1 and 2, he also offered to testify against other ISIL recruiters, fighters, and supporters, including Mizanur Rahman.[8] Attempting to cooperate against individuals like Rahman sends a strong counternarrative that helps delegitimize [ISIS's] self-proclaimed authority." *Khan*, No. 14 CR 564, Doc. 95 at pp. 8-9.

In other words, Khan had the introspection at 19 years old to realize the gravity of his mistakes, accept responsibility for his criminal conduct, and help the government investigate and mitigate the risks relating to the threat of terrorism—both domestically and internationally. Alebbini—who is approaching 30 years old—has demonstrated none of the attributes exhibited by Khan. What is more, here, unlike *Khan*, the Court has the full record of Alebbini's statements and intentions, including Alebbini's views on beheadings, burning of living people, and use of children as suicide bombers, and Alebbini's desire to serve as that most lethal type of soldier— an inghimasi soldier.

At the time of Khan's offense, the statutory maximum sentence for violations of 18 U.S.C. § 2339B was 15 years of incarceration. Given Khan's extensive and comprehensive cooperation, the government recommended a sentence of 60-months incarceration, consistent with the terms of its plea agreement with Khan. The Court sentenced Khan to 40-months incarceration after considering the extensive cooperation provided by Khan. If not for Khan's extensive cooperation, the government was free to "recommend any sentence" appropriate under the law. *Khan*, No. 14 CR 564, Doc. 74 at p. 10. The government offered to recommend 60-months incarceration rather than a higher sentence (potentially as much as 180 months, given the statutory maximum) because of the importance of truthful and complete cooperation from

---

[8] According to the United Kingdom's Crown Prosecution Service, Mizanur Rahman was convicted in London's central criminal court in 2016 for encouraging support for ISIL.

defendant's like Khan.  Unlike Khan, Alebbini did not plead guilty, though he had an opportunity to do so, which likely would have prevented the Court and the public from understanding just how dangerous and prone to violence Alebbini remains given his unwavering commitment to ISIS.

Alebbini also refused to accept responsibility for his criminal conduct, even at the time of his allocution; to be sure, instead of accepting responsibility after his conviction, Alebbini tried to explain his actions and resorted to his preplanned "cover story" that he developed before leaving for the airport in April 2017.  And Alebbini did not apologize to anyone—including his wife and son—and he did not cooperate with the government (perhaps in part because he never was willing to accept responsibility for his conduct).  Simply, Alebbini is nothing like Mr. Kahn, who did everything in his power to right his wrong.  The United States asks the Court not to overlook these critical distinctions—doing so would subvert the purpose of the sentencing guidelines and serve only as a disincentive for people like Mr. Kahn, who recognized their errors and worked with the government to prevent terrorist attacks in the United States and abroad.  Simply, Alebbini deserves none of the benefits provided to Mr. Kahn and, instead, should be sentenced consistent with the sentencing guidelines and the presentence report.

The other defendant supposedly "most akin" to Alebbini, according to the defense, is Shannon Maureen Conley, who pled guilty to one count of conspiracy in violation 18 U.S.C. § 371.  Like Mr. Kahn, though unlike Alebbini, Ms. Conley pled guilty, accepted responsibility for her illegal conduct, and agreed "to cooperate and debrief completely and truthfully . . . concerning her knowledge of other individuals involved in providing or attempting to provide material support in any form to any terrorist organization . . . ."  *United States v. Conley*, No. 14-cr-00163 (D. Col. 2014), Doc. 37, p. 2.  Though Conley communicated with an active member of

al-Qaeda, that member was Conley's fiancé.  Conley made the decision to train in military tactics and, more relevant to her, first-aid treatment and nursing, before attempting to travel overseas for the purpose of joining her fiancé in Syria.  The FBI arrested Conley at the airport.

Because Conley pled guilty to violating Section 371, the statutory-maximum penalty was 60-months incarceration.  The government advocated in support of Conley receiving a three-point reduction in her offense level under the Sentencing Guidelines because Conley accepted responsibility for her criminal conduct.  Given that acceptance, and Conley's cooperation with the government, the Court sentenced Conley to 48-months incarceration, which, given the 60-month statutory maximum, equates to 80% of the maximum sentence allowed under law.  The government identifies the percent of Conley's sentence in this memorandum only because the defense advocates for a formula-based approach to sentencing.  (*See* R. 74, Def. Sent. Mem. 403-404 (calculating what percent of the statutory-maximum incarceration permitted under law was entered by the Court at various sentencings).)  Following the formula advocated by the defense, where it looks to the percent of a statutory-maximum penalty for an appropriate sentence, and given that the defense believes Conley to be "most akin" to Alebbini, the calculated sentence in this case would fall within the advisory range (under that formula, namely, 80% of the statutory maximum in this case, *i.e.*: 480 months, the result would be 384 months).

The defense also provides the Court with a chart of terrorism-related sentencings that supposedly includes defendants comparable to Alebbini.  But the defense fails to provide any context in its chart.  Had it done so, the Court would see that nearly all of the cases cited by the defense involved defendants who pled guilty, accepted responsibility, and, at times, cooperated with the government.  The government, though reluctant to engage in the "compare and contrast" approach, provides context to the cases cited by the defense in the chart attached hereto as Ex. A.

60

Courts appropriately have discretion to enter particularized sentences based on the circumstances relevant to specific defendants. There are many other cases not cited by the defense, and in addition to the cases cited by the government *supra*, that would support this Court deciding to enter a sentence consistent with the Sentencing Guidelines.  As one example, just this week, on April 2, 2019, the Southern District of New York sentenced Adam Raishani to 20-years imprisonment for attempting to provide material support and resources to ISIS, in violation of 18 U.S.C. § 2339B (statutory-maximum sentence: 20 years), and 5-years imprisonment for conspiracy to provide material support and resources to ISIS, in violation of 18 U.S.C. § 371 (statutory-maximum sentence: 5 years).  Raishani entered a guilty plea rather than proceed to trial.  In doing so, Raishani pled to a conspiracy charge in violation of Section 371, not Section 2339B (thus the statutory-maximum sentence of 5 years instead of 20 years on the conspiracy charge).  The Court also ordered 23 years of supervised release following the defendant's term of incarceration.  Like Alebbini, Raishani was arrested at the airport where he intended to board a flight to Portugal and then Turkey.  And, like Alebbini, Raishani intended to cross into Syria and fight on behalf of ISIS.  The Sentencing Guidelines range here is consistent with and in line with sentences imposed in similar terrorism cases around the nation.  But, the United States is not advocating for a sentence here based on what Raishani or anyone else received.  It is advocating for a sentence for *Alebbini*, based on *his* offenses, *his* conduct, and the analysis of the sentencing factors applicable to *him*.

8.  Conclusion.

The Sentencing Guidelines advise a custodial sentence in this case of between 30 years and life imprisonment.  The statutory maximum penalties serve to place a 40-year "cap" on the range.  Notwithstanding the presence of several aggravating factors, no room exists for an

upward variance. No principled reason exists for a downward variance. A sentence within the applicable advisory Sentencing Guidelines range is the only sentence, in this instance, that will meet the goals of sentencing.

Respectfully submitted,

BENJAMIN C. GLASSMAN
United States Attorney

s/Vipal J. Patel
VIPAL J. PATEL (CA 156212)
First Assistant United States Attorney
DOMINICK S. GERACE (OH 0082823)
Assistant United States Attorney
200 West Second Street, Suite 600
Dayton, Ohio 45402
Office: (937) 225-2910
Fax: (937) 225-2564
vipal.patel@usdoj.gov
dominick.s.gerace@usdoj.gov

s/Justin Sher
JUSTIN SHER (DC 974235)
Trial Attorney
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20004
Office: (202) 353-3909
justin.sher@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that this pleading was filed with this Court on this 5th day of April 2019, a process that automatically provides an electronic copy to all counsel of record.

s/Vipal J. Patel
VIPAL J. PATEL (CA 156212)
First Assistant United States Attorney