# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| vs. | : | Case No. 3:17CR071 |
| LAITH ALEBBINI, | : | JUDGE WALTER H. RICE |
| Defendant. | : | |

**REPLY TO UNITED STATES' SENTENCING MEMORANDUM BY LAITH ALEBBINI**

Now comes the Defendant, LAITH ALEBBINI, ("Laith") by and through counsel, and hereby submits this reply to the United States' sentencing memorandum for the Court's consideration at sentencing.

**Introduction**

To justify an unprecedented forty-year sentence, the government's memorandum recites fractions of Laith's recorded conversations with the confidential human source, as well as his friends and family, about his belief that ISIS had created a true caliphate and his unwavering desire to leave the United States and make his way to Syria to fight Bashar al-Assad. According to the government, some of the statements he made about his intentions to fight and die for the Syrian people with the Islamic State place him on par with some of the most violent terrorists ever prosecuted by the United States government. That is simply not true.

These statements concerning "inghimasi" soldiers and a willingness to serve as a soldier to protect The Islamic State and even to die as a martyr to defend the Syrian people with the Islamic State were carefully pulled out of hours and hours of conversations and are not put into any context

by the government. Fortunately, this Court has the benefit of reviewing all of these *words* the government now relies on to place Laith in prison for nearly a half century. The government's case in chief relied almost exclusively on these same recordings, and they only played for the Court those portions of the conversations they believed established his intent to join ISIS and discussed controversial topics like beheadings and martyrdom.

At trial, the defense pointed out a multitude of *other* statements made by Laith, often in the same lengthy and passionate religious and philosophical discussions and arguments, which showed he was unsure and questioned what he was reading on-line about ISIS and the Syrian civil war. Laith had no first-hand experience of what was actually happening in Syria, nor did he have any contact with anyone from the Islamic State, or know anyone who actually did. Often in these conversations, he would indicate his fondness for the American system of government and felt the best way he could help the Islamic State was to impart the federalist ideas he had seen while living in America. Most importantly, in these same conversations, he makes it abundantly clear that he did not advocate the killing of any innocent people, and believed the Islamic State only killed those who were murdering and raping innocent Muslims in Syria:

> "And, and … by God Hussein, by God Hussein, by God Hussein, from what I saw and followed through until now, from what I saw and followed through, I mean… I want to eventually go and see. Are the people right or are they not right? If they are not right, then they are not right. I do not care. I will not fight. If they want to kill me, let them kill me." … "[c]ousin, I can't kill him. I can't kill him. Why I Can't kill him? As long as the man is peaceful, I will not kill peaceful people."

Govt. Ex. 5o1 at 59-60.

A complete examination of Laith's words mitigate any lengthy potential jail sentence. Laith is highly intelligent and like many young Arab Muslims in America, he developed strong convictions that compelled him to do more than just send thoughts and prayers to the Syrian people. This obsession with the plight of the Syrian people caused him to spend countless hours on the

2

internet ingesting everything about The Islamic State and Syria that he could possibly find. Laith openly questioned with the CI and his friends and family what was really happening in Syria, and what the Islamic State truly stood for, but over time he had become convinced that their propaganda espousing a utopian physical caliphate rang true. He never shared any ISIS propaganda that called for any attacks in the United States or anywhere else. In fact, the first time Laith had ever seen the end of the video depicting the burning of the Jordanian pilot was when the government played it at his trial. Finally, he never advocated performing any acts of terrorism, or the killing of any innocents in the name of Islam. Laith felt compelled to fight for the Syrian people and he believed the Islamic State was the most successful group.

The court rightly concluded that the government did not need to prove he joined ISIS. In addition, the Court found after reviewing all of the evidence that "he did emotionally and intellectually" join ISIS. (Tr. of Verdict 12/6/2018 p. 13). However, The Islamic State he emotionally and intellectually joined was the Islamic State that he believed only killed those who murdered or tortured innocent Muslims. The organization he sought to seek out had created the caliphate, a legitimate territorial "Islamic State" that had the right to defend itself from any foreign invasion just like the United States or any country would. This conclusion is evident from the totality of the words captured by the government and the testimony and letters of those who have known him his entire life. Laith was not radicalized to the point where he would carry out acts of terrorism while he was in the United States or anywhere else in the world. The government has no evidence of this, so they must rely on a tiny fraction of Laith's recorded conversations and paint him as a ruthless murderer bent on destroying America.

The FBI poured over every word uttered by Laith for months. They found no evidence of any planning of attacks, just the deeply passionate arguments between Laith and those closest to

him where he desperately tried to convey his commitment to help the Syrian people. Although he argued with his friends and family about the true motivations behind ISIS, never did he try to justify the killings of innocent people. To the contrary, he was steadfast that he would only kill those who sought to murder innocent Muslims.

**Avoiding Unwarranted Sentencing Disparity (18 U.S.C. § 3553(a)(6))**

The government is correct that the Sixth Circuit explained, "Subsection 3553(a)(6) is concerned with national disparities among the many defendant's with similar criminal backgrounds convicted of similar criminal conduct." *United States v. Simmons*, 501 F.3d 620 (6th Cir. 2007). But the 40-year sentence the government urges would clearly make Laith Alebbini the most severely punished defendant for these crimes in American history – and it would not even be close.

The government differentiates other comparable cases cited by defendant that resulted in far lower sentences because those defendant's plead guilty or cooperated. This begs the question, what information could Laith have possibly provided to the government to provide substantial assistance? He had no contact with anyone from ISIS or an ISIS recruiter. He swore no oath of allegiance to ISIS. He did not attempt to recruit anyone to swear allegiance to ISIS. He did not seek out advanced training or try to gather weapons, and he certainly did not know of any information that could have helped the government prosecute an actual terrorist or any other criminals for that matter. The government had eyes and ears on Laith from the moment he entered the Southern District of Ohio until they arrested him at the Cincinnati airport. Surely, they did not hold anything back at the trial.

Laith waived a jury, stipulated to all the government's evidence and translations, and went to trial because he maintains he would not have joined the Islamic State if he saw they were in fact

ruthless terrorists. Mr. Alebbini exercised his right to trial because he felt all of his words, when taken as a whole, provided a defense to the specific intent of placing himself under the direction and control of ISIS. He maintains that if he were able to ascertain with his own senses that ISIS did in fact kill innocent people, he would have found another way to fight al-Assad. He had researched many different factions fighting for the Syrian people.

Laith accepts the Court's verdict that the government proved he had "emotionally and intellectually" joined ISIS. However, the Court also noted that this was "not an easy decision to have reached" because the evidence (almost entirely recorded conversations of the defendant) could also support inferences that the specific intent to join ISIS was not present at the moment he took a substantial step. (Tr. of Verdict 12/6/2018 p. 18). Further, the letters submitted from his family and the testimony of his cousin at sentencing, are clear that the family was not worried about Laith committing a terrorist act, but rather that he would be inevitably killed if he defied the Islamic State once he got into Syria and saw the truth for himself.

The government cites to three cases out of the District of Minnesota that saw the imposition of a similar sentence to the one they seek here. Govt at 54. In *United States v. Guled Ali Omar*, *Abdurahman Yasin Daud*, and *Mohamed Abdihamid Farah*, No. 15-049 (D. Minn. 2016) the government points to the fact that the defendants received sentences of 35 years, 30 years, and 30 years. These sentences were imposed after a jury convicted them of *conspiring to commit murder* on behalf of ISIS *and* providing material support. As noted below, those three sentences cited by the government were for *the most serious terrorist* related cases ever seen in that district.

<u>*The U.S District Court of Minnesota's recent program for defendant's like Laith*</u>

It is interesting that the government points to cases from the District of Minnesota to justify a forty-year sentence. This is because first-time non-violent offenders, convicted of the same

5

crimes here, typically receive sentences far less severe than the three cases mentioned above. While Laith's case was the first trial of its kind in this district, as of the end of 2018, the District of Minnesota has dealt with 59 foreign terrorism related cases. *See* Kevin D. Lowery: Responding to the Challenges of Violent Extremism/Terrorism Cases for United States Probation and Pretrial Services, Journal for Deradicalization, Nr. 17 (December 28, 2018)(attached as exhibit A).

> To date, there have been a total of 54 defendants and offenders related to the foreign terrorist organizations Al-Qaeda, Al-Shabaab, and ISIL/ISIS publicly identified by the government for the District of Minnesota. In addition, the District has had 5 other international terrorism-related cases not involved with groups officially identified as foreign terrorist organizations. This brings the current total of foreign terrorism-related cases in the District to 59. Somali community leaders claim the number is much higher due to travelers successfully leaving the U.S. to join foreign terrorist organizations without their departure being detected or reported.
>
> Of the 59 terrorism participants identified, 35 have been already sentenced, of which 15 were Al-Shabaab-related defendants, 15 were ISIL/ISIS-related, and 5 were involved with international groups not officially identified as foreign terrorist organizations. 15 of the remaining 24 participants have died, of which 10 participants were Al-Shabaab and 5 were ISIL/ISIS, with 2 of those being identified as suicide bombers. There are still a number of fugitives unaccounted for and others who were never charged due to their death preceding the government's knowledge of their terrorism-related activities, per District of Minnesota Assistant U.S. Attorney Charles Kovats (C. Kovats, interview, November 16, 2018).

*Id*. at 40.

The District of Minnesota has become home to an estimated immigrant population of as many as 60,000 to 100,000 people from Somalia. Mr. Lowery's study points out that many of these young Somali men have become disillusioned with America, and are especially vulnerable to ISIS propaganda. This resulted in an explosion of these cases after ISIS proclaimed the caliphate and the atrocities perpetrated by al-Assad in Syria. Although Laith is from Jordan, the similarities between himself and these young disaffected Somalis struggling to find their place in America is striking.

6

Because many of these young men charged with attempting to join ISIS had no criminal record and were facing extraordinary prison time, Senior Judge Michael J. Davis worked with both the U.S. Attorney's office and the Federal Public Defender to deal with this modern phenomenon that has just now apparently reached Dayton, Ohio.

> It was determined through extensive research that there were no other federal agencies, state or local jurisdictions, or nongovernment organizations in the U.S. that had specialized evaluation and assessment practices or intervention programming for radicalized defendants and offenders. This imminent issue required further initiatives to provide for public safety on a number of levels. Therefore, the District conducted further research to evaluate international programs for possible solutions. The focus of this research was to identify components of other countries' extremism/terrorism intervention programs claiming success, which could be useful to the circumstances in Minnesota and the U.S.

*Id.* at 41.

Mr. Lowery continues:

> The scarcity of civil prevention and intervention programs in the U.S. has unfortunately resulted in criminal prosecutions being the nation's almost exclusive intervention response to extremism thus far. The District of Minnesota's justice system model team process for intervention starts at the point of arrest or criminal charges. Although the federal justice system has worked with domestic terrorism cases such as white supremacists for many generations, this new brand of jihadist extremist involved with foreign terrorist organizations has brought new challenges. The ability within the legal structure of the criminal justice system to incorporate necessary and appropriate responses addressing the effects of a highly sophisticated radicalization process on young defendants and offenders will continue to be a challenge in the U.S. for some time. Included in the justice system team decision-making process is a more elaborate consideration of the underlying motivating factors and levels of radicalization, which is in addition to assessing the motivations or circumstances for other types of criminal behavior.

*Id.* at 58-59.

The District of Minnesota, overwhelmed with material support to foreign terrorist organizations cases, understood the need to look beyond just the federal sentencing laws if they were to treat this relatively new class of defendant justly. The young people who have attempted to leave the United States to join ISIS emerged out of an extraordinary confluence of

modernization, the Syrian Civil war, and ISIS' unprecedented success in using the internet to seduce vulnerable Muslims all over the world.

> The District of Minnesota and many other criminal justice professionals are committed to developing effective *alternative solutions to lengthy incarceration* alone to best deal with extremism/terrorism-related cases. There is no need to debate on how critical it is to incapacitate radicalized individuals involved in and committed to carrying out terrorism-related offenses. *However, in terrorism-related activities, there are a number of differing types of offenses and levels of involvement.* Failing to develop sentencing and supervision practices at the appropriate, varying levels for these defendants and offenders could have catastrophic future consequences.
>
> Terrorism defendants generally fit no set profile. However, many terrorism defendants seen in the District of Minnesota and in other districts have been young, often first exposed to the radicalization process as teenagers, and have little or no history of criminal behavior or actual violence. Dissecting the underlying motivations and *understanding the level of radicalization* of terrorism-involved defendants are factors criminal justice professionals must consider when recommending an appropriate sentence.
>
> Treating this population ineffectively may result in dire, catastrophic consequences that range from freeing a dangerous offender to commit an act of terrorism in the community *to unnecessarily overincarcerating very young offenders, possibly creating long-term breeding grounds for terrorists in prisons.* Probation and Pretrial Services faces the challenge of determining a defendant's level of radicalization and intent to pinpoint actual, potential harm to the community through acts of violence in addition to the threat he/she could pose to national and international security. Determining if a sentence within the guideline range of imprisonment greatly increased by the Chapter 3 terrorism adjustment is greater than necessary to accomplish the statutory goals of sentencing is a complex and concerning process.

*Id*. at 68-69 (emphasis added).

The result was the hiring of an expert consultant that gets involved immediately after these types of cases are charged and who works to assist the Court with issues from bond all the way through sentencing.

> Thus far, there have been a number of variances and departures from the enhanced sentences in the District of Minnesota, demonstrating that a one-size-fits-all approach was not justified based on U.S. Criminal Code Title 18, Section 3553 sentencing factors. District of Minnesota sentences for the first 30 jihadist-type, terrorism-related cases ranged from *3 years' probation*

> *for cooperators and those with minor involvement to 35 years' custody with life terms of supervised release to follow for the most serious offenders.*

*Id*. at 75-76 (emphasis added).

### *United States v. Abdullahi Mohamud Yusuf*

On November 14, 2016, Chief Judge Michael Davis sentenced a similarly situated defendant to credit for approximately 22 months of time served with 20 years of supervised release. *See United States v. Abdullahi Mohamud Yusuf*, Sentencing hearing transcript, case 0:15-cr-00046-MJD 11/14/2016 (attached as exhibit B).

To be sure, Yusuf plead guilty and received a 5K motion from the government – both factors not present here. Nevertheless, Yusuf was far more radicalized, and knew far more beneficial information because of his commitment and his level of involvement with ISIS that he could exchange for a better deal. He was a member of a long running conspiracy "in which the defendants were actually stopped by law enforcement, persisted in trying to reach Syria by any means possible, whether that was from Minneapolis-St. Paul international airport, by taking Greyhound busses to New York and attempting to fly out of JFK, by flying to California, and finally, by driving to California" (*Id* at 8).

Yusuf knew individuals who had already died after joining ISIS in Syria, and was not only in regular communication with someone who was actively a member of ISIS fighting in Syria – he received instructions from an *active terrorist cell* about what to say at the airport if questioned. He then lied to the FBI when confronted. (*Id*. at 22-29). Yet despite all of these aggravating facts, the government only asked for 42 months after his cooperation and he was sentenced to only 22 months. One can only scratch their head at the difference between how the government viewed Yusuf in Minnesota and how the government views Laith in this case. Yusuf was not only intimately involved with active ISIS members, but he communicated with an active cell in the United States.

9

After an unusually high volume of these cases, the *entire federal system* in Minnesota recognized the uniqueness of these type of cases and the need for an individualized program to start immediately after arrest of these young men with no prior criminal record who fell victim to ISIS' unprecedented propaganda war. Yusuf clearly benefitted from the District of Minnesota's program after his arrest. At the court's request, a mentoring program was created to begin to de-radicalize his affinity for ISIS. (*Id*. at 16). Dr. Koehler, the court's expert, found that Yusuf was a "medium to low" risk of recidivism after his evaluation. (*Id*. at 17-18). However, much of the literature on risk assessments for these particular defendants conclude that as of today there are no validated assessments for measuring violence risk assessment.[1] Nevertheless, Yusuf, unlike Laith, was much more radicalized towards ISIS. He was in active communication with active ISIS members, and lied to the FBI about his connection to ISIS after coaching from other ISIS members. Yusuf was in contact with close acquaintances who were active ISIS fighters. None of these aggravating factors are present in this case.

Another factor in Yusuf's case, and most of the other comparable cases, was the fact that the defendants were American citizens. Sentencing judges of citizens face the inevitable fact that whatever sentence they impose, the defendant will someday return to the community. They would be subject to supervised release when their sentences were over, and a genuine concern the courts has was that they will only get more radicalized in the BOP.

Counsel could not find any specific de-radicalization programs in the "super max" prisons to which these defendants are likely to be designated. Laith, however, will certainly be deported after any sentence and sent back to Jordan – where what awaits him, at best, may be the three-month anti-ISIS program his cousin Raid completed. Mr. Lowery points out that the United States criminal justice

---

[1] (www.dhs.gov/sites/default/files/publications/OPSR_TP_CVE-Application-Risk-Assessment-Tools-Criminal-Rehab-Process_2018Feb-508.pdf )(attached as Exhibit C).

10

system is already looking to foreign countries to help develop de-radicalization programs, and whatever exists must be more effective than what exists in the B.O.P. (Ex. A at 42).

Laith will never be able to lawfully enter the United States. While this Court may set prospective conditions of supervised release, the fact is Laith will never be in the United States after his release from prison and deportation. As a practical matter, this Court need not concern itself with what the Probation Department can do to assist Laith after his release. If Laith does try to re-enter, a supervised release violation would be the least of his problems.

*United States v. Natsheh*

Not all districts confront the vast number of these cases like the District of Minnesota. In *United States v. Natsheh*, District Court Judge Richard Seeborg was the first judge in the Northern District of California to impose a sentence on another similarly situated defendant. Islam Natsheh plead guilty to attempt to provide material support to ISIS. He was also caught at the airport after attempting to board a flight from San Francisco to Amsterdam, and ultimately to Turkey with the ultimate goal to fight in Syria with ISIS against Bashar al-Assad. There was no "District of Minnesota like" program for these young men in the Northern District of San Francsico when he was sentenced on December 13, 2016. Judge Seeborg acknowledged this was the first case of its kind to be sentenced in the district.[2] In determining a sentence sufficient but not greater than necessary, Judge Seeborg calculated the advisory range to be well over the statutory maximum of 20 years. Although the probation department recommended a statutory maximum sentence of 20, the government recommended a sentence of 15 years, which was not based on a 5k motion. The Court, however, only imposed a sentence of 5 years. The facts of Natsheh's case are similar to this case, but contain even more aggravating factors than exist here.

---

[2] *See United States v. Islam Said Natsheh*, Sentencing Transcript, 12/13/2016 at p.9 (attached as exhibit D).

11

Natsheh was an American citizen, had he made his way to ISIS he could have come back to the United States. There was at least some evidence that he discussed with another potential recruit the possibility of *actually committing an act in the United States*, although he decided not to do anything. (*Id*. at 8,15). He had reposted and shared the ISIS propaganda video involving the burned Jordanian pilot. (*Id*. at 21). He had purchased a ticket for a minor to accompany him to join ISIS in Syria and had been in contact with a radicalized woman in Spain who knew he had become radicalized and intended on travelling to join ISIS in Syria.

After reviewing cases from across the country and the much more egregious factors than here, the court concluded:

> Well, isn't it fair to say that this one involves the lowest end of all of those factors? This involves no recruitment, no money being advanced, no violence, no activity beyond post dates, which are offensive no doubt about it, and then apprehension at the airport. He's very fortunate he was apprehended because we will never know what might have happened and part of your argument, which I think is a fair one, is that had Mr. Natsheh made it to Syria and then further radicalized and being a citizen and comeback, we don't know what would have happened. He might have become dissolutioned. However, he also might have come back and become a danger to the United States. So I understand the argument. But in terms of looking at all the comparables, I don't --you point out these comparables have different factors. I think this one has zero factors beyond the absolute most basic unless I misread.

*Id*. at 4.

Judge Seeborg, convinced he had not seen a case less egregious in all of the comparable cases cited by the government, and troubled with the lack of any BOP programs to address these particular defendants, sentenced Natsheh to 60 months with six years of supervised release. (*Id*. at 8-9, 32-33). Although the guidelines called for the 20 year statutory maximum, the court concluded, "The terrorist enhancement and the statutory maximum, I think, are intended for very different cases than we have here". (*Id*. at 31). This finding is the norm rather than the exception, especially since the District of Minnesota has just started to lead the way with how to deal with these young, first time offenders,

arrested after trying to get on a plane to join a group many of them have only known from propaganda on the internet.

## **Conclusion**

Laith Alebbini had not joined ISIS nor sworn allegiance to them. He absolutely respects the Court's findings that he had professed an emotional and intellectual commitment to the Islamic State. But it is clear he did not believe they were the evil group they actually are. His own words and the letters and testimony from his family, demonstrate that he would never knowingly participate in violence against innocent people. The government warns that Laith has "entered the slippery slope of comparing himself to other individual defendants". (Gov't sen. Memo at 51). However, this was the first trial of this kind in this district, and subsection §3553(a)(6) clearly compels this Court to consider national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct. The government's proffered sentence of forty years is preposterous in light of similarly situated defendants. Indeed, a review of these comparable cases can only lead to the conclusion that Laith is the least culpable of similarly situated defendants, and presents the least amount of risk of violence – even less than those who received 22 month or 60 months for more alarming conduct and who, unlike Laith, will remain in this country. Respectfully, a sentence of time served, with the inevitable deportation to Jordan is

a sentence sufficient but not greater than necessary in this unusual case.

                                    Respectfully submitted,

                                    DEBORAH L. WILLIAMS
                                  FEDERAL PUBLIC DEFENDER

                                  s/Thomas W. Anderson, Jr.
                                  Thomas W. Anderson, Jr (0073138)
                                  Office of the Federal Public Defender
                                  1 South Main Street, Suite 490
                                  Dayton, Ohio 45402
                                  (937) 225-7687
                                  Thomas_Anderson@fd.org

                                  Attorney for Defendant
                                  Laith Waleed Alebbini

## CERTIFICATE OF SERVICE

     I hereby certify that a copy of the foregoing was served upon Vipal Patel, Assistant United States Attorney, on the date same was filed.

                                  s/Thomas W. Anderson, Jr.
                                  Thomas W. Anderson, Jr.